IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIPCRICKET, INC.,[1] | ) | Case No. 15-10104 (____) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF TODD E. WILSON IN SUPPORT OF FIRST DAY MOTIONS

I, Todd E. Wilson, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am the Interim Chief Executive Officer of Hipcricket, Inc., the above-captioned debtor and debtor in possession (the "Debtor" or the "Company"). I am familiar with the day-to-day operations, business, and financial affairs of the Debtor, having served as the Debtor's Interim CEO since May 30, 2014, as a member of the Company's board of directors since June 2010 (including as the chairman since March 2013), and as the Company's principal financial officer since July 2014. I have more than 16 years of experience as a board member, investor and advisor to middle-market companies. My prior experience includes executive and other positions at equity firms and investment banks, including most recently as a Partner at Crane Street Capital, a California-based investment firm, as well as former positions at American Capital, Ltd., Wind Point Partners, Merrill Lynch and Montgomery Securities.

---

[1] The last four digits of the Debtor's tax identification number are 2076. The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

2.      I am authorized to make decisions with respect to all aspects of the

management and operation of the Debtor's business including, without limitation, organization,

human resources, marketing, sales, logistics, finance, administration, oversight, and the

prosecution of this bankruptcy case.  In my capacities with the Debtor, I have general knowledge

of the books and records of the Debtor, and am familiar with the Debtor's financial and

operational affairs.

3.      I submit this declaration (the "Declaration") in support of the Debtor's

chapter 11 petition and "first day" motions and applications, described further below

(collectively, the "First Day Motions").  Except as otherwise indicated, all statements in this

Declaration are based upon my personal knowledge, my review of the Debtor's books and

records, relevant documents and other information prepared or collected by the Debtor's

employees and agents, or my opinion based on my experience with the Debtor's operations and

financial condition.  In making my statements based on my review of the Debtor's books and

records, relevant documents and other information prepared or collected by the Debtor's

employees and agents, I have relied upon these persons accurately recording, preparing or

collecting any such documentation and other information.  If I were called to testify as a witness

in this matter, I could and would competently testify to each of the facts set forth herein based

upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this

Declaration on behalf of the Debtor.

4.      Based on my personal knowledge, and through my review of the Debtor's

books, records and other information, I believe that the relief sought by the Debtor in the First

Day Motions is necessary to enable the Debtor to continue to operate as a debtor in possession during the course of the bankruptcy case and in particular, up through a sale of substantially all of the Debtor's assets, which such sale the Debtor seeks to expeditiously effectuate, as discussed more fully herein.

5.      Part I of this Declaration describes the business of the Debtor and the developments that led to the filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2]  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of this chapter 11 case.

## PART I

### A.      Overview of Debtor's Business and Operations

6.      Headquartered in Bellevue, Washington, the Company is in the business of providing end-to-end,[3] data-driven mobile advertising and marketing solutions through its proprietary AD LIFE® software-as-a service platform (the "AD LIFE Platform" or "Platform") - a proprietary, mobile engagement platform for businesses to communicate with customers through cellphones, tablets and other mobile devices.  The Platform powers mobile marketing and mobile advertising campaigns using proprietary data, along with data from key strategic partners, to provide more informed mobile marketing and advertising solutions to customers.

7.      More specifically, the AD LIFE Platform provides a single, scalable, self-service access point and creates measurable, real-time, one-to-one relationships between

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the applicable First Day Motions.

[3] End product to end user.

companies and their current or prospective customers, using text messages, multimedia messages, mobile web sites, mobile applications, mobile coupons, quick response codes and via mobile advertising. This Platform enables the Company's customers to quickly plan, create, test, deploy, monitor, measure and optimize interactive mobile marketing and advertising programs across nearly every major mobile channel. Using patented device-detection and proprietary mobile content adaptation software, the AD LIFE Platform addresses the mobile marketing industry problem of disparate operating systems, device types, and on-screen mobile content rendering; the Company also provides business-to-consumer utilities, including national mobile couponing solutions, strategic mobile healthcare tools, custom mobile application development, and consumer data tracking and analytics. The Company has been involved with over 400,000 campaigns since 2004, across hundreds of customers including Fortune 100 and other established brand clients. The Company's software and other products serve marketers, brands, and agencies in many vertical markets, including automotive, retail, consumer products, food and beverage, media and broadcast, pharmaceutical and restaurant brands.

8.     The Company's mobile marketing product line is a software platform primarily used by the Company's customers to engage and interact with their customers through SMS (text messages). In general, the Company's mobile marketing products are sold directly to large brands under contracts lasting 12-36 months. This mobile marketing revenue primarily represents software licensing fees paid monthly. The Company's mobile advertising product is a tool that allows advertisers to create, manage and optimize their mobile advertising campaign. This product is generally sold through advertising agencies on a campaign-by-campaign basis.

9.      As of the Petition Date, the Company had approximately 77 full-time employees in development, sales, sales support, client services, marketing, and corporate and administrative positions, to perform the functions necessary to effectively and efficiently operate the Debtor's business.  None of the Company's employees are represented by a labor union or covered by a collective employment agreement.    Most of the Debtor's employees are based in the Company's leased Bellevue, Washington headquarters; the Debtor also has leased offices located in New York, Atlanta, and Chicago, as well as some employees working out of their homes in various other cities.

10.      As of November 30, 2014, the Company had total assets of approximately $18.6 million (including approximately $4.6 million in net accounts receivable) and total liabilities of approximately 16.3 million (book value figures).  For fiscal year ended February 28, 2014, the Company generated $26.7 million in revenue and $14.3 million in gross profits.  The Company generates revenue from the delivery of mobile advertising campaigns as well as through license fees, content development fees, messaging campaign fees, and fees associated with various add-on products.  For the nine months ended November 30, 2014, due to, among other things, substantial operating and other expenses and a goodwill impairment adjustment, the Company had a net loss of approximately $53 million.

**B.      Corporate Structure and Management**

11.      The Company, formerly known as Augme Technologies, is a publicly held Delaware corporation.  The Company's former subsidiaries were merged into the Debtor in October 2013.  Constituting a "low-priced" security or "penny stock" under rules promulgated

under the Securities Exchange Act of 1934, as amended, the Company's common stock is quoted

on the OTCQB under the symbol "HIPP." As of the Petition Date, approximately 154 million

shares of common stock were outstanding.

12.     As noted above, I have been the Debtor's Interim CEO since the end of

May 2014 and Chairman of the board of directors since March 2013. Other members of senior

management include Doug Stovall, President and Chief Operating Officer; David Hostetter,

Chief Technology Officer; Kate Farley, SVP Business Operations; Ingrid Onstad, Controller;

and Tiffany Bradford, Director of Finance. The members of the board of directors (in addition to

me) are Michael Brochu, John Devlin and Donald Stout.

**C.     Significant Indebtedness**

13.     Since May 2014, the Company has been funding operations primarily

through borrowings under a factoring arrangement  (the "Fast Pay Facility"), up to a maximum

of $5 million, provided by Fast Pay Partners LLC ("Fast Pay"). (Proceeds from the Fast Pay

Facility were used to repay in full the Company's prior loan facility with Silicon Valley Bank.)

The Debtor and Fast Pay are parties to that certain Financing and Security Agreement dated May

12, 2014, which was amended on June 3, 2014 and again on October 15, 2014 (as amended,

modified or supplemented from time to time, the "Fast Pay Agreement"). Pursuant to the Fast

Pay Agreement, Fast Pay purchases accounts receivable from the Debtor and advances 80% of

the gross value of the invoices to the Debtor, promptly after Fast Pay notifies the Debtor that Fast

Pay will purchase a particular account receivable (prior to October 2014 the advance rate was

70%). In addition to receiving payments from the applicable Debtor's customers under the

Factored ARs, to secure any shortfall, the Debtor granted Fast Pay a first priority security interest

in substantially all of the Debtor's assets; on May 27, 2014, Fast Pay filed a UCC-1 financing

statement covering its collateral. Fast Pay may terminate the Fast Pay Agreement at any time

upon written notice and require payment of all outstanding obligations. As of the Petition Date,

the Debtor owed Fast Pay approximately $1.7 million under the Fast Pay Facility, in connection

with approximately $2.02 million in factored accounts receivable (face value). As of the Petition

Date, there is approximately $1.7 million in non-factored accounts receivable (for a total of

approximately $3.7 million in all accounts receivable). The Debtor does not plan on continuing

to request Fast Pay to factor its accounts receivable postpetition, and as discussed below, upon

Court approval, Fast Pay's prepetition claims will be paid using DIP financing proceeds.

   14. The Debtor has two accounts with Silicon Valley Bank ("SVB"), which

are controlled by Fast Pay. The first account serves as a Deposit Account, and pursuant to a

Deposit Account Control Agreement, SVB acknowledges that Fast Pay has a lien and security

interest in the account, and that Fast Pay has control over said account. Fast Pay may withdraw

funds from the Deposit Account without the Debtor's consent. In addition, SVB will comply

only with withdrawal or disposition instructions from Fast Pay and will not comply with any

instructions from the Debtor concerning the Deposit Account or funds therein. The Debtor's

second account with SVB is a Lockbox Service Account that is governed by a Blocked Deposit

Account Control Agreement. Checks, drafts and other collection remittances tendered by or on

behalf of the Debtor are deposited into the Lockbox Service Account, and Fast Pay has full

control over and a security interest in this account.

15.     The Company believes that generally there is relatively low risk in respect to the collectability of its accounts receivable ("ARs"), including the ARs selected and factored by Fast Pay. Historically, the Company has written off very few ARs as bad debt. So far this current fiscal year (from March 2014 to now), only approximately $257,000 has been written off as bad debt (as compared to approximately $22.6 million in revenue during such period). Since the inception of the Fast Pay Facility, approximately $9.77 million in cash has been remitted by the Debtor's customers on account of factored ARs. The trade terms of these factored ARs ranged from due upon receipt (only one invoice), up to net 120 payment terms (for one of the Debtor's clients), with most of the factored ARs (nearly 80%) having trade terms ranging from net 30 days to net 60 days. Of the $9.77 million total, approximately $5.87 million (or approximately 60%) in ARs was paid within 60 days of invoice date; another 37.5% was paid between 61 and 120 days; and only approximately 2.5% in factored ARs have not been paid more than 120 days later. In respect to the current pool of the Company's non-factored ARs (totaling approximately $1.7 million), approximately 20% of such ARs are greater than 60 days past due. In respect to the current pool of outstanding factored ARs (totaling approximately $2.02 million), only approximately 3% of such ARs are greater than 60 days past due. It should be noted that, each month, on average, only approximately 40% of the Company's ARs are purchased/factored by Fast Pay, leaving approximately 60% in non-factored ARs - which additional ARs serve as collateral for Fast Pay's claims as well.

16.     In addition to the foregoing secured indebtedness, the Debtor owes material amounts with respect to various unsecured obligations, including approximately $9.5 to

$10.5 million in trade and other business debt (including unpaid facility rent obligations, which may be secured by deposits).

**D.**    **Circumstances Leading to Bankruptcy Filing**

     **(1)**    **General Operating Performance and Liquidity Issues**

       17.    For the past several years, despite growing revenue, the Debtor has been incurring substantial operating losses.  For the fiscal years 2014, 2013, and 2012, the Company's net loss from operations was $22.3 million, $48.8 million, and $22.6 million, respectively.  For the fiscal year ended February 28, 2014, the Company had negative operating cash flows of $11.7 million, and as of that date, the Company had an accumulated deficit of $133.6 million.

       18.    The Company is and has been subject to risks and challenges associated with companies at a similar stage of development including dependence on key individuals, successful development and marketing of products and services, integration of prior business combinations, competition from substitute products and services and larger companies with greater financial, technical management and marketing resources.  In particular, the mobile marketing and mobile advertising sectors are both highly competitive and fragmented, and the Company has faced intense competition for revenue and margin from larger, more established companies.

       19.    Further, the Fast Pay Facility (discussed above) has not provided during relevant times in 2014 and does not currently provide sufficient liquidity for the Debtor to continue to fund operations and execute key business strategies.  Prior to the Petition Date, the

Debtor had been obtaining longer payment terms from certain vendors, to address in part the Debtor's liquidity issues.

**(2)    Prepetition Marketing/Sale Efforts**

20.    In late 2013, the Company was approached by a number of suitors about potential strategic partnerships.  Given this inbound interest and concerns over liquidity, in January 2014, the Company retained the advisory services of Canaccord Genuity ("Canaccord") to explore and evaluate potential strategic alternatives with a focus of selling the business or raising capital.  In connection therewith, an online data room was created, marketing materials were prepared or circulated including a detailed Confidential Information Memorandum, and a number of management meetings or calls were conducted with potential interested parties.

21.    Starting in February 2014, and over a number of months, Canaccord reached out to approximately 96 potential interested parties (strategic and financial parties, domestic and international) as to potential strategic opportunities.  The Company itself announced in mid-February 2014 (through a press release and other public filings) that it was exploring potential strategic alternatives, resulting in various parties contacting the Company and Canaccord as to potential interest in the Company's business and assets.  Of the numerous parties with whom Canaccord had discussions about a potential strategic transaction, at that juncture, approximately 28 parties executed nondisclosure agreements and received confidential information.  The Company requested offers to be submitted by April 23, 2014; no bids for the Company were submitted.  Based on discussions with Canaccord, I believe no bids were submitted because of the lack of revenue growth in FY 2014, significant operating losses over

the prior several years, and continued inability of the Company to meet its prior financial

forecasts, among other factors.

22.    Based on the lack of interest from potential buyers and concern over the

Company's financial viability, in May 2014, the Company's Board of Directors elected to make

several changes to management and the Company's strategy.  On May 31, 2014, I was appointed

Interim CEO and Doug Stovall was promoted from COO to President/COO.  Additionally, I

made a number of changes to the Company's strategy to focus the business more acutely on

operating profitability and cash flow.  Based on the revised operating strategy, with Canaccord's

assistance, the Company re-launched the exploratory and marketing process.  Ultimately, in total,

Canaccord contacted or recontacted approximately 108 potential interested parties regarding

strategic options (of which 32 parties in total provided nondisclosure agreements).  During this

subsequent stage, three parties expressed significant interest in the entire company, while two

additional parties indicated interest in only certain assets and aspects of the business.

Discussions among the parties continued over a number of months, and four non-binding

indications of interest (two in respect to the entire business and two in relation to certain assets)

were submitted in the late September / early October 2014 timeframe.

23.    On a separate but related track, before and after the changes to strategy

and personnel, Canaccord reached out to approximately 33 parties regarding potentially

financing (equity and/or debt) the Company's business (as opposed to a business combination,

asset sale or other transaction).  Approximately nine parties executed nondisclosure agreements

and received confidential information; however, no viable offer emerged from those financing-related efforts.

24.     During October/November 2014, the Company and Canaccord continued discussions with certain parties, including two of the parties who had expressed interest in the entire business and the two parties who had indicated interest in certain assets. During this time, three of the parties conducted substantial due diligence into the Debtor's business and operations. This led to the submission to the Company of three non-binding indications of interest or letters of intent – two for the entire business and one for select assets. The Company subsequently executed a non-binding letter of interest with the party interested in select assets. The Company and Canaccord spent significant time discussing, negotiating and documenting these potential transactions. As of early December 2014, all three of these indications of interest were still being analyzed and negotiated.

25.     Unfortunately, the inability to resolve a shareholder lawsuit gave potential purchasers of the business significant concern. Additionally, the Company's financial condition continued to deteriorate and given the prolonged public strategic process, employee morale suffered. As such, the Company's financial performance weakened and all three interested parties rescinded or modified their offers. At that time, with Canaccord's assistance, the Company broadened its efforts to gauge interest specifically in a potential § 363 sale. Approximately fifteen parties were contacted in this specific regard, of which nine parties executed nondisclosure agreements and received confidential information. While described above as separate exploratory tracks, the Company's efforts regarding a potential sale or other

transaction and debt/equity financing were interrelated components of an overall comprehensive and fluid process, with some overlap among potential interested parties and the development and regauging of parties' potential interest, designed to maximize value for the Company.

26.     Ultimately, only one party –the stalking horse bidder– continued to further progress with the negotiations resulting in a final and definitive Asset Purchase Agreement dated as of January 20, 2015, for the purchase of substantially all of the Debtor's assets.

## PART II

### First Day Motions and Applications

27.     In order to enable the Debtor to minimize the adverse effects of the commencement of this chapter 11 case, the Debtor has requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

28.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to current business operations; and (b) is essential to maximizing the value of the Debtor's assets for the benefit of the estate and creditors.

**A.     Debtor's Application for Appointment of Rust Consulting**
**Omni Bankruptcy as Claims and Noticing Agent**

29.     The Debtor seeks to authorize and approve the retention and appointment of Rust Consulting Omni Bankruptcy ("Rust Omni") as claims and noticing agent (the "Claims

and Noticing Agent") in this Case (the "Rust Omni Application") to assume full responsibility

for the maintenance, processing, and docketing of proofs of claim, filed in the Case, and such

other services as the Debtor may request to the extent set forth in the services agreement attached

to the Rust Omni Application.  I am informed that Rust Omni has acted as the claims and

noticing agent in numerous cases in this and other judicial districts, including, in this district and

has substantial experience acting in such capacity.  I believe that the appointment of Rust Omni

as claims and noticing agent is both necessary and in the best interests of the Debtor's estate and

its creditors.  The Debtor's selection of Rust Omni to act as the Claims and Noticing Agent

satisfies the Court's *Protocol for the Employment of Claims and Noticing Agents Under 28*

*U.S.C. § 156(c)*, instituted by the Clerk on February 1, 2012, in that the Debtor has obtained and

reviewed engagement proposals from at least two other court-approved claims and noticing

agents to ensure selection through a competitive process.  Moreover, the Debtor submits, based

on all engagement proposals obtained and reviewed, that Rust Omni's rates are competitive and

reasonable given Rust Omni's quality of services and expertise.

**B.      Motion of Debtor for Order Under 11 U.S.C. §§ 105, 345, 363,
          1107, and 1108 Authorizing (I) Maintenance of Existing Bank
          Accounts, (II) Continued Use of Existing Business Forms,
          (III) Continued Use of Existing Cash Management System, and
          (IV) Waiver of Section 345(b) Deposit and Investment Requirements**

          30.      The Debtor seeks an order authorizing the (i) maintenance of existing

bank accounts, (ii) continued use of existing business forms, (iii) continued use of existing cash

management system for the Debtor, and (iv) limited waiver of section 345(b) of the Bankruptcy

Code deposit and investment requirements (the "Cash Management Motion").

31.     The Debtor's cash management system (the "Cash Management System") facilitates the timely and efficient collection, management and disbursement of funds used in the Debtor's business.  Because of the disruption to the business that would result if the Debtor was forced to close certain of its existing bank accounts, it is critical that the existing Cash Management System remain in place, subject to certain anticipated modifications as described herein.

32.     The existing Cash Management System consists of the bank accounts listed on Exhibit B to the Cash Management Motion (the "Bank Accounts"), which are maintained at Silicon Valley Bank ("SVB") and Wells Fargo Bank, N.A. ("Wells Fargo" and, together with SVB, the "Banks").

33.     Substantially all collections from accounts receivable are deposited directly into an account maintained by the Debtor at SVB (the "Collections Account").[4]  As of the Petition Date, deposits in the Collections Account are automatically swept daily by the Debtor's factor, Fast Pay.  Of the deposits swept each day, Fast Pay (a) retains (i) interest and processing fees and (ii) a percentage of the Debtor's collections which is applied to reduce the balance of the Debtor's line of credit, and (b) transfers the remaining balance into the Debtor's disbursement account at SVB (the "Main Disbursement Account") for use by the Debtor in its operations.  The Debtor makes disbursements from the Main Disbursement Account to third parties and, through two separate accounts at SVB (the "Payroll/FSA/HSA Accounts"), funds payroll and FSA/HSA obligations.

---

[4]  One of the Debtor's customers makes direct deposits into the Main Disbursement Account on a quarterly basis.

34.     The Debtor also maintains three restricted accounts (the "Restricted Accounts") at the Banks.  The Restricted Accounts at SVB are interest-bearing accounts for the purpose of securing the Debtor's obligations with respect to (a) the real property lease for the Debtor's headquarters in Bellevue, Washington; and (b) the outstanding letter of credit to SVB with respect to the Debtor's corporate credit cards.  The Restricted Account maintained at Wells Fargo is an interest-bearing account containing a set-aside pursuant to a settlement with Yahoo! Inc.

35.     The Debtor uses two corporate credit cards to fund certain payments related to the operation of its business: an American Express credit card and corporate credit card accounts with SVB.  The SVB credit cards are used to fund certain payments related to the operation of the Debtor's business.  Use of the SVB corporate credit cards is critical to the Debtor's ordinary course business operations because it provides additional liquidity on an as-needed basis.  The balance on the SVB credit card account is fully collateralized in the amount of $100,000 held by SVB in a restricted account.  As such, SVB is a secured creditor of the estate.  As of the Petition Date, the prepetition amount owed to SVB is $96,053.61.  Under section 553 of the Bankruptcy Code, SVB would be entitled to setoff the amount it is owed against the amounts it is holding, which would require the Debtor to post additional collateral under section 364 of the Bankruptcy Code in order to continue doing business with SVB.  Rather than requiring the Debtor to re-post collateral, the DIP Lender has consented to the Debtor paying $40,000 of the pre-petition amounts owing to SVB, as reflected in the DIP Budget, subject to Court approval.  In light of the importance of use of the SVB corporate credit cards, and SVB's

status as a fully secured lender, the Debtor requests authority to pay the foregoing pre-petition

amounts owing to SVB.

36.     A diagram showing the role of each Bank Account is attached to the Cash

Management Motion as Exhibit C.

37.     The Debtor seeks approval to continue using the Bank Accounts in all

respects as described above and on Exhibit C to the Cash Management Motion in the ordinary

course after the Petition Date, subject to its right to open or close accounts in accordance with

any approved debtor-in-possession ("DIP") financing.  Moreover, the Debtor's proposed DIP

financing order contemplates that, inter alia, certain proceeds of the DIP financing will be used

to pay the balance owing to Fast Pay in full.  Accordingly, the Debtor reserves its right, subject

to approval of the DIP financing and payoff of Fast Pay, to instruct SVB to give effect to the

termination of Fast Pay's existing automatic daily sweep of the Collections Account and use of

funds therein to pay obligations owing to Fast Pay as described above and on Exhibit C to the

Cash Management Motion.  Continuing the Debtor's Cash Management System without

interruption is vital to the success of this Case.  The Cash Management System is an efficient

mechanism whereby the Debtor is able to transfer its revenues toward the payment of its

obligations.

38.     Accordingly, I believe that it is critical that the Debtor continues to utilize

its existing Cash Management System without disruption and believe that the relief requested in

the Cash Management Motion is both necessary and in the best interests of the Debtor's estate

and its creditors.

**C.    Motion of the Debtor for Entry of an Order: (I) Authorizing the
Debtor to (A) Pay Wages, Salaries, and Other Compensation,
(B) Maintain Employee Medical and Similar Benefits, and (C) Pay
Reimbursable Employee Expenses; and (II) Authorizing and Directing
Banks and Other Financial Institutions to Pay All Checks and Electronic
Payment Requests Made by the Debtor Relating to the Foregoing**

39.    The Debtor seeks an order (a) authorizing, but not requiring the Debtor to

(i) pay and/or honor and remit prepetition wages, salaries, and certain other compensation,

payroll withholdings and benefits contributions, (ii) maintain employee medical and similar

benefits, (iii) pay reimbursable employee expenses, and (iv) pay prepetition payroll and benefits

administrative fees and expenses, subject to caps shown below; and (b) authorizing banks and

other financial institutions to receive, process, honor, and pay all checks presented for payment

and electronic payment requests relating to the foregoing (the "Wages Motion").

40.    The Debtor utilizes, in the aggregate, 77 employees in engineering, mobile

solutions, creative, sales, marketing, IT, and administrative positions to perform the functions

necessary to effectively and efficiently operate the Debtor's business (collectively, the

"Employees").  Of that workforce, 70 are full-time Employees and 7 are part-time Employees.

41.    To minimize the personal hardships that the Employees will suffer if

prepetition employment-related obligations are not paid or honored, to maintain the morale of the

retained Employees during this critical time, and to minimize disruptions to the Debtor's ongoing

business operations and the administration of the estate, the Debtor, by this Motion, seeks

authority, in its sole discretion, to:  (i) pay unpaid prepetition claims for wages, salaries, non-

insider bonuses, and other compensation (collectively, the "Unpaid Wages") to the Employees

(both those who have been or may be terminated and those who are being retained) up to

$12,475 per employee; (ii) pay and remit the Withholding Obligations (defined below) to the

proper third parties; (iii) pay any prepetition fees and charges owed to the Payroll Related

Administrators (as defined below); (iv) honor and maintain certain Employee related benefits

offered by the Debtor (collectively, the "Benefits"); (v) reimburse certain unpaid business

Expense Reimbursement Obligations (defined below) incurred prepetition by Employees; and

(vi) pay all costs incident to the foregoing as set forth in the Wages Motion.

42.    In summary, the Debtor seeks authority, in its sole discretion, to continue

to honor and implement the employee related policies and practices as described above and pay

Unpaid Wages, the Other Worker Compensation, and the various Benefits as described above,

including the estimated amounts set forth below:

| | |
|---|---|
| Unpaid Wages (including Withholding Obligations other than Payroll Related Tax Obligations) | $150,000 |
| Expense Reimbursement Obligations | $20,000 |
| Medical Plan Obligations | $52,000 |
| Debtor-Spending Account Contributions (excluding Employee-funded contributions that are part of Withholding Obligations) | $200 |
| Life/AD&D Insurance, Disability Insurance and Supplemental Insurance | $2,430 |
| Dental and Vision Plans | $5,600 |
| Payroll Related Administrators | $425 |
| 401(k) Auditor | $10,000 |
| Workers' Compensation Obligations | $21,000 |
| Sales Rep/Account Mgr. Bonuses | $85,000 |

| COBRA Administration Fees | $100 |
|---|---|

provided that no Employee will be paid a total distribution of more than the $12,475 statutory priority cap on account of prepetition Wages, any prepetition bonuses, and accrued Paid Time Off (if applicable).

43.    Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses.  These Employees may be exposed to significant financial and healthcare related problems if the Debtor is not permitted to pay and/or honor the Unpaid Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtor's business.  Moreover, the Debtor believes that if it is unable to honor accrued Unpaid Wages and Benefits described in the Wages Motion, Employee morale and loyalty will be jeopardized at a time when support by the remaining Employees is critical.

44.    The Payroll Related Tax Obligations and certain other amounts either voluntarily or involuntarily withheld from Employee paychecks do not constitute property of the Debtor's estate and principally represent employee earnings that governments (in the case of taxes), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks.  The failure to transfer these withheld funds could result in hardship to certain Employees.  The Debtor expects inquiries from garnishers regarding the Debtor's failure to submit, among other things, child support and alimony payments, which are not the Debtor's property but, rather, have been withheld from Employee

paychecks. Moreover, if the Debtor cannot remit these amounts, the applicable Employees may face legal action due to the Debtor's failure to submit these payments.

45.    Finally, the Debtor submits that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the estate given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, and the withheld funds with respect to the 401(k) Plan, are not property of the Debtor's estate.

46.    Generally, the Employees are critical components to the success of this Case. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtor and its ability to maximize the value of its assets. Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to ensure continued, efficient operation in order to maximize value for all creditors.

47.    Accordingly, I believe that the relief requested in the Wages Motion is both necessary and in the best interests of the Debtor's estate and its creditors.

**D.    Motion of the Debtor for Entry of an Order (I) Authorizing, But Not Requiring, the Debtor to Remit and Pay Certain Prepetition Sales and Use Taxes in the Ordinary Course of Business, and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

48.    The Debtor seeks an order (i) authorizing, but not requiring the Debtor to remit and pay prepetition taxes as the Debtor, in its discretion, deems necessary; and

(ii) authorizing financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made relating to the foregoing (the "Taxes Motion").

49.    The Debtor is licensed to operate in at least fourteen states,[5] Ontario, Canada and Quebec, Canada.  In the ordinary course of business, the Debtor pays taxes, including, but not limited to, sales and use taxes, and other regulatory and licensing fees payable to governmental agencies necessary to operate its business (collectively, the "Taxes").[6]  Taxes are remitted to various governmental bodies (the "Taxing Authorities") in accordance with the requirements of such Taxing Authorities.   In particular, the Debtor pays on a routine basis sales and use taxes in Washington and New York, and business and occupation taxes in Washington and the City of Bellevue, Washington.

50.    The Taxes are paid on a monthly basis or at the conclusion of each quarter in arrears.  Accordingly, as of the Petition Date, the Debtor estimates that accrued prepetition taxes will be owing to the Taxing Authorities in the estimated amount of $15,000 on account of fourth quarter 2014 Taxes and any accrued Taxes in January 2015.

51.    If the Debtor does not remit or pay Taxes in a timely manner, certain Taxing Authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the Debtor's estate.  The Debtor's failure to pay the Taxes could have a material adverse impact on its ability to operate in the

---

[5]  The states in which the Debtor is licensed to operate are:  California, Illinois, Michigan, Nebraska, Oregon, Arizona, Florida, Georgia, Maryland, North Carolina, New Jersey, Pennsylvania, Texas and Washington.

[6]  Employment-related taxes are not addressed by this Motion.  Employment-related taxes are addressed in the concurrently filed motion to pay employee wages and maintain benefits.

ordinary course of business.  Any disputes that could impact its ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole.

52.     In summary, the Debtor seeks authorization to pay or remit prepetition Taxes required to conduct the Debtor's business to the appropriate Taxing Authorities (the "Prepetition Tax Obligations") in the ordinary course of the Debtor's business.  The Debtor seeks authority to remit Prepetition Tax Obligations in an aggregate amount not to exceed $20,000 (the "Prepetition Tax Obligations Cap"),[7] without prejudice to the Debtor's right to contest the amounts of any Prepetition Tax Obligations on any grounds it deems appropriate.

53.     Any failure to make the requested payments could cause:  (a) the Taxing Authorities to initiate audits of the Debtor that would unnecessarily divert its attention away from its restructuring efforts; (b) certain Taxing Authorities to file liens, seek to lift the automatic stay, and pursue other remedies that will harm the Debtor's estate; and (c) certain of the Debtor's directors and officers to face personal liability—even if failure to pay such prepetition Taxes was not a result of malfeasance on their part—that would undoubtedly distract those key employees from its duties related to the Debtor's restructuring.  Moreover, I am advised that portions of the Prepetition Tax Obligations not property of the estate and that portions of the Prepetition Tax Obligations are entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code.

---

[7] By this Motion, the Debtor is not seeking authority to pay outstanding amounts owing to the State of New York for sales and use tax periods beyond those that are currently due.  Such outstanding sales and use taxes will be addressed in the Debtor's plan.

54.    Accordingly, I believe that the relief requested in the Taxes Motion is both necessary and in the best interests of the Debtor's estate and its creditors.

**E.    Debtor's Motion for Entry of Interim and Final Orders (a) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (b) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (c) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (d) Granting Related Relief**

55.    The Debtor seeks interim and final orders (a) approving the Debtor's Proposed Adequate Assurance of payment for future utility services, (b) prohibiting Utility Companies from altering, refusing, or discontinuing services, (c) approving the Debtor's proposed procedures for resolving Adequate Assurance Requests, and (d) granting related relief (the "Utilities Motion").

56.    In connection with the operation of its business and management of its property for offices in the states of Washington, Georgia and New York, the Debtor obtains electricity, natural gas, telephone, water, waste disposal, and other similar services (collectively, the "Utility Services") from a number of utility companies or brokers (collectively, the "Utility Companies"). A nonexclusive list of the Utility Companies and their affiliates that provide Utility Services (the "Utility Providers") to the Debtor as of the Petition Date is attached to the Utilities Motion as Exhibit C (the "Utility Services List").[8] The relief requested herein is requested with respect to all Utility Companies providing Utility Services to the Debtor.

---

[8] The inclusion of any entity on, or the omission of any entity from, the Utility Services List is not an admission by the Debtor that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtor reserves all rights with respect to any such determination.

57.    To the best of the Debtor's knowledge, there are no defaults or arrearages with respect to the Debtor's undisputed invoices for prepetition Utility Services. On average, the Debtor pays approximately $13,759 each month for third party Utility Services. Accordingly, the Debtor estimates that its cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $12,259. To the best of the Debtor's knowledge, none of the Utility Companies hold deposits from the Debtor, nor does the Debtor have any existing prepayments with respect to any Utility Companies.

58.    The Debtor intends to pay postpetition obligations owed to the Utility Companies in a timely manner. Cash held by the Debtor, cash generated in the ordinary course of business, and cash available to the Debtor through its debtor in possession financing facility, will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with prepetition practice.

59.    To provide additional assurance of payment, the Debtor proposes to deposit into a segregated account $6,130 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one half of the Debtor's average monthly cost of Utility Services, calculated based on the Debtor's average third party utility expenses during 2014. The Adequate Assurance Deposit will be held in the segregated account for the duration of the Case. The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in accordance with prepetition practice (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

60.    Uninterrupted Utility Services are essential to the Debtor's ongoing business operations.  The Debtor's operations require electricity and gas for lighting, heating, trash, sewer services, and air conditioning.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtor's ability to operate its business.  Accordingly, it is essential that the Utility Services continue uninterrupted during the Case.

61.    Accordingly, I believe that the relief requested in the Utilities Motion is both necessary and in the best interests of the Debtor's estate and its creditors.

F.    **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (VI) Granting Related Relief**

62.    The Debtor seeks an interim order (the "Interim Order") and a final order (the "Final Order" and together with the Interim Order, the "DIP Orders"):  (a) authorizing the Debtor to obtain postpetition secured financing (the "DIP Facility") from SITO Mobile, Ltd., the proposed stalking horse bidder in respect to the proposed sale of substantially all of the Debtor's assets (the "Stalking Horse Bidder" or "DIP Lender"); (b) granting liens and super-priority claims with respect to such postpetition financing; (c) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim DIP Order; (d) prescribing the form and manner of notice and setting the time for the final hearing on this Motion to consider entry of the Final DIP Order; and (e) granting related relief (the "DIP Financing Motion").

63.    The proposed DIP Facility generally provides for a line of credit, up to a maximum of $3.4 million, secured by first priority liens on any and all of the Debtor's previously

unencumbered assets and junior liens on the Debtor's assets encumbered by Permitted Liens (including Fast Pay's liens on substantially all of the Debtor's assets).  Borrowings and disbursements would be made pursuant to the terms of an agreed-to budget, a copy of which is attached as Exhibit A to the DIP Note, which is attached as Exhibit A to the Interim DIP Order (as the same may be modified in accordance with the DIP Documents, the "Budget"), including, promptly after the entry of the Interim DIP Order, the payment in full, with DIP Facility proceeds, of the undisputed secured claims of Fast Pay under the Fast Pay Credit Facility (totaling approximately $1.725 million as of the Petition Date, which amount is expected to decrease prior to the payoff as reflected in the Budget, as Factored AR payments are received postpetition).

64.    As noted above, after entry of the Interim DIP Order, using DIP Facility proceeds, the Debtor will immediately pay off the valid claims of Fast Pay under the Fast Pay Agreement.  Fast Pay is a factor and not a traditional lender; as noted, Fast Pay purchases specified accounts receivable and it has a security interest against substantially all of the Debtor's assets (including non-factored accounts receivable) in order to secure the Debtor's obligation to stand behind the collectability of the factored accounts receivable.  Fast Pay is not affiliated with the DIP Lender in any manner.  The DIP Lender, also not a traditional lender, made clear to the Debtor that, as part of any DIP financing, the DIP Lender would not agree to second position lienholder status as to the Debtor's assets including the non-factored accounts receivable, on any extended basis.  Thus, the DIP Lender and Debtor agreed to the immediate

payment of Fast Pay's valid secured claims under the DIP Facility, and as a result, the DIP Lender is ready to proceed with the proposed DIP Facility.

65.     Fast Pay has made certain requests relating to its prepetition claims and security interest. The Debtor and Fast Pay are in discussions regarding the terms of potential stipulations regarding these claims and interests and such stipulations may be reflected in a revised form of DIP order.

66.     The Debtor proposes to use the DIP Loans and Cash Collateral to satisfy employee wages, employee benefits, certain other operational expenses as set forth in the Budget, and to fund administration of this chapter 11 estate in order to achieve a sale of the assets to a buyer that will, to the extent possible, preserve jobs of the Debtor's current employees, and which sale is expected to yield sufficient proceeds to fund a distribution to general unsecured creditors under a confirmed plan. Without access to the DIP Loans and Cash Collateral to satisfy these obligations, the Debtor will have insufficient funds to continue to pay wages for its employees, and preserve and maximize the value of the estate, and administer the chapter 11 case. Thus, the Debtor's access to the DIP Loans and Cash Collateral will facilitate the Debtor's efforts to maximize value for its stakeholders through the proposed sale transaction. Absent approval of the Interim DIP Order, the Debtor will not have access to the DIP Loans or the Cash Collateral necessary to fund administration of the chapter 11 estate, causing immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders and other parties in interest.

67.     The DIP Facility represents the best source of financing available to the

Debtor under the circumstances, and was negotiated vigorously at arm's length with the DIP

Lender, resulting in terms that the Debtor submits are reasonable and appropriate to meet the

Debtor's financing needs during the chapter 11 case. The Debtor has not been able to obtain an

alternative financing commitment on terms better than proposed by the DIP Lender. The DIP

Facility will provide the Debtor with sufficient liquidity to remarket its assets postpetition and

enable it to maximize value through a Court-approved auction process.

68.     Beginning in mid-December, 2014, upon the Debtor's request, the

Debtor's investment banker, Canaccord, initiated a process to identify prospective DIP lenders in

conjunction with a possible chapter 11 filing by the Debtor. Canaccord analyzed its proprietary

database and identified six possible DIP lenders for a DIP loan of appropriate size. Canaccord

contacted such parties, discussed the terms of a possible financing and explored whether any of

them would be interested in submitting a proposal after signing a nondisclosure agreement and

receiving confidential information. Two prospective lenders signed a nondisclosure agreement

and, after receiving the confidential information, all parties declined to provide a term sheet.

Canaccord understands that the reasons for not submitting a term sheet included company

performance, size and duration of the DIP loan, repayment risk and transaction risk.

69.     Based on Canaccord's efforts and counsel, the Debtor does not believe

that alternative sources of financing are readily available. Additionally, the Debtor does not

believe it would prudent, or even possible, to administer the chapter 11 estate on a "cash

collateral" basis. As noted above, without access to the DIP Facility, the Debtor has limited cash

on hand, and does not expect to be able to generate sufficient levels of cash flow through its

business to cover its cash needs and the projected costs of the chapter 11 case. In addition,

substantially all of the Debtor's assets are encumbered by Fast Pay's liens. Typically, other

potential DIP lenders would require their liens to be priming, first priority liens on all of the Fast

Pay Collateral, which scenario could result in expensive, time-consuming litigation with Fast

Pay. As noted above, Canaccord's inquiry into other potential DIP loans yielded no results –

either on a fully priming basis, *pari passu* or unsecured basis.

      70.     In sum, the Debtor does not believe any other DIP financing would be

reasonably available given the realities imposed by the Debtor's existing capital structure and

current circumstances. The proposed DIP Facility represents the best (and likely only) option

available to address the Debtor's immediate liquidity needs. It is the product of extensive arm's

length negotiations with the DIP Lender and is an essential component of the broader plan to sell

the assets to maximize value for stakeholders.

      71.     Absent interim approval of the DIP Facility, the Debtor will not have

sufficient liquidity to continue operating and preserve the Debtor's business as a going concern.

Accordingly, the Debtor would have no choice but to cease operations and liquidate its assets

which would result in a deterioration of value for creditor constituencies. In addition, after

efforts by the Debtor's investment banker to explore DIP financing options, the Debtor believes

that the proposed DIP Facility is the optimal, and only, postpetition financing alternative

available under all of the circumstances. The proposed DIP Facility provides the best path

forward under the circumstances to address the Debtor's immediate liquidity needs, to fund the

chapter 11 case, and to provide a clear path toward a successful sale of the assets.

      72.      Accordingly, I believe that entering into the DIP Facility will provide the

Debtor's creditors and other stakeholders with the best opportunity possible for maximizing the

value of the estate.

**G.      Motion for Order: (A) Approving Bid Procedures for the Sale of Substantially All of Debtor's Assets Outside the Ordinary Course of Business; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee and Expense Reimbursement; and (D) Granting Related Relief**

      73.      The Debtor seeks entry of an order:  (a) approving bid procedures and a

break-up fee in connection with the sale (the "Sale") of substantially all assets of the Debtor (the

"Assets"); (b) scheduling an auction and hearing to consider the Sale of the Assets, including the

potential assumption and assignment of designated contracts, and approve the form and manner

of notices related thereto; and (c) granting related relief (the "Bid Procedures Motion").

      74.      As set forth in the Bid Procedures Motion, shortly hereafter, the Debtor

will file the *Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale*

*of Substantially All of Debtor's Assets Outside the Ordinary Course of Business; (B) Authorizing*

*the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other*

*Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) and 363(m); (C) Assuming*

*and Assigning Certain Executory Contracts and Unexpired Leases; and (D) Granting Related*

*Relief* (the "Sale Motion"), which seeks authorization of the Sale of the Acquired Assets to

(i) SITO Mobile, Ltd. (the "Stalking Horse Bidder" or the "Purchaser") pursuant to that certain

*Asset Purchase Agreement* between the Debtor and the Stalking Horse Bidder dated as of

January 20, 2015, a copy of which agreement, is attached to the Bid Procedures Motion as

Exhibit A (as amended or modified in accordance with its terms, the "Stalking Horse

Agreement"),[9] or alternatively, (ii) the highest or otherwise best bidder for such Assets

determined in accordance with the proposed bid procedures.

      75.     Pursuant to the Sale Motion, the Debtor seeks approval of the Sale of

substantially all of its assets necessary to the operation of its business, including, *inter alia*,

unexpired leases and executory contracts, accounts receivable and other personal property,

intellectual property and other intangible property, books and records and other documents

including customer lists, the estate's avoidance action claims, and certain claims and liabilities to

be assumed by the Stalking Horse Bidder, all as more fully set forth in the Stalking Horse

Agreement (collectively, the "Acquired Assets").  The total consideration to be paid by

Purchaser to Debtor for the Acquired Assets shall be (the "Purchase Price"):  (i) an amount equal

to the sum of (a) $4,500,000 in cash (the "Cash Purchase Price"), plus (b) an amount equal to the

Cure Amounts up to the Cure Cap ($500,000), plus (c) the amounts approved by the Bankruptcy

Court with respect to the KEIP up to the KEIP Limit ($255,000), less (ii) the sum of (a) the

amount of Assumed DIP Obligations plus (b) the amount of Cure Amounts that are required to

be paid in excess of the Cure Cap up to a maximum of $50,000.

      76.     In light of (i) the extensive marketing process already undertaken; (ii) the

additional efforts that will be made postpetition during the proposed sale process; and (iii) the

---

[9]    All capitalized terms not defined herein have the meaning ascribed to them in the Stalking Horse Agreement.

current liquidity issues facing the Debtor, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse Bidder under the terms of the Stalking Horse Agreement or, alternatively, to a higher and better bidder for the Acquired Assets.  Pursuant to the Stalking Horse Agreement, the Debtor must obtain an order approving the Bid Procedures Motion (the "Bid Procedures Order") within 23 days after the Petition Date, conduct an auction (if applicable) no later than three business days prior to the sale hearing, have set a sale hearing no later than 40 days after the Petition Date, and obtain a sale order no later than 45 days after the Petition Date.  In light of the prepetition marketing efforts and based upon the declining financial condition of the business, the Debtor believes that the sale process, while accelerated to some extent, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process.

77.    As discussed above, the Purchaser is also the proposed postpetition lender pursuant to the DIP Motion.  The DIP Motion seeks, *inter alia*, approval of up to $3.4 million in postpetition financing necessary to fund the Debtor's operations and Case.  Given the Debtor's liquidity position, it is in the best interest of the Debtor and its stakeholders to expedite the sales process in this case.

78.    While the prepetition marketing and sale process was thorough (as discussed in detail above), the Debtor will send, or will have sent, notice of the Sale Motion and Bid Procedures Motion to all parties that the Debtor believes may be potentially interested in acquiring the Acquired Assets.  The Debtor will also maintain its electronic data room with key documents and company-specific information in order to streamline the due diligence process

going forward. The data room has been, and will be, available to interested parties who have, or will, execute confidentiality agreements acceptable to the Debtor. The Debtor and its agents will continue to respond to inquiries from prospective buyers through the bid deadline approved by the Court for alternative bidders to bid on the Acquired Assets.

79.     In light of the prepetition marketing efforts, the Debtor believes that the sale process, while accelerated, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process. Further, given the current financial position of the Debtor, it is necessary to consummate a sale in an expeditious manner.

80.     Accordingly, I believe that the consummation of the Sale to the Purchaser or other Successful Bidder will provide its creditors and other stakeholders with the best opportunity possible for maximizing the value of the Acquired Assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 20, 2015

By:     Todd E. Wilson
Title:   Interim Chief Executive Officer