## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIPCRICKET, INC.,[1] | ) | Case No. 15-10104 (____) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING,
## (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE PRIORITY, (III) MODIFYING THE AUTOMATIC
## STAY, (IV) SCHEDULING A FINAL HEARING, AND
## (V) GRANTING RELATED RELIEF

Hipcricket, Inc., the above-captioned debtor and debtor in possession (the "Debtor") files

this motion (this "Motion")[2] for entry of an interim order (the "Interim DIP Order"),

substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final DIP Order"

and, together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtor to obtain

postpetition secured financing pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title

11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and in

accordance with Rules 2002, 4001, and 9014, of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"); (b) granting liens and super-priority claims with respect to such postpetition financing;

(c) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of

the Interim DIP Order; (d) prescribing the form and manner of notice and setting the time for the

---

[1] The last four digits of the Debtor's tax identification number are 2076. The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

[2] Unless otherwise noted herein, all capitalized terms used in this Motion shall have the meanings ascribed to such terms herein, regardless of whether the definitions of such terms appear later in this Motion than the first use of such term. Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order.

final hearing on this Motion (the "Final Hearing") to consider entry of the Final DIP Order; and (e) granting related relief.  In further support of this Motion, the Debtor respectfully states as follows.[3]

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## Preliminary Statement

4.      The Debtor requires immediate access to liquidity to ensure that it is able to preserve the value of the estate pending the proposed sale of its assets, which sale is expected to yield sufficient proceeds to fund a distribution to general unsecured creditors under a confirmed

---

[3] The facts and circumstances supporting this Motion are set forth in the *Declaration of Todd E. Wilson in Support of First Day Motions* (the "Wilson Declaration"), filed contemporaneously herewith and incorporated by reference herein.

plan. To that end, the Debtor has secured a DIP Facility, up to $3.4 million, to ensure that overall enterprise value can be preserved. Prepetition, the Debtor had a secured factoring arrangement with Fast Pay, whereby Fast Pay purchased accounts receivable from the Debtor and advanced 80% of the gross value of the invoices to the Debtor. Among other things, the DIP Facility proceeds will be used to pay off the prepetition secured amount owed to Fast Pay, honor employee wages and benefits, and fund necessary operational and related expenses as set forth in the Budget, and satisfy administrative expenses incurred during the chapter 11 case pending the consummation of the proposed sale of the Debtor's assets.

5.      The DIP Facility represents the best source of financing available to the Debtor under the circumstances, and was negotiated vigorously at arm's length with the Stalking Horse Bidder, resulting in terms that the Debtor submits are reasonable and appropriate to meet the Debtor's financing needs during the chapter 11 case. The Debtor has not been able to obtain an alternative financing commitment on terms better than proposed by the Stalking Horse Bidder. The DIP Facility will provide the Debtor with sufficient liquidity to remarket its assets postpetition and enable it to maximize value through a Court-approved auction process. The Debtor has successfully negotiated a financing that generally provides:

- a line of credit, up to a maximum of $3.4 million, secured by first priority liens on any and all of the Debtor's previously unencumbered assets and junior liens on the Debtor's assets encumbered by Permitted Liens (including Fast Pay's liens on substantially all of the Debtor's assets);

- borrowings and disbursements to be made pursuant to the terms of an agreed-to budget, a copy of which is attached as Exhibit A to the DIP Note, which is attached as Exhibit A to the Interim DIP Order (as the same may be modified in accordance with the DIP Documents, the "Budget"), including, promptly after the entry of the Interim DIP Order, the payment in full, with DIP Facility proceeds, of the undisputed secured claims of Fast Pay under the Fast Pay Credit Facility (totaling approximately $1.725 million as of the Petition Date, which amount is expected to decrease prior to the payoff as reflected in the Budget, as factored accounts receivable payments are received postpetition).

6.    Absent interim approval of the DIP Facility, the Debtor will not have sufficient liquidity to continue operating and preserve the Debtor's business as a going concern. Accordingly, the Debtor would have no choice but to cease operations and liquidate its assets which would result in a deterioration of value for creditor constituencies. In addition, and as discussed more fully below, after efforts by the Debtor's investment banker to explore DIP financing options, the Debtor believes that the proposed DIP Facility is the optimal, and only, postpetition financing alternative available under all of the circumstances. The proposed DIP Facility provides the best path forward under the circumstances to address the Debtor's immediate liquidity needs, to fund the chapter 11 case, and to provide a clear path toward a successful sale of the assets.

## Terms and Conditions of the DIP Facility

### I.    Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2

7.    The following chart contains a summary of the essential terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.4.[4]

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Hipcricket, Inc. *See* Interim DIP Order, Preamble; DIP Note (attached as Exhibit A to Interim DIP Order), Preamble. |
| **DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | SITO Mobile, Ltd., the proposed stalking horse bidder in respect to the proposed sale of substantially all of the Debtor's assets. *See* Interim DIP Order at p. 2, clause i; DIP Note, Preamble. |

---

[4]  The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Documents.

4

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Facility shall include loans to be advanced and made available to the Debtor in the aggregate maximum principal amount of $3,400,000. Up to $2,100,000 in DIP Facility proceeds will be available upon entry of the Interim DIP Order.[5] *See* Interim DIP Order p. 1, clause i; ¶ 3; DIP Note, p. 1, recital 3; § 1(a)(i) & (ii). |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br>Local 4001-2(a)(ii) | The Obligations shall be due and payable on the earliest to occur of (i) the date the Sale is consummated; (ii) April 3, 2015; (iii) upon acceleration of the DIP Note pursuant to the terms hereof; and (iv) the Termination Date. *See* Interim DIP order, ¶ 14; DIP Note, § 2(f). |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br>Local Rule 4001- 2(a)(ii) | The DIP Facility shall be used for operating working capital purposes and chapter 11 administrative costs in the amounts and otherwise in accordance with and for the purposes provided for in the Budget.<br><br>No borrowings, Cash Collateral, DIP Collateral, DIP Indebtedness, or proceeds of the DIP Financing or any part of the Carve-Out may be used for any of the following without the prior written consent of the DIP Lender: (a) to object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, or the liens or claims granted under this Interim Order, the DIP Documents, (b) investigate any claims, defenses or causes of action that may exist under law, equity or otherwise against the DIP Lender or its respective agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Documents or this Interim Order, (d) seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Documents, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted to be paid under the DIP Documents.<br><br>*See* Interim DIP Order ¶¶ 4, 8, 26; DIP Note, § 3(a). |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | Fast Pay – Pursuant to the DIP Documents, including the Budget, all valid obligations of the Debtor owed to Fast Pay under the Fast Pay Agreement will be paid with DIP Facility proceeds immediately after the entry of the Interim DIP Order (the "Fast Pay Payoff"), in which case, among other things, the Fast Pay Agreement will be deemed terminated, Fast Pay will reconvey "Purchased Accounts" (as defined in the Fast Pay Agreement) to Debtor, and all liens of Fast Pay on Purchased Accounts and all "Collateral" (as defined in the Fast Pay Agreement) shall be extinguished.[6] *See* Interim DIP Order, ¶ 7; Budget. |

---

[5] As set forth in the Budget, the Debtor anticipates an additional, approximately $453,000, being drawn on the DIP Facility, prior to the Final Hearing, subject to the formula and other terms and conditions set forth in the DIP Documents.

[6] As discussed herein, Fast Pay was the Debtor's prepetition factor, which had purchased certain accounts receivable from the Debtor. Fast Pay contends it owns all of the Factored ARs, and it also has a security interest in substantially all of the Debtor's assets to protect Fast Pay from any deficiency as the Factored ARs are collected upon. Fast Pay's prepetition claim is oversecured and, as noted, will be paid within a few days of this case filing upon entry of the Interim DIP Order. Under such circumstances, no adequate protection of Fast Pay's liens and claims is required.

5

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | No fees, other than reimbursement of all of DIP Lender's reasonable attorneys' fees and other professional fees, in addition to all costs and expenses incurred in connection with the DIP Financing and the Debtor's case. *See* Interim DIP Order ¶ 10; DIP Note, §§ 4(d), 6(b). As set forth in the Budget, payments on account of the DIP Lender's legal fees, as well as interest owed under the DIP Facility, will be made. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | 13% per annum, plus an additional 2% upon default. *See* Interim DIP Order ¶ 10; DIP Note, § 2(a) & (b). |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001- 2(a)(ii) | The obligation of the DIP Lender to make advances is subject to customary borrowing conditions and certain Sale related conditions including the Debtor having filed the Sale Motion and related pleadings, the Stalking Horse Agreement having been delivered and not terminated, and the Debtor having been in compliance with its obligations under the Stalking Horse Agreement and Bid Procedures Order. *See* DIP Note, § 1(c). |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Budget attached to the DIP Note. *See* DIP Note, § 3(a), Exhibit A. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001- 2(a)(ii) | Standard or ordinary reporting requirements including, without limitation, Budget related information; providing copies of, or access to, Debtor's books and records and other information, and discussing with the DIP Lender the business and other matters relating to the Debtor; and providing notice of certain litigation and other proceedings. *See* DIP Note, § 1(b), 3 (including (b), (c) and (g)). |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001- 2(a)(ii) | Notwithstanding the then applicable Budget, the Debtor may exceed the budgeted amount for any line item (other than professional fees) during any weekly budget period by 10%, excluding any timing difference resulting from the roll-forward of budgeted expenses from previous weekly periods that were unpaid and which may be rolled forward to subsequent periods, subject to certain other terms and conditions. *See* DIP Note, § 3(a). |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001- 2(a)(ii) | The Debtor shall achieve each of the following milestones: (i) the Final DIP Order must be entered within 30 days after the Petition Date; (ii) the Bid Procedures Order must be entered within 21 days after the Petition Date; (iii) the Sale Order must be entered within 45 days after the Petition Date; and (iv) the Sale must close by 15 days after the hearing on the Sale Motion. *See* Interim DIP order, ¶ 14 (definition of Termination Date); DIP Note, § 4(a) (Events of Default). |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Subject and subordinate to the Carve-Out, in all respects, all obligations of the Debtor under the DIP Facility shall be (i) pursuant to section 364(c)(1) of the Bankruptcy Code, afforded superpriority allowed administrative expense claim status in the chapter 11 case; (ii) secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on all of the Debtors' unencumbered assets (including, as noted below, upon entry of the Final Order, the Debtor's avoidance claims and actions); and (iii) secured, pursuant to section 364(c)(3), a second priority lien on all of the Debtor's assets encumbered by valid Permitted Liens, provided that the DIP Liens shall not be subject or subordinate to (1) any lien that is avoided and preserved for the benefit of the Debtor and estate under section 551, (2) any liens arising after the Petition Date including any liens granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor to |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | the extent permitted by applicable non-bankruptcy law, or (3) any intercompany or affiliate liens of the Debtor. *See* Interim DIP Order ¶¶ 15, 19; DIP Note, § 5. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(f) | The liens and claims of or granted to the DIP Lender shall be subject and subordinate to the payment of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"):  (a) all allowed fees and expenses of attorneys, investment bankers and financial advisors (the "Estate Professionals") employed by the Debtor, and, if applicable, the Committee, pursuant to sections 327, 328, 1102 and 1103 and any disbursements of any member of the Committee which are incurred or accrued prior to the Termination Date of the Debtor's use of Cash Collateral to the extent set forth in (and limited by) the Budget; provided, that following the Termination Date of the Debtor's use of Cash Collateral, the payment of allowed fees and disbursements of Estate Professionals incurred or accrued after such Termination Date by the Estate Professionals in an aggregate amount not to exceed $100,000 plus the fees and expenses of Estate Professionals previously incurred or accrued in accordance with the Budget prior to termination of the Debtor's use of Cash Collateral but which are subsequently allowed, and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court or to the Debtor's appointed claims agent.<br><br>Following entry of the Final Order and on a weekly basis thereafter, the Debtor shall be authorized to transfer funds to the Pachulski Stang Ziehl & Jones LLP Client Trust Account (the "Expense Reserve Account") in the amounts set forth in the Budget for fees and expenses of the Estate Professionals.  Such funds shall be held in the Expense Reserve Account for the benefit of the Estate Professionals, respectively, to be applied to the fees and expenses of such Estate Professionals approved for payment pursuant to orders of the Bankruptcy Court (the "Segregated Funds"), provided, however, fees and expenses payable to the Estate Professionals shall be paid first out of the Expense Reserve Account, and all amounts deposited in the Expense Reserve Account shall reduce, on a dollar for dollar basis, the obligation to fund the Carve-Out, and provided further that there shall be no requirement that any amounts in respect of any success fees that may be earned by any Estate Professional be deposited into the Expense Reserve Account.  Without in any way limiting the Debtor's ability to use the Segregated Funds to pay fees payable to the United States Trustee and Clerk of the Court and the fees/expenses of Estate Professionals, the Segregated Funds in the Expense Reserve Account shall remain encumbered by and subject to the DIP Liens, and the Superpriority Claim, in their respective order of priority; provided, however, that such liens and claims shall be subordinate to the Carve-Out. Notwithstanding the foregoing, none of the the Carve-Out, proceeds from the DIP Financing or Cash Collateral may be used (1) to investigate or challenge in any respect the validity, perfection, priority, extent or enforceability of the DIP Liens, (2) to delay, challenged or impede any rights of the DIP Lender under any of the DIP Documents or the Interim Order, or (3) to pursue any claims or causes of action against the DIP Lender.<br><br>Subject to the terms of this Interim Order, the Debtor shall be permitted to pay compensation and reimbursement of reasonable fees and expenses of the Retained Professionals allowed and payable under sections 328, 330 or 331, as the same may be due and payable, that constitute pre-Termination Date expenses and such payments shall not reduce or be deemed to reduce the post-Termination Date fees and |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | expenses.<br><br>*See* Interim DIP Order ¶¶ 16-18. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br>Local Rule 4001-2(a)(i)(B) | Fast Pay has made certain requests relating to the Prepetition Fast Pay Debt, the Prepetition Fast Pay Security Interest, and related matters, as discussed herein. As provided below, the Debtor is willing to provide certain stipulations, agreements and waivers in favor of Fast Pay in the Interim DIP Order and/or Final DIP Order, and the Debtor will work with Fast Pay and the DIP Lender to prepare a modified form of order to reflect such matters. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001- 2(a)(ii) | <u>Events of Default.</u>  Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest, and fees, defaults under affirmative and negative covenants and breaches of representations and warranties. The DIP Note contains case milestones (discussed above), the failure of which to satisfy would constitute an Event of Default thereunder.  Additionally, certain actions, if taken, or pleadings, if filed, would constitute an Event of Default.<br><br><u>Remedies.</u>  Upon the occurrence of an Event of Default and after three  days' notice to the Debtor, if any Event of Default shall then be continuing, DIP Lender may take any of the following actions: (i) declare all or any portion of the outstanding Obligations due and payable, whereupon the same shall become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower; (ii) enforce all liens and security interests in the Collateral; (iii) institute proceedings to enforce payment of such Obligations; (iv) terminate the obligation of the DIP Lender to make Loans; and (v) exercise any other remedies and take any other actions available to it at law, in equity, under the DIP Note, the Bankruptcy Code, other applicable law or pursuant to the DIP Order.<br><br>In addition to the foregoing, if any Event of Default shall occur and be continuing, but subject only to any required notice, the DIP Lender may exercise in addition to all other rights and remedies granted to it in the DIP Note and the DIP Order, all rights and remedies of a secured party under the UCC or other applicable law. Without limiting the generality of the foregoing, the Debtor agrees that in any such event the DIP Lender may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, subject to other terms as set forth in the DIP Documents including ¶ 12 of the Interim DIP Order.<br><br>*See* Interim DIP Order ¶¶ 11-13, 22; DIP Note, § 4. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay shall be modified to the extent necessary to permit the DIP Lender to retrieve, collect and apply payments and proceeds in respect of the DIP Collateral and exercise its remedies, as applicable, in accordance with the terms of the Interim DIP Order and DIP Documents, including subject to any notice requirements set forth therein. Notwithstanding the provisions of section 362, (i) the DIP Lender, may, at its sole option, file or record or cause the Debtor to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtor's expense, any such UCC financing statements, notices of liens and security interests, mortgages, amendments to mortgages and/or other similar documents or instruments as the DIP Lender may require, and (ii) the DIP Lender, may require the Debtor to deliver to the DIP Lender, any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtor is directed to cooperate and comply therewith. *See* Interim DIP Order ¶¶ 9, 20. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Liens shall be effective and perfected upon the date of the Interim Order and without the necessity of the execution, recordation of filings by the Debtor or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of or over any DIP Collateral. The DIP Liens shall be deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of the Interim Order, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of section 362 of the Bankruptcy Code, (i) the DIP Lender, may, at its sole option, file or record or cause the Debtor to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtor's expense, any such UCC financing statements, notices of liens and security interests, mortgages, amendments to mortgages and/or other similar documents or instruments as the DIP Lender may require, and (ii) the DIP Lender, may require the Debtor to deliver to the DIP Lender, any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtor is directed to cooperate and comply therewith. If the DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages, amendments to mortgages or other documents or instruments with respect to such security interests and liens, or if the DIP Lender, in accordance with the DIP Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements, mortgages, amendments to mortgages or similar documents or instruments or taking possession shall be deemed to have been filed or recorded or taken in these cases as of the commencement of these cases but with the priorities as set forth herein.  The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of the Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall be accepted and shall constitute further evidence of the DIP Lender's |

DOCS_LA:284979.7 36480/001

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | interest in the DIP Collateral.   See Interim DIP Order ¶ 20; DIP Note, § 5(e). |
| **Releases**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Each stipulation, admission and agreement contained in the Interim Order, shall be binding upon the Debtor and any successor thereto (including any chapter 7 or chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all claims against the DIP Lender as of the date of entry of the Interim Order.  Each stipulation, admission and agreement contained in the Interim Order shall also be binding upon all other parties in interest, including any Committee (if appointed), under all circumstances and for all purposes. See Interim DIP Order ¶ 28. |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(l)(B)(xi)<br>Local Rule 4001-2(a)(i)(D) | Upon entry of the Final DIP Order, the DIP Lender shall have a first priority lien on the proceeds of the Debtor's claims and causes of action under Chapter 5 of the Bankruptcy Code. See Interim DIP Order ¶ 19(a); DIP Note, § 5(xv). |
| **Credit Bid Rights**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001- 2(a)(ii) | Subject to Code section 363(k), the DIP Lender shall have the right to credit bid the full amount of its claims in connection with any sale of all or any portion of the Debtor's assets, including, without limitation, the Sale Transaction or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii); <u>provided</u>, that in the event the DIP Lender is also the purchaser of the Debtor's assets and agrees to assume the DIP Financing, the DIP Financing shall not be double counted as purchase consideration. See Interim DIP Order ¶ 27. |
| **No Priming or Pari Passu Liens**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001- 2(a)(ii) | No claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order to the DIP Lender shall be granted or allowed until the occurrence of (i) the payment in full of all of the DIP Obligations or the application of all of the DIP Obligations to the consideration paid by the DIP Lender to purchase the Debtor's assets, (ii) the termination or expiration of all commitments to extend credit to the Debtor under the DIP Documents, and (iii) the cash collateralization in respect of any asserted claims, demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, or damages for which the DIP Lender may be entitled to indemnification by the Debtor, as applicable plus an additional $750,000 reserve for contingent claims ("Paid in Full").  While any portion of the DIP Financing (or any refinancing thereof) or the DIP Obligations remain outstanding and the commitments thereunder have not been terminated, the DIP Liens shall not be (x) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under Bankruptcy Code section 551 or (y) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise. See Interim DIP Order ¶ 21; DIP Note, § 5(f). |

## Relief Requested

8.     The Debtor seeks entry of the Interim DIP Order and, pending the Final Hearing,

the Final DIP Order, in each case:

    a.     Authorizing the Debtor to enter into the secured DIP Facility, which shall include loans to be advanced and made available to the Debtor, up to a maximum of $3,400,000 million (subject to the terms of the DIP Documents), with up to

$2,100,000 to be available upon entry of the Interim DIP Order and satisfaction of other conditions to borrowing (with additional DIP proceeds anticipated to be later available prior to the Final Hearing, as set forth in the Budget);

b.  ordering that, subject to the Carve Out, in all respects, all obligations of the Debtor under the DIP Documents shall be:

(i)  entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code;

(ii)  secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on all of the Debtors' unencumbered assets (including upon entry of the Final Order, the Debtor's avoidance claims and actions); and

(iii)  secured, pursuant to section 364(c)(3), a second priority lien on all of the Debtor's assets encumbered by valid Permitted Liens, provided that the DIP Liens shall not be subject or subordinate to (1) any lien that is avoided and preserved for the benefit of the Debtor and estate under section 551, (2) any liens arising after the Petition Date including any liens granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor to the extent permitted by applicable non-bankruptcy law, or (3) any intercompany or affiliate liens of the Debtor;

c.  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order or the Final DIP Order, as applicable;

d.  scheduling the Final Hearing to consider entry of the Final DIP Order and approving the form of notice with respect to the Final Hearing; and

e.  granting related relief.

### Background

9.  On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its assets as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no committees have been appointed or designated.

11

**The Debtor's Prepetition Factoring Lender**

10.     As discussed in the Wilson Declaration, since May 2014, the Debtor has been funding operations primarily through borrowings under an accounts receivable-based credit facility (the "Fast Pay Facility"), up to a maximum of $5 million, provided by Fast Pay Partners LLC ("Fast Pay"). (Proceeds from the Fast Pay Facility were used to repay in full the Company's prior loan facility with Silicon Valley Bank.) The Debtor and Fast Pay are parties to that certain Financing and Security Agreement dated May 12, 2014, which was amended on June 3, 2014 and again on October 15, 2014 (as amended, modified or supplemented from time to time, the "Fast Pay Agreement", a copy of which is attached hereto as **Exhibit B**). Pursuant to the Fast Pay Agreement, Fast Pay purchases certain accounts receivable from the Debtor and advances 80% of the gross value of the invoices to the Debtor (the "Factored ARs"), promptly after Fast Pay notifies the Debtor that Fast Pay will purchase a particular account receivable (prior to October 2014 the advance rate was 70%). Fast Pay contends that it owns the Factored ARs. To secure any shortfall, the Debtor granted Fast Pay a first priority security interest in substantially all of the Debtor's assets; on May 27, 2014, Fast Pay filed a UCC-1 financing statement covering its collateral (a copy of which is attached hereto as part of **Exhibit B**). Fast Pay may terminate the Fast Pay Agreement at any time upon written notice and require payment of all outstanding obligations. As of the Petition Date, the Debtor owed Fast Pay approximately $1.7 million under the Fast Pay Facility.

11.     As noted above, after entry of the Interim DIP Order, using DIP Facility proceeds, the Debtor will immediately pay off the valid claims of Fast Pay under the Fast Pay Agreement. Fast Pay is a factor and not a traditional lender; as noted, Fast Pay purchases specified accounts receivable and it has a security interest against substantially all of the Debtor's assets (including non-factored accounts receivable) in order to secure the Debtor's obligation to stand behind the

12

collectability of the factored accounts receivable.[7] Fast Pay is <u>not</u> affiliated with the DIP Lender in any manner. The DIP Lender, also not a traditional lender, made clear to the Debtor that, as part of any DIP financing, the DIP Lender would not agree to second position lienholder status as to the Debtor's assets including the non-factored accounts receivable, on any extended basis. Thus, the DIP Lender and Debtor agreed to the immediate payment of Fast Pay's valid secured claims under the DIP Facility, and as a result, the DIP Lender is ready to proceed with the proposed DIP Facility.

12.     In connection with the foregoing, the Debtor believes that the sale to Fast Pay of the Factored ARs was a true sale of such Factored ARs and, as noted, intends to pay Fast Pay's outstanding balance in full upon entry of the Interim Order. Prior to the submission of this Motion, Fast Pay has requested, however, that the Debtor admit, stipulate and agree that as of the Petition Date, the Debtor, without defense, counterclaim or offset of any kind, was indebted and liable to Fast Pay for a certain amount in respect of financial accommodations made by Fast Pay under the Fast Pay Agreement, together with all other obligations due and payable thereunder, including accrued interest (the "Prepetition Fast Pay Debt"). Fast Pay has further requested that the Debtor (A) stipulate and agree that the Prepetition Fast Pay Debt is secured by first priority liens (the "Prepetition Fast Pay Security Interest") on substantially all of the Debtor's assets, including the Debtor's accounts, chattel paper, inventory, equipment, instruments, investment property, documents, letter of credit rights, commercial tort claims and general intangibles (the "Prepetition Fast Pay Collateral"), (B) stipulate and agree that the Prepetition Fast Pay Debt constitutes the legal, valid and binding obligation of the Debtor, enforceable in accordance with

---

[7] As explained in the Wilson Declaration, historically, there has been low risk associated with the collectability of the Debtor's accounts receivable and in particular, factored accounts receivable (which are selected by Fast Pay for purchase under the Fast Pay Agreement). In this current fiscal year to date (from March 2014 to now), only approximately $257,000 has been written off by the Debtor as bad debt (as compared to approximately $22.6 million in revenue during such period).

its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (C) stipulate and agree that no portion of the Prepetition Fast Pay Debt or any payments made to Fast Pay or applied to the obligations owing under the Fast Pay Agreement prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense of "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law, (D) waive and release any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against Fast Pay, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, and (E) stipulate and agree that the Prepetition Fast Pay Security Interest granted to Fast Pay in the Prepetition Fast Pay Collateral pursuant to and in connection with the Fast Pay Agreement, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by the Debtor in favor of Fast Pay are valid, binding, perfected and enforceable liens and security interest in the property described in the Fast Pay Agreement.  Without any preclusive effect in the event the Interim DIP Order or Final DIP Order are not entered on the terms requested and/or the Debtor and Fast Pay are unable to agree to a form of order, the Debtor is willing to provide such stipulations, agreements and waivers in favor of Fast Pay in the Interim DIP Order and/or Final DIP Order, and the Debtor anticipates working with Fast Pay and the DIP Lender to revise the proposed form of Interim Order submitted with this Motion in order to reflect such stipulations, agreements and waivers.

### The Debtor Has an Immediate Need for Cash

13.    As noted above, the Debtor proposes to use the DIP Loans and Cash Collateral to satisfy employee wages, employee benefits, certain other operational expenses as set forth in the

Budget, and to fund administration of this chapter 11 estate in order to achieve a sale of the assets to a buyer that will, to the extent possible, preserve jobs of the Debtor's current employees, and which sale is expected to yield sufficient proceeds to fund a distribution to general unsecured creditors under a confirmed plan. Without access to the DIP Loans and Cash Collateral to satisfy these obligations, the Debtor will have insufficient funds to continue to pay wages for its employees, and preserve and maximize the value of the estate, and administer the chapter 11 case. Thus, the Debtor's access to the DIP Loans and Cash Collateral will facilitate the Debtor's efforts to maximize value for its stakeholders through the proposed sale transaction. Absent approval of the Interim DIP Order, the Debtor will not have access to the DIP Loans or the Cash Collateral necessary to fund administration of the chapter 11 estate, causing immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders and other parties in interest.

<u>**Alternative Sources of Financing Are Not Readily Available**</u>

14.    Beginning in mid-December, 2014, upon the Debtor's request, the Debtor's investment banker, Canaccord Genuity ("<u>Canaccord</u>") initiated a process to identify prospective DIP lenders in conjunction with a possible chapter 11 filing by the Debtor. Canaccord analyzed its proprietary database and identified six possible DIP lenders for a DIP loan of appropriate size. Canaccord contacted such parties, discussed the terms of a possible financing and explored whether any of them would be interested in submitting a proposal after signing a nondisclosure agreement and receiving confidential information. Two prospective lenders signed a nondisclosure agreement and, after receiving the confidential information, all parties declined to provide a term sheet. Canaccord understands that the reasons for not submitting a term sheet included company performance, size and duration of the DIP loan, repayment risk and transaction risk.

15.    Based on Canaccord's efforts and counsel, the Debtor does not believe that alternative sources of financing are readily available.  Additionally, the Debtor does not believe it would prudent, or even possible, to administer the chapter 11 estate on a "cash collateral" basis.  As noted above, without access to the DIP Facility, the Debtor has limited cash on hand, and does not expect to be able to generate sufficient levels of cash flow through its business to cover its cash needs and the projected costs of the chapter 11 case.  In addition, substantially all of the Debtor's assets are encumbered by Fast Pay's liens.  Typically, other potential DIP lenders would require their liens to be priming, first priority liens on all of the Fast Pay Collateral, which scenario could result in expensive, time-consuming litigation with Fast Pay.  As noted above, Canaccord's inquiry into other potential DIP loans yielded no results – either on a fully priming basis, *pari passu* or unsecured basis.

16.    In sum, the Debtor does not believe any other DIP financing would be reasonably available given the realities imposed by the Debtor's existing capital structure and current circumstances.  The proposed DIP Facility represents the best (and likely only) option available to address the Debtor's immediate liquidity needs.  It is the product of extensive arm's length negotiations with the DIP Lender and is an essential component of the broader plan to sell the assets to maximize value for stakeholders.

### Provisions to Be Highlighted Pursuant to Local Rule 4001-2

17.    In accordance with Local Rule 4001-2, the following provisions of the DIP Facility are highlighted below.  As discussed in detail herein, the Debtor believes these provisions are reasonable in light of the facts and circumstances of this chapter 11 case and should be approved.

a.    **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions*.**  Subject to entry of the Final DIP Order, the DIP Liens will be granted on any claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance

DOCS_LA:284979.7 36480/001

or other power vested in or on behalf of the Debtors or the estates of the Debtors under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements. *See* Interim DIP Order ¶ 18(a).

b.    **Local Rule 4001-2(a)(i)(F) — *Disparate Carve Out Treatment*.** The Debtor's estate professionals and the professionals of any Committee are afforded a carve out for their respective fees and expenses as provided in the Budget. The Budget provides different amounts for the Debtor's professionals and the Committee's professionals. *See* Budget.

**Basis for Relief**

**I.    The Debtor Should Be Authorized to Obtain Postpetition Financing through the DIP Documents**

    **A.    Entering into the DIP Documents Is an Exercise of the Debtor's Sound Business Judgment**

18.    The Court should authorize the Debtor, as an exercise of its sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and use Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that

leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

19.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code").

20.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtor and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That

which helps foster consensus may be preferable to a notionally better transaction
that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

21.     The Debtor's determination to move forward with the DIP Facility is an exercise

of the Debtor's sound business judgment following an arm's length process and careful

evaluation of alternatives.  Specifically, and in the face of limited cash on hand, the Debtor and

its advisors determined that the Debtor would require substantial postpetition financing to

support itself during the chapter 11 case pending the consummation of the proposed sale of the

Debtor's assets.  Accordingly, the Debtors negotiated the DIP Documents with the DIP Lender in

good faith, at arm's length, and with the assistance of its advisors, and the Debtor believes that it

has obtained the best financing available.

### B.      The Debtor Should Be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis

22.     The Debtor proposes to obtain financing under the DIP Facility by providing

security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.

The statutory requirement for obtaining postpetition credit under section 364(c) is a finding,

made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under

Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp.,*

*Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the

Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit

cannot be obtained).

23.     Courts have articulated a three-part test to determine whether a debtor is entitled

to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.      the debtor is unable to obtain unsecured credit under section 364(b) of the
        Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

19

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

24.    Based on current capital market conditions, after consultation with its advisors, the Debtor determined that postpetition financing on an unsecured basis would be unobtainable. Without postpetition financing, the Debtor will not be able to preserve and maximize the value of its estate. Absent sufficient financing to operate the business during the chapter 11 case and consummate the proposed sale transaction, the value of the Debtor's estate would be substantially impaired to the detriment of all stakeholders. Given the Debtor's circumstances, the Debtor believes that the terms of the DIP Facility, as set forth in the DIP Documents, are fair, reasonable, and adequate, all as more fully set forth below.

25.    In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtor is unable to obtain unsecured credit. Therefore, approving the DIP Superpriority Claim in favor of the DIP Lender is reasonable and appropriate. Further, section 364(c)(2) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by lien on property of the estate that is not otherwise subject to a lien. The DIP Liens sought herein are senior only with respect to the Debtors' unencumbered property. As the Debtor is unable to obtain the critical financing it needs to administer the chapter 11 case from any other source, the Debtor respectfully represents that granting DIP Liens to the DIP Lender is warranted under the circumstances.

### C.    No Comparable Alternative to the DIP Facility Is Reasonably Available

26.    In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor

need not seek credit from every available source, but should make a reasonable effort to seek

other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy

Code. A debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.

*See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("the statute imposes no duty to

seek credit from every possible lender before concluding that such credit is available"); *see also*

*In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in

circumstances where only a few lenders likely can or will extend the necessary credit to a debtor,

"it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive

search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub*

*nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also*

*In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was

unavailable absent the senior lien by establishment of unsuccessful contact with other financial

institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981)

(bankruptcy court's finding that two national banks refused to grant unsecured loans was

sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*,

115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of

financing under section 364(a) and (b); finding that debtor demonstrated the unavailability of

unsecured financing where debtor approached several lending institutions); *In re 495 Cent. Park*

*Ave. Corp.*, 136 B.R. 626, 631 (Bank. S.D.N.Y. 1992) (element satisfied where "specialist in

commercial lending practices … explained that most banks lend money only in return for a

senior secured position.  The debtor cannot obtain financing secured by a lien on unencumbered

21

property … because there is no property in the estate which is not already subject to a lien."). Generally, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time of the essence' nature of this type of financing." *In Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). *See also In re Sky Valley, Inc.*, 100 B.R. at 112-13 (exhaustive search not required where the business suffered from financial stress, had little or no unencumbered property, and primary property was subject to numerous liens, and thus debtors' approach of only four lenders was sufficient under such circumstances).

27.    As noted above, after consulting with its advisors, the Debtor does not believe that alternative sources of financing are reasonably available. Thus, the Debtor has determined that the DIP Facility provides the best option forward under the circumstances to both fund the chapter 11 case and bridge the gap until consummation of the proposed sale of assets. Therefore, the Debtor submits that the requirements of sections 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtor is satisfied.

**II.    The DIP Lender Should Be Deemed a Good-Faith Lender under Section 364(e)**

28.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

29.     As explained herein and in the Wilson Declaration, the DIP Facility is the result

of the Debtor's reasonable and informed determination that the DIP Lender offered the most

favorable terms on which to obtain needed postpetition financing, and of arm's length, good-

faith negotiations between the Debtor and the DIP Lender.  The terms and conditions of the DIP

Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP

Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further,

no consideration is being provided to any party to the DIP Facility other than as described herein.

Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the

meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections

afforded by that section.

## III.    The Automatic Stay Should Be Modified on a Limited Basis

30.     The Debtor requests that automatic stay imposed by section 362 be modified to

the extent necessary to implement and effectuate the terms and provisions of the Interim DIP

Order or the Final DIP Order, as applicable.  Among other things, the proposed Interim DIP

Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be

modified to allow the DIP Lender, to the extent necessary, to permit the DIP Lender to retrieve,

collect and apply payments and proceeds in respect of the DIP Collateral, as applicable, in

accordance with the terms and provisions of the Interim DIP Order and the DIP Documents

31.     Such and similar stay modifications are commonplace and standard features of

debtor-in-possession financing arrangements, and, in the Debtor's business judgment, are

reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g., In re Peak*

*Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay

after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW)

(Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of

23

the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010)

(same); *In re Haights Cross Commc'ns, Inc.,* No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010)

(same).

**IV.    Failure to Obtain the Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm**

32.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

of such motion.  Upon request, however, the Court is empowered to conduct a preliminary

expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral

to the extent necessary to avoid immediate and irreparable harm to a Debtors' estate.

33.    The Debtor requests that the Court hold and conduct a hearing to consider entry of

the Interim DIP Order authorizing the Debtor from and after entry of the Interim DIP Order until

the Final Hearing to receive advances contemplated by the DIP Facility.  The Debtor requires

these advances prior to the Final Hearing and entry of the Final DIP Order to be able to continue

to operate and pay administrative expenses.  This relief will enable the Debtor to preserve and

maximize value and, therefore, avoid immediate and irreparable harm and prejudice to the

estates and all parties in interest, pending the Final Hearing.

**V.    Fast Pay Payoff**

34.    As discussed above, under the negotiated DIP Facility, Fast Pay's secured claim is

to be paid off using DIP proceeds after the entry of the Interim DIP Order.  Based on Fast Pay's

requests, as discussed above, the Debtor is willing to provide certain stipulations, agreements and

waivers in favor of Fast Pay in the Interim DIP Order and/or Final DIP Order, and the Debtor

will work with Fast Pay and the DIP Lender to prepare a modified form of order to reflect such

24

matters.  In the unlikely event that a consensual resolution cannot be reached among the parties, the Debtor believes that Fast Pay's interests can nonetheless be adequately protected, pending a final Court determination on the proposed Fast Pay Payoff and the Debtor's interim use of cash collateral.  Such adequate protection may consist of:

(i)     Fast Pay being authorized to, postpetition, collect upon all Factored ARs and withdraw funds from the Debtor's applicable bank accounts holding customer remittances on account of Factored ARs, and the DIP Lender being provided with first position, priming liens against all of Fast Pay's collateral, other than the Factored ARs (on which the DIP Lender would have liens junior to those of Fast Pay, to the extent such Factored ARs are property of the estate), and all other unencumbered property of the Debtor, subject to any Permitted Liens other than those of Fast Pay; or

(ii)    alternatively, the amount of the Fast Pay Payoff being funded in accordance with the DIP Facility and held in a segregated bank account of the Debtor (the "Fast Pay Reserve") and paid by the Debtor to Fast Pay in accordance with a subsequent order thereon, and (b) the DIP Lender being provided with first position, priming liens against all of Fast Pay's collateral including any Factored ARs if and to the extent such Factored ARs are property of the estate, all other unencumbered property of the Debtor, and the Fast Pay Reserve, subject to any Permitted Liens other than those of Fast Pay.

Neither the DIP Lender nor Fast Pay has consented to any such potential treatment.  In all events, the Debtor believes that the DIP Facility and the terms thereof, including the Fast Pay Payoff, are in the best interest of the Debtor, its estate and creditors, and the Motion should be granted in its entirety.

### Request for Final Hearing

35.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

25

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

36.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

37.     The Debtor will provide notice of this Motion to the following parties, or their counsel, if known: (a) the Debtor's 20 largest unsecured creditors; (b) the DIP Lender; (c) Fast Pay; (d) all known holders of liens on the Debtor's assets; (e) the United States Attorney for the District of Delaware; (f) the Internal Revenue Service; (g) the United States Trustee for the District of Delaware; and (h) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.

38.     Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that it be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim DIP Order, and notice of the Final Hearing, by first class mail upon the parties referenced in the foregoing section above.  The Debtors respectfully request that such notice is sufficient and requests that this Court find that no further notice of the Final Hearing and Final DIP Order is required.

### No Prior Request

39.     No prior request for the relief sought in this Motion has been made to this or any other court.

DOCS_LA:284979.7 36480/001

**WHEREFORE**, the Debtor respectfully requests entry of the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein, and granting such other relief as is just and proper.

Dated: January *20*, 2015

PACHULSKI STANG ZIEHL & JONES LLP

*James E O'Neill*

Ira D. Kharasch (CA Bar No. 109084)
Linda F. Cantor (CA Bar No. 153762)
James O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      ikharasch@pszjlaw.com
             lcantor@pszjlaw.com
             joneill@pszjlaw.com

[Proposed] Counsel to Debtor and
Debtor in Possession

DOCS_LA:284979.7 36480/001