IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIPCRICKET, INC.,[1] | ) | Case No. 15-10104 (____) |
| | ) | |
| Debtor. | ) | |

**MOTION FOR ORDER: (A) APPROVING
BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF
DEBTOR'S ASSETS OUTSIDE THE ORDINARY COURSE OF
BUSINESS; (B) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER THE SALE AND APPROVE THE FORM AND MANNER
OF NOTICE RELATED THERETO; (C) APPROVING PAYMENT OF
A BREAK-UP FEE AND EXPENSE REIMBURSEMENT;
AND (D) GRANTING RELATED RELIEF**

Hipcricket, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), files this motion (the "Bid Procedures Motion") for entry of an order: (a) approving bid procedures and a break-up fee in connection with the sale (the "Sale") of substantially all assets of the Debtor (the "Acquired Assets"); (b) scheduling an auction and hearing to consider the Sale of the Acquired Assets, including the potential assumption and assignment of designated contracts, and approve the form and manner of notices related thereto; and (c) granting related relief.

Shortly hereafter, the Debtor will file the *Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of Debtor's Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) and 363(m); (C) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "Sale Motion"), which seeks

---

[1] The last four digits of the Debtor's tax identification number are 2076. The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

authorization of the Sale of the Acquired Assets to (i) SITO Mobile, Ltd. (the "Stalking Horse Bidder" or the "Purchaser") pursuant to that certain *Asset Purchase Agreement* between the Debtor and the Stalking Horse Bidder dated as of January 20, 2015, a copy of which agreement, is attached hereto as **Exhibit A** (as amended or modified in accordance with its terms, the "Stalking Horse Agreement"),[2] or alternatively, (ii) the highest or otherwise best bidder for such Assets determined in accordance with the proposed bid procedures.  As discussed below and in the Sale Motion, the sale process is in the best interests of the Debtor, the bankruptcy estate and its creditors.

In support of this Bid Procedures Motion, the Debtor respectfully states as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over this Bid Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

### Background

4.      On January 20, 2015, the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued

---

[2]     All capitalized terms not defined herein have the meaning ascribed to them in the Stalking Horse Agreement.

in the possession of its property and assets, and has continued to operate and manage its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    The factual background relating to the commencement of the Debtor's chapter 11 case (the "Case") is set forth in detail in the *Declaration of Todd E. Wilson in Support of First Day Motions*, which is incorporated herein by reference.

<u>Debtor's Operations and the Assets to Be Sold</u>

6.    Pursuant to the Sale Motion, the Debtor seeks approval of the Sale of substantially all of its assets necessary to the operation of its business, including, *inter alia*, unexpired leases and executory contracts, accounts receivable and other personal property, intellectual property and other intangible property, books and records and other documents including customer lists, the estate's avoidance action claims, and certain claims and liabilities to be assumed by the Stalking Horse Bidder, all as more fully set forth in the Stalking Horse Agreement (collectively, the "Acquired Assets"). The total consideration to be paid by Purchaser to Debtor for the Acquired Assets shall be (the "Purchase Price"): (i) an amount equal to the sum of (a) $4,500,000 in cash (the "Cash Purchase Price"), plus (b) an amount equal to the Cure Amounts up to the Cure Cap ($500,000), plus (c) the amounts approved by the Bankruptcy Court with respect to the KEIP up to the KEIP Limit ($255,000), less (ii) the sum of (a) the amount of Assumed DIP Obligations plus (b) the amount of Cure Amounts that are required to be paid in excess of the Cure Cap up to a maximum of $50,000.

7.    In light of (i) the extensive marketing process already undertaken; (ii) the additional efforts that will be made postpetition during the proposed sale process; and (iii) the current liquidity issues facing the Debtor, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse Bidder under the terms

of the Stalking Horse Agreement or, alternatively, to a higher and better bidder for the Acquired Assets. Pursuant to the Stalking Horse Agreement, the Debtor must obtain an order approving the Bid Procedures Motion (the "Bid Procedures Order") within 23 days after the Petition Date, conduct an auction (if applicable) no later than three business days prior to the sale hearing, have set a sale hearing no later than 40 days after the Petition Date, and obtain a sale order no later than 45 days after the Petition Date. In light of the prepetition marketing efforts and based upon the declining financial condition of the business, the Debtor believes that the sale process, while accelerated to some extent, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process.

## Marketing Process

8.      In late 2013, the Company was approached by a number of suitors about potential strategic partnerships. Given this inbound interest and concerns over liquidity, in January 2014, the Company retained the advisory services of Canaccord Genuity ("Canaccord") to explore and evaluate potential strategic alternatives with a focus of selling the business or raising capital. In connection therewith, an online data room was created, marketing materials were prepared or circulated including a detailed Confidential Information Memorandum, and a number of management meetings or calls were conducted with potential interested parties.

9.      Starting in February 2014, and over a number of months, Canaccord reached out to approximately 96 potential interested parties (strategic and financial parties, domestic and international) as to potential strategic opportunities. The Company itself announced in mid-February 2014 (through a press release and other public filings) that it was exploring potential strategic alternatives, resulting in various parties contacting the Company and Canaccord as to potential interest in the Company's business and assets. Of the numerous parties

4

with whom Canaccord had discussions about a potential strategic transaction, at that juncture, approximately 28 parties executed nondisclosure agreements and received confidential information. The Company requested offers to be submitted by April 23, 2014; no bids for the Company were submitted.

      10.     Based on the lack of interest from potential buyers and concern over the Company's financial viability, in May 2014, the Company's Board of Directors elected to make several changes to management and the Company's strategy. On May 31, 2014, Todd Wilson was appointed Interim CEO and Doug Stovall was promoted from COO to President/COO. Additionally, the Debtor made a number of changes to the Company's strategy to focus the business more acutely on operating profitability and cash flow. Based on the revised operating strategy, with Canaccord's assistance, the Company re-launched the exploratory and marketing process. Ultimately, in total, Canaccord contacted or re-contacted approximately 108 potential interested parties regarding strategic options (of which 32 parties in total provided nondisclosure agreements). During this subsequent stage, three parties expressed significant interest in the entire company, while two additional parties indicated interest in only certain assets and aspects of the business. Discussions among the parties continued over a number of months, and four non-binding indications of interest (two in respect to the entire business and two in relation to certain assets) were submitted in the late September / early October 2014 timeframe.

      11.     On a separate but related track, before and after the changes to strategy and personnel, Canaccord reached out to approximately 33 parties regarding potentially financing (equity and/or debt) the Company's business (as opposed to a business combination, asset sale or other transaction). Approximately nine parties executed nondisclosure agreements

and received confidential information; however, no viable offer emerged from those financing-related efforts.

12.     During October/November 2014, the Company and Canaccord continued discussions with certain parties, including two of the parties who had expressed interest in the entire business and the two parties who had indicated interest in certain assets. During this time, three of the parties conducted substantial due diligence into the Debtor's business and operations. This led to the submission to the Company of three non-binding indications of interest or letters of intent – two for the entire business and one for select assets. The Company subsequently executed a non-binding letter of interest with the party interested in select assets. The Company and Canaccord spent significant time discussing, negotiating, and documenting these potential transactions. As of early December 2014, all three of these indications of interest were still being analyzed and negotiated.

13.     Unfortunately, the inability to resolve a shareholder lawsuit gave potential purchasers of the business significant concern. Additionally, the Company's financial condition continued to deteriorate and given the prolonged public strategic process, employee morale suffered. As such, the Company's financial performance weakened and all three interested parties rescinded or modified their offers. At that time, with Canaccord's assistance, the Company broadened its efforts to gauge interest in a potential section 363 sale. Approximately fifteen parties were contacted in this specific regard, of which nine parties executed nondisclosure agreements and received confidential information. While described above as separate exploratory tracks, the Company's efforts regarding a potential sale or other transaction and debt/equity financing were interrelated components of an overall comprehensive and fluid

process, with some overlap among potential interested parties and the development and regauging of parties' potential interest, designed to maximize value for the Company.

14.     Ultimately, only one party -- the Stalking Horse Bidder -- continued to further progress with the negotiations, resulting in the Stalking Horse Agreement.

15.     The Debtor believes that the prepetition and postpetition marketing of the Debtor's assets up to the proposed deadline to submit competing bids for the Acquired Assets will provide a reasonable and sufficient opportunity to generate any potential overbids, will serve to maximize the value of the Debtor's assets, and is in the best interest of the Debtor and its estate and creditors.

16.     The Purchaser is also the proposed postpetition lender pursuant to the *Motion of Debtor for Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtor to (A) Use Cash Collateral and (B) Incur Postpetition Secured Indebtedness; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Scheduling a Final Hearing* (the "DIP Motion"), filed concurrently herewith.   The DIP Motion seeks, inter alia, approval of up to $3.4 million in postpetition financing necessary to fund the Debtor's operations and Case.   Given the Debtor's liquidity position, it is in the best interest of the Debtor and its stakeholders to expedite the sales process in this Case.

17.     While the prepetition marketing and sale process was thorough, as discussed above, the Debtor will send, or will have sent, notice of the Sale Motion and Bid Procedures Motion to all parties that the Debtor believes may be potentially interested in acquiring the Acquired Assets.  The Debtor will also maintain its electronic data room with key

7

documents and company-specific information in order to streamline the due diligence process going forward. The data room has been, and will be, available to interested parties who have, or will, execute confidentiality agreements acceptable to the Debtor. The Debtor and its agents will continue to respond to inquiries from prospective buyers through the bid deadline approved by the Court for alternative bidders to bid on the Acquired Assets.

18.     In light of the prepetition marketing efforts, the Debtor believes that the sale process, while accelerated, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process. Further, given the current financial position of the Debtor, it is necessary to consummate a sale in an expeditious manner. The Debtor believes that the consummation of the Sale to the Purchaser or other Successful Bidder will provide its creditors and other stakeholders with the best opportunity possible for maximizing the value of the Acquired Assets.

**Relief Requested**

19.     Pursuant to this Bid Procedures Motion, the Debtor requests that the Court, among other things:

  (a)     approve the Purchaser's status as the Stalking Horse Bidder;

  (b)     approve the proposed bidding procedures (the "Bidding Procedures") attached hereto as **Exhibit B**;

  (c)     approve, pursuant to the terms of the Stalking Horse Agreement, the requested expense reimbursement, up to a $100,000 cap (the "Expense Reimbursement"), and break-up fee in the amount of $225,000 (or approximately 4.3% of the Purchase Price)[3] (the "Break-Up Fee"), both of which will have superpriority administrative claim status in the Debtor's Case under section 364(c)(1) of the Bankruptcy Code, with priority over all expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to any superpriority claims of the

---

[3]     This calculus assumes a Purchase Price of $4,500,000 plus the Cure Cap ($500,000) plus the KEIP Limit ($255,000).

Debtor's lenders and carve-out provided in a DIP financing order; provided, as discussed further below, the Purchaser is not in material violation of its obligations under the Stalking Horse Agreement, the Expense Reimbursement and Break-Up Fee would be fully payable directly by the Successful Bidder to the Purchaser if the Stalking Horse Agreement is terminated upon (i) approval by the Bankruptcy Court of an Alternate Transaction (as defined in the Stalking Horse Agreement) unless the Purchaser is designated a "back-up bidder" or (ii) the consummation of an Alternate Transaction;

(d)   establish a date for holding an auction (the "Auction"), if necessary, and approve certain procedures in connection therewith;

(e)   to schedule the hearing to approve any sale transaction to the Purchaser or to such other party that makes the highest or otherwise best offer for the Acquired Assets (the "Successful Bidder") and establish deadlines for objections and responses to the relief requested in the Sale Motion; and

(f)   approve the form and manner of notice to be served upon certain parties, including: (i) the form of notice, substantially in the form attached hereto as **Exhibit C**, to be served on the Sale and Bid Procedures Notice Parties (defined below); (ii) the form of notice, substantially in the form attached hereto as **Exhibit D**, to be served on all known creditors of the Debtor (the "Creditor Notice"); and (iii) the form notice for parties holding executory contracts or unexpired leases with the Debtor that are likely to be assumed and assigned in conjunction with the proposed sale of the Acquired Assets, in substantially the form attached hereto as **Exhibit E** (the "Cure Notice").

### Proposed Bidding Procedures

20.   The Bidding Procedures are attached hereto as **Exhibit B**. The Bidding Procedures are summarized as follows:[4]

(a) Assets to be Sold: The Debtor seeks to sell substantially all of its assets in their entirety as a going concern. Notwithstanding the foregoing, however, the Debtor may consider offers for all of the Acquired Assets or for portions thereof in the Debtor's discretion. The Debtor will evaluate all bids, in its sole

---

[4]   Nothing in this summary shall be construed in any way to limit or alter any of the provisions of the Bidding Procedures, or to guide in the interpretation of the Bidding Procedures in any other proceeding. This summary is provided merely as a convenience to the Court and parties in interest evaluating the Bidding Procedures.

DOCS_LA:285138.3

discretion, to determine which bid constitutes the highest or best offer for the Acquired Assets.

(b) <u>Participation Requirements</u>.  In order to be a Qualified Bidder, any party that may be interested in the Acquired Assets (a "<u>Potential Bidder</u>") must deliver the following to the Debtor (with a copy to the Stalking Horse Bidder, unless otherwise noted below), at the addresses specified below (unless a particular document has been previously delivered to the Debtor and the Stalking Horse Bidder) not later than five (5) days before the Bid Deadline (defined below) (the "<u>Participation Requirements</u>"):

   i. An executed confidentiality agreement ("<u>Confidentiality Agreement</u>") in form and substance acceptable to the Debtor, which Confidentiality Agreement shall not be less restrictive than the confidentiality agreement entered into with the Stalking Horse Bidder (unless such Confidentiality Agreement was executed prior to the Petition Date);

   ii. A statement of Potential Bidder identifying the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction;

   iii. Written disclosure of any connections or agreements with the Debtor, the Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, and/or any officer, director, manager or direct or indirect equity security holder of the Debtor;

   iv. Solely to the Debtor, information sufficient to allow the Debtor to determine that the Potential Bidder is reasonably likely to close on the Sale in a timely manner if selected as the Successful Bidder (as defined below).

   A "<u>Qualified Bidder</u>" is a Potential Bidder who meets the Participation Requirements and submits a Qualified Bid (defined below) by the Bid Deadline; provided, that the Stalking Horse Bidder shall be deemed a Qualified Bidder.

(c) <u>Due Diligence</u>:   Only Potential Bidders that meet the Participation Requirements are eligible to receive due diligence access and/or certain non-public information.  The Debtor may choose to restrict access to certain information that is competitively sensitive or privileged as to any Potential Bidder.  If the Debtor determines that a Potential Bidder no longer meets the Participation Requirements, then such Potential Bidder's access to due diligence or other non-public information shall terminate.  Except as set forth in any definitive purchase agreement (including the Stalking Horse Agreement), the Debtor is not responsible for, and will bear no liability with

respect to, any information obtained by Potential Bidders or Qualified Bidders in connection with the sale of the Acquired Assets.

The Debtor will afford any Potential Bidder that meets the Participation Requirements the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.

(d) <u>Bid Requirements</u>: A Qualified Bid, other than the Stalking Horse Bid, shall be in writing, include the information and documents set forth below (the "<u>Required Bid Materials</u>"), and meet the following conditions:

    i.    State that that the Potential Bidder is prepared to enter into a legally binding purchase agreement for the acquisition of the Acquired Assets on terms and conditions no less favorable to the Debtor than the terms and conditions in the Stalking Horse Bid (as determined by the Debtor in its business judgment and taking into account the Bid Protections (as defined below)).

    ii.    Include a clean and duly executed binding asset purchase agreement (the "<u>Marked Purchase Agreement</u>") reflecting any variations from the Stalking Horse Agreement (including the exhibits and schedules thereto).

    iii.    Provide for higher consideration than is included in the Stalking Horse Bid by providing value of not less than the sum of (A) the Purchase Price set forth in section 3.1 of the Stalking Horse Agreement, plus (B) $325,000 (on account of the Break-Up Fee and Expense Reimbursement), plus (C) the assumption of the Assumed Liabilities under the Stalking Horse Agreement plus (D) an initial bid increment of $50,000 (the "<u>Minimum Overbid Amount</u>") in cash.

    iv.    Provide for a purchase of all or substantially of the Acquired Assets.

    v.    Include a letter stating and agreeing that the offer is irrevocable until the earlier of (i) the second business day after the Acquired Assets have been sold pursuant to the closing of the sale or sales or (ii) up to and including the close of business on the date that is three (3) Business Days after the Termination Date of the applicable asset purchase agreement, and that such offer will serve as a Backup Bid (as defined below).

    vi.    Provide (a) a commitment to close within the same (or shorter) time period set forth in the Stalking Horse Agreement; (b) a representation that the Potential Bidder will, if applicable, (1) make all necessary filings under any applicable regulatory filing, and pay the fees associated

with such filings and (2) submit all necessary regulatory filings within the same (or shorter) time period, if any, set forth in the Stalking Horse Agreement.

vii.   Be accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price provided in the bid, in the form of a wire transfer, certified check or such other form acceptable to the Debtor (the "Bid Deposit"), which shall be placed in an escrow account or other segregated account acceptable to the Debtor (the "Escrow Account").

viii.  Include a representation of the Potential Bidder and written evidence acceptable to the Debtor that the Potential Bidder has the financial wherewithal to consummate the proposed transaction, provided that if a bid is based partly or completely on financing, (provided such financing shall not be a condition to Closing) written evidence of the commitment for financing and the appropriate contact information for such financing source must be provided.  The financial information shall demonstrate to the Debtor's satisfaction that such Potential Bidder has the wherewithal to provide the adequate assurance of future performance required under section 365 of the Bankruptcy Code.

ix.    The bid shall not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment, and shall include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Acquired Assets, the financial performance of the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Marked Agreement.

x.     The bid shall not contain any due diligence, financing, or regulatory contingencies of any kind (other than a condition that any applicable waiting period under any regulatory agency (if applicable) shall have expired or been terminated), though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing, which conditions shall be no less favorable to the Debtor than those contained in the Stalking Horse Agreement.

xi.    The bid shall fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

DOCS_LA:285138.3

xii. The bid shall state that the offering party consents to the core jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of the Potential Bidder's contemplated transaction documents.

xiii. The bid shall provide that the Potential Bidder shall be bound as a "Backup Bidder" as provided below.

xiv. The bid shall include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

xv. Be accompanied by a list of any executory contracts or unexpired leases that are to be assumed and/or assigned under such bid to the extent such list is not included in the Marked Agreement.

xvi. Set forth the anticipated timeframe for consummating the proposed transactions.

xvii. Include a written acknowledgment that such Potential Bidder agrees to the terms of the Bidding Procedures.

xviii. Provide for a closing date which shall be no later than 15 days after the date of the Sale Hearing.

A bid received from a Potential Bidder that meets the Participation Requirements, includes all of the Required Bid Materials and otherwise meets the conditions set forth above to the satisfaction of the Debtor in its discretion, and is received by the Bid Deadline is a "Qualified Bid." A Potential Bidder submitting a Qualified Bid shall be a "Qualified Bidder". Notwithstanding the foregoing, the Stalking Horse Bid will be a Qualified Bid. The Debtor reserves the right to determine the value of any Qualified Bid, and which Qualified Bid constitutes the highest or best offer (subject to Bankruptcy Court approval). The Debtor shall notify the Stalking Horse Bidder within 24 hours after the Bid Deadline if one or more Qualified Bids are received and the identity of the bidders making any such Qualified Bids shall provide the Stalking Horse Bidder with a copy of any Marked Agreement and all other Required Bid Materials constituting a Qualified Bid.

(e) Bid Deadline: The deadline for submitting Qualified Bids by a Qualified Bidder shall be _____, 2015 at 4:00 p.m. (Eastern Time) (the "Bid Deadline").

(f) Auction: If a Qualified Bid other than that submitted by the Stalking Horse Bidder has been received by the Debtor by the Bid Deadline, the Debtor may conduct an auction (the "Auction") of the Acquired Assets. The Debtor shall

13

provide the Qualified Bidders that submitted Qualified Bids and the Stalking Horse Bidder with a copy of the asset purchase agreement(s) relating to the other Qualified Bids at least twenty-four (24) hours prior to the Auction. The Auction shall be conducted at the offices of Pachulski, Stang, Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY 10017-2024 (the "Auction Site") at 10:00 a.m. (prevailing Eastern Time) on _____, 2015 (the "Auction Date"), or upon the consent of the Stalking Horse Bidder, at such other place and time as the Debtor shall notify all Qualified Bidders including the Stalking Horse Bidder who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

The Auction shall be governed by the following procedures:

i.  All Qualified Bids made at the Auction shall be made and received on an open basis, and all material terms of each subsequent bid shall be fully disclosed to all other Qualified Bidders including the Stalking Horse Bidder. The Debtor shall maintain a transcript of all bids made and announced at the Auction, including the opening bid, all subsequent bids, and the Successful Bid.

ii.  Except with respect to subsections (e) and (f) below, the Debtor, may conduct the Auction, in the manner that it determines, in its business judgment and may adopt rules for the Auction at the Auction that, in the Debtor's business judgment will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order or the Stalking Horse Agreement. All such rules will provide that: (i) the Auction procedures must be fair and open, and not intended to cause any participating Qualified Bidder (including the Stalking Horse Bidder) to be disadvantaged in any material way as compared to any other participating Qualified Bidder, and (ii) all participating Qualified Bidders (including the Stalking Horse Bidder) shall be entitled to be present for all bidding with the understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other participating Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction. Each bid by a Qualified Bidder at the Auction, if not inconsistent with the provisions of these Bid Procedures, shall be deemed to constitute a Qualified Bid.

iii.  The Debtor will arrange for the actual bidding at the Auction to be transcribed.

iv.  Each Qualified Bidder (including the Stalking Horse Bidder) participating in the Auction will be expected to confirm at the Auction that it has not engaged in any collusion regarding these Bidding Procedures with any other Qualified Bidder, the Auction or any proposed transaction relating to the Acquired Assets.

DOCS_LA:285138.3

v.    At the Auction, the first bid for the Acquired Assets other than the offer of Stalking Horse Bidder set forth in the Stalking Horse Agreement shall be considered only if it exceeds the purchase price set forth in the Stalking Horse Agreement by a minimum of (i) the amount that would be owed if the Debtors would be required to pay the Bid Protections to the Stalking Horse Bidder plus (ii) cash consideration in an amount not less than $200,000. Subsequently, bidding will continue in minimum increments of at least $50,000, with the specific increments for each round of bidding to be announced on the record at the Auction.

vi.    The Stalking Horse Bidder shall be permitted to credit bid the Bid Protections in each round of bidding.

vii.   All Qualified Bidders (including the Stalking Horse Bidder) shall have the right to, at any time, request that the Debtor announce, subject to any potential new bids, the then current highest or best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtor's announcement of the then current highest or best bid.

viii.  Upon conclusion of the bidding, the Auction shall be closed.

ix.    Representatives of (1) the Debtor, (2) the Stalking Horse Bidder and (3) other Qualified Bidders, shall be entitled to be present at the Auction. Creditors of the Debtor may attend the Auction pursuant to Local Rule 6004(c)(ii)(C). Creditors wishing to attend the Auction should provide written notice of intent to attend to the Debtor no later than 12:00 p.m. on the day preceding the Auction.

x.     Only the Stalking Horse Bidder and other Qualified Bidders shall be entitled to make any subsequent bids at the Auction. Pursuant to Local Rule 6004-1 (c)(ii)(B), the Stalking Horse Bidder and each Qualified Bidder participating at the auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

xi.    The Auction shall continue until the Debtor determines, and subject to Bankruptcy Court approval, that the Debtor has received (a) the highest or otherwise best Qualified Bid or Bids for the Acquired Assets (as determined by the Debtor) from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at the Auction (the "Successful Bid"), and (b) the Backup Bid.

The Debtor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction; provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith and provided no substantive changes shall be made

15

without the prior approval of the Stalking Horse Bidder. After closing of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of the Auction shall not be considered by the Debtor. At the Sale Hearing, the Debtor shall present the Successful Bid(s) and Backup Bid(s) to the Bankruptcy Court for approval.

(g) <u>Acceptance of Qualified Bids</u>: The Debtor shall sell the Acquired Assets to any Successful Bidder (or the party who submitted the Backup Bid ("<u>Backup Bidder</u>") should such bidder become the Successful Bidder as described below) only upon the approval of such bidder's bid by the Bankruptcy Court after the Sale Hearing. The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the Qualified Bid. The Debtor will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

(h) <u>Return of Bid Deposits</u>: The Bid Deposits shall not be subject to the claims, liens, security interests, or encumbrances of Debtor's creditors. The Bid Deposits of Qualified Bidders (others than the Stalking Horse Bidder) shall be disbursed from the Escrow Account only as follows: (i) if the Qualified Bidder becomes the Successful Bidder, its Bid Deposit will be released to the Debtor or applied as provided under any asset purchase agreement between the Debtor and such Successful Bidder, and (ii) if such Qualified Bidder is not the Successful Bidder at the Auction, then its Bid Deposit shall treated as set forth below.

Other than the Bid Deposits of the Successful Bidder and the Backup Bidder(s), Bid Deposits of all other Qualified Bidders shall be returned as soon as practicable after entry of the order approving the sale of the Acquired Assets. In addition to any other remedies available to the Debtor, the Debtor may retain the Bid Deposit of any Qualified Bidder who breaches or fails to perform any of its obligations pursuant to these Bidding Procedures or its Qualified Bid.

(i) <u>Modifications</u>: Notwithstanding anything to the contrary provided herein, the Debtor shall have the right to amend the rules set forth herein for the bidding/auction process (including, without limitation, extending the Bid Deadline) or impose such other terms and conditions for the bidding/auction process which the Debtor determines, in its business judgment, will better promote the goals of the bidding/auction process and the discharge of the Debtor's fiduciary duties and which are not inconsistent with any Bankruptcy Court order, including the Bid Procedures Order; <u>provided</u>, <u>however</u>, that nothing in these Bidding Procedures should be construed to permit the Debtor to (i) accept any Qualified Bid that does not, subject to the terms hereof, equal or exceed the Minimum Overbid Amount, (ii) impose any terms and

conditions upon the Stalking Horse Bidder that are contradictory to or in breach of the terms of the Agreement, or (iii) amend the bidding procedures in a substantive manner without prior approval of the Stalking Horse Bidder

**Notice of Sale Hearing**

21.     As noted above, given the Debtor's current financial condition, its limited liquidity, and based on the Stalking Horse Agreement's requirement that a sale order be entered within 45 days after the Petition Date, the Debtor requests that the Court schedule the Sale Hearing no later than February 27, 2015. The Debtor proposes that objections, if any, to the Sale Motion be filed on or before 4:00 p.m. on February 20, 2015 (Eastern Time).

22.     The Debtor requests that the Court approve the manner of notice of the Sale Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as **Exhibit C** (the "Sale and Bid Procedures Notice"), which the Debtor will serve on the following parties:

   (a)  the U.S. Trustee;

   (b)  the official committee of unsecured creditors (if any);

   (c)  the twenty largest unsecured creditors of the Debtor;

   (d)  all parties known by the Debtor to assert a lien on any of the Acquired Assets, if any;

   (e)  all entities who executed NDAs with the Debtor in connection with a potential acquisition of any or all of the Acquisition Assets or whom the Debtor believes may have an interest in bidding;

   (f)  all counterparties to executory contracts and leases with the Debtor, which have been identified by the Purchaser in the Stalking Horse Agreement;

   (g)  the Purchaser and its counsel; and

   (h)  all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure as of the date of entry of the Bid Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

17

23.     Additionally, the Debtor proposes to serve the Creditor Notice substantially in the form attached hereto as **Exhibit D** on all known creditors of the Debtor.

24.     The Debtor proposes to serve the Sale and Bid Procedures Notice and the Creditor Notice within three (3) Business Days from the date of entry of the Bid Procedures Order, by first-class mail, postage prepaid, on the appropriate parties.  Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bid Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Debtor's counsel.

## Sale Hearing

25.     At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of the sale of the Acquired Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted under the Stalking Horse Agreement) with all such liens, claims and interests to attach to the proceeds of the Sale of the Acquired Assets, except as otherwise provided with the same validity and in the same order of priority as they attached to the Acquired Assets prior to the Sale.

## Closing

26.     The closing shall take place in accordance with terms of the Stalking Horse Agreement, or in accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale Hearing.

## Procedures for the Assumption and Assignment of Assigned Contracts

27.     As set forth in the Stalking Horse Agreement and the Sale Motion, the Purchaser has designated or will designate certain executory contracts and unexpired leases for

assumption and assignment to it (the "Assigned Contracts").  The Purchaser may add or delete the list of Assigned Contracts for assumption and assignment up until five business days prior to the Sale Hearing.  The Debtor will serve the Auction and the Sale Hearing Notice and the proposed cure notice (the "Cure Notice") in substantially the form of **Exhibit E** hereto upon each counterparty to such potential Assigned Contracts (collectively, the "Counterparties").  The Cure Notice will state the date, time, and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of the Assigned Contracts must be filed and served.  The Cure Notice also will identify the Cure Amounts, if any, that the Debtor believes are owed to each Counterparty to a Assigned Contract in order to cure any defaults that exist under such Assigned Contract.  If a contract or lease is assumed and assigned pursuant to this Court's order approving same, then unless the Assigned Contract Counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Assigned Contract Counterparty will receive at the time of the Closing (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, with payment made pursuant to the terms of the Stalking Horse Agreement or the agreement of the Successful Bidder.  If an objection is filed by a Counterparty to an Assigned Contract, the Debtor proposes that such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Notice.  As noted above, the Purchaser may elect to add or delete agreements from the list of Assigned Contracts at any time until five business days prior to the Sale Hearing.  The non-debtor party or parties to any such deleted Assigned Contract will be notified of such deletion by written notice mailed within two business days of such determination.

DOCS_LA:285138.3

28.    If any Counterparty objects for any reason to the assumption and assignment of the Assigned Contract, the Debtor proposes that the Counterparty must file the objection by no later than (i) 4:00 p.m. (Eastern Time), February 25, 2015, or (ii) the date otherwise specified in the Cure Notice.  Objections to Cure Amounts shall either be considered by the Court at the Sale Hearing, or at some later hearing date scheduled by the Court for objections to Cure Amounts that have not been resolved at or prior to the Sale Hearing.

29.    The Purchaser or Successful Bidder shall be responsible for payment of all Cure Amounts required to be made to Counterparties pursuant to section 365(b)(1) of the Bankruptcy Code, subject to the Cure Cap and other terms of the Stalking Horse Agreement. The Purchaser or the Successful Bidder shall also be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assigned Contract. Information prepared by the Stalking Horse Bidder relating to adequate assurance of future performance by the Stalking Horse Bidder ("Adequate Assurance Information") shall be served on applicable Counterparties at the same time as the service of the Cure Notice.  Objections to the adequate assurance of future performance by the Stalking Horse Bidder must be filed and served within the same deadline for objecting to proposed Cure Amounts.  Objections to the adequate assurance of future performance of a Successful Bidder other than the Stalking Horse Bidder may be raised and considered at the Sale Hearing.

30.    Except to the extent otherwise provided in the Stalking Horse Agreement or the agreement entered into with the Successful Bidder, subject to the payment of any Cure Amounts up to the Cure Cap, the assignee of the Assigned Contracts will not be subject to any liability to the assigned contract Counterparty that accrued or arose before the closing date of the

20

sale of the Acquired Assets and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

### Approval of Bid Protections Is Appropriate

31.    As indicated above, the Debtor hereby requests that the Court approve the Break-up Fee, Expense Reimbursement,[5] and Bidding Procedures in their entirety, as is customary in similar circumstances.  To compensate the Purchaser whose bid will be subject to higher or better offers, the Debtor seeks approval of the Break-Up Fee and Expense Reimbursement in accordance with the terms of the Stalking Horse Agreement.

32.    The Debtor believes that the amounts of the Break-Up Fee ($225,500) and Expense Reimbursement (up to $100,000) are reasonable, given the benefits to the Debtor's estate of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Purchaser, and the risk to the Purchaser that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee and Expense Reimbursement under the terms of the Stalking Horse Agreement (including the superpriority administrative claim status thereof) are necessary to preserve and enhance the value of the Debtor's estate.  The Debtor believes that the agreement to pay the Break-Up Fee and Expense Reimbursement on the terms of the Stalking Horse Agreement is necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse Agreement and thus to enable the Debtor to obtain the highest and best possible price for the Acquired Assets.

---

[5]    The "Expense Reimbursement" is defined in the Stalking Horse Agreement as: an amount equal to the lesser of (a) the aggregate documented, actual, reasonable out-of-pocket fees and expenses (including, without limitation, fees and expenses of legal counsel, accounting fees and expenses, HSR Act filing fees, escrow and other fees and expenses) incurred by Buyer in connection with this Agreement (including, without limitation, the drafting, negotiation and implementation of this Agreement), the transactions contemplated hereby and matters related hereto and thereto (including, without limitation, relating to business, legal and accounting due diligence and all matters in connection with the Bankruptcy Case), in each case whether incurred before or after the Petition Date, and (b) $100,000.

21

33.     Further, the Debtor believes that the Break-Up Fee and Expense Reimbursement are fair and reasonable provisions under all the circumstances. Provided the Purchaser is not in material violation of its obligations under the Stalking Horse Agreement, the Break-Up Fee and Expense Reimbursement would be payable directly by the Successful Bidder to the Purchaser only if the Stalking Horse Agreement is terminated upon (i) approval by the Bankruptcy Court of an Alternate Transaction (as defined in the Stalking Horse Agreement) unless the Purchaser is designated a "back-up bidder" or (ii) the consummation of an Alternate Transaction. The Break-Up Fee and Expense Reimbursement will be super-priority administrative expense priority obligations under Code section 364(c)(1), with priority over all expenses of the kinds specified in sections 503(b) and 507(b), subject to any super-priority claims of the Debtor's lenders and the carve-out provided in any order on the Debtor's postpetition financing. If for any reason the Successful Bidder fails to pay the Break-Up Fee and Expense Reimbursement directly to the Stalking Horse Bidder, the Debtor will be authorized and directed to pay the Break-Up Fee and Expense Reimbursement to the Stalking Horse Bidder from the gross cash proceeds of the Alternate Transaction without further order of the Court.

34.     The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. The Break-Up Fee, Expense Reimbursement, and Bidding Procedures will encourage competitive bidding, and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

35.     Bidding incentives encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with the Debtor and perform the necessary due diligence attendant to the acquisition of the Debtor's assets, despite the inherent risks and uncertainties of

the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

36.    The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtor's estate. *See id.* at 533.

37.    The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

23

38.    Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee and Expense Reimbursement passes muster. The Stalking Horse Agreement and the Debtor's agreement to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms thereunder is the product of good faith, arm's-length negotiations between the Debtor and the Purchaser. The Break-Up Fee and Expense Reimbursement are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Purchaser of being used as a stalking horse bidder. Similarly, the Stalking Horse Agreement provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [property will be] sold will reflect [its] true worth." *Id.*

39.    Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Break-Up Fee and Expense Reimbursement will permit the Debtor to insist that competing bids for the Acquired Assets, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the Stalking Horse Agreement (or competing agreement), which is a clear benefit to the Debtor's estate.

40.    Furthermore, the Break-Up Fee and Expense Reimbursement, up to a total amount of $325,000, or 4.3% of the Purchase Price under the Stalking Horse Agreement, are within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See, e.g.*, *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved

24

break-up fee of less than credit bid or $3,000,000 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 (6.25%) to $6,500,000 (3.8%)); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale).

### No Prior Request

41.    No prior request for the relief sought in this Bid Procedures Motion has been made to this or any other court.

### Notice

42.    Notice of this Motion and a copy of this Motion will be provided to (a) the Office of the United States Trustee; (b) the twenty largest unsecured creditors of the Debtor; (c) all parties who are known by the Debtor to assert liens with respect to the Acquired Assets, if

any; (d) all entities who executed NDAs with the Debtor in connection with a potential acquisition of any or all of the Acquired Assets or whom the Debtor believes may have an interest in bidding; (e) counterparties to executory contracts and leases with the Debtor, as identified in the Stalking Horse Agreement; (f) the Purchaser and its counsel; and (g) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  Upon approval of this Motion, the Debtor will serve notice of the Sale Hearing, Bidding Procedures and related matters on all of the foregoing service parties and all other creditors of the Debtor known by it (as proposed herein, subject to Court approval).  The Debtor respectfully submits that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form filed contemporaneously with this Bid Procedures Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  January 20, 2015

PACHULSKI STANG ZIEHL & JONES LLP

_James E O'_____

Ira D. Kharasch (CA Bar No. 109084)
Linda F. Cantor (CA Bar No. 153762)
James O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:       ikharasch@pszjlaw.com
              lcantor@pszjlaw.com
              joneill@pszjlaw.com

[Proposed] Counsel to Debtor and
Debtor in Possession