**Exhibit A**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Hipcricket, Inc.[1] | Case No. 15-10104 (LSS) |
| Debtor. | **Ref. Docket No. 11** |

### INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO
### (A) OBTAIN POST-PETITION SECURED FINANCING;
### (B) UTILIZE CASH COLLATERAL; AND (C) PAY CERTAIN
### RELATED FEES AND CHARGES; AND (II) SCHEDULING A FINAL HEARING

Upon the motion, dated January 20, 2015 (the "**Motion**"), of above-captioned debtor and debtor-in-possession (the "**Debtor**") for the entry of an order pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of emergency interim and final orders, among other things:

     i.     authorizing the Debtor to (A) obtain senior secured post-petition financing in an aggregate maximum principal amount of $3,500,000 (the "**DIP Financing**") on a superpriority basis pursuant to the terms and conditions of that certain Debtor-in-Possession Promissory Note in substantially the form attached hereto as Exhibit A

---

[1] The last four digits of the Debtor's tax identification number are 2076. The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE, Suite 410, Bellevue, WA 98004.

(the **"DIP Note"**; together with any additional agreements, documents, instruments and certificates executed by the Debtor or otherwise delivered in connection therewith, the **"DIP Documents"**), between the Debtor as borrower, and SITO Mobile, Ltd. as lender (the **"DIP Lender"**);

ii.    authorizing the Debtor to execute and deliver the DIP Note and other DIP Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Documents;

iii.    authorizing the Debtor's use of cash collateral, as defined in Section 363(a) of the Bankruptcy Code (collectively, **"Cash Collateral"**), pursuant to the terms and conditions set forth in this Interim Order and the DIP Note; and

iv.    scheduling a final hearing (the **"Final Hearing"**) to be held within thirty (30) days of the Petition Date to consider entry of a final order (the **"Final Order"**) authorizing the DIP Financing on a final basis, as set forth in the Motion and the DIP Documents filed with this Court.

Due and appropriate notice of the Motion under the circumstances, the relief requested therein and an interim hearing (the **"Interim Hearing"**) on the Motion having been held before this Court; and upon the entire record made at the Interim Hearing; and this Court having found good and sufficient cause appearing therefor;

IT IS HEREBY FOUND:

A.    Unless otherwise indicated herein, all capitalized terms used but not defined herein shall have the meanings given in the Motion.

B.    On January 20, 2015 (the **"Petition Date"**), the Debtor filed a voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy Code. The Debtor is continuing in

2

possession of its property, and operating and managing its business, as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, official committee of unsecured creditors or any other committee has been appointed in this case.

C.     This Court has jurisdiction over the Debtor's chapter 11 case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue for this chapter 11 case and this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

D.     The Debtor and Fast Pay Partners, LLC ("**Fast Pay**") are parties to that certain Financing and Security Agreement dated May 12, 2014, which was amended on June 3, 2014 and again on October 15, 2014 (as amended, modified or supplemented from time to time up to the Petition Date, the "**Fast Pay Agreement**", a copy of which is attached to the Motion as Exhibit B). Pursuant to the Fast Pay Agreement, prepetition, Fast Pay purchased certain accounts receivable from the Debtor (the "**Factored ARs**") and advanced 80% of the gross value of the invoices to the Debtor with respect to Factored ARs purchased on or after about October 15, 2014 and 70% of the gross invoice value with respect to Factored ARs purchased prior to about October 15, 2014, promptly after Fast Pay notified the Debtor that Fast Pay would purchase a particular account receivable. To secure any shortfall, the Debtor granted Fast Pay a first priority security interest in substantially all of the Debtor's assets. On or about May 27, 2014, Fast Pay filed a UCC-1 financing statement (the "**Fast Pay Financing Statement**") covering its collateral (a copy of which is attached to the Motion as Exhibit B).

E.     The Debtor admits, stipulates and agrees as follows (collectively, the "**Admissions/Releases**"):

3

(i)     As of January 22, 2014, the Debtor, without defense, counterclaim or offset of any kind, was indebted and liable to Fast Pay for $1,833,713.13 (which is comprised of principal and accrued interest and financing fees as of such date and includes certain reserves described in and subject to paragraphs 7(b) and (d)) in respect of financial accommodations made by Fast Pay under the Fast Pay Agreement, together with all other obligations due and payable thereunder, including any unpaid accrued interest and financing fees (the "**Prepetition Fast Pay Debt**").

(ii)     As of the Petition Date, the Prepetition Fast Pay Debt is secured by first priority liens (the "**Prepetition Fast Pay Security Interest**") on substantially all of the Debtor's assets, including the Debtor's accounts, chattel paper, inventory, equipment, instruments, investment property, documents, letter of credit rights, commercial tort claims and general intangibles (as further described in the Fast Pay Agreement and Fast Pay UCC-1, the "**Prepetition Fast Pay Collateral**").  The Prepetition Fast Pay Security Interest granted to Fast Pay in the Prepetition Fast Pay Collateral, pursuant to and in connection with the Fast Pay Agreement, including, without limitation, any and all security agreements and other security documents executed by the Debtor in favor of Fast Pay, are valid, binding, perfected and enforceable liens and security interests in the property described in the Fast Pay Agreement.

(iii)     The Prepetition Fast Pay Debt constitutes the legal, valid and binding obligation of the Debtor, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).

(iv)     No portion of the Prepetition Fast Pay Debt or any payments made to Fast Pay or applied to the obligations owing under the Fast Pay Agreement prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim,

DOCS_LA:285302.4 36480/002
DOCS_LA:285332.2 36480/002

defense of "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law.

(v)     The Debtor hereby waives and releases any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against Fast Pay and its former and current officers, directors, employees, agents, representatives, owners, members, partners, managers, advisors and attorneys (each of the foregoing parties other than Fast Pay acting in its respective capacity as such) (collectively, the "**Releasees**"), whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

(vi)    The Debtor acknowledges and agrees that it has been informed by its attorneys and advisors and that it is familiar with and hereby expressly waives, the provisions of section 1542 of the California Civil Code, and any similar statute, code, law or regulation of any state of the United States, or of the United States, to the fullest extent that they may waive such rights and benefits.  Section 1542 provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Debtor acknowledges and agrees that it is are aware that it may hereafter discover claims presently unknown or unsuspected or facts in addition to or different from those which it now knows or believe to be true, as to the matters released herein. Nevertheless, it is the intention of Debtor through this release, to fully, finally and forever release all such matters, and all claims related thereto, which do now exist, may exist or heretofore have existed.  In furtherance of such intention, the releases herein given shall be and remain in effect as full and complete releases of

5

such matters, notwithstanding the discovery or existence of any such additional or different claims or facts related thereto by any of the parties hereto.  In entering into this release, Debtor does not rely upon any statement, representation or promise of any other party hereto or any other person or entity, except as expressly stated herein.

(vii)    The waivers and releases provided for in this paragraph E shall be effective as provided but in all respects subject to the provisions in paragraphs 27, 28 and 29.

F.    The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Financing on a post-petition basis is also not otherwise available pursuant to section 364(c) of the Bankruptcy Code.

G.    Based on the record presented to this Court by the Debtor, including the Wilson Declaration, the DIP Financing and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtor and the DIP Lender and any credit extended and loans made to the Debtor by the DIP Lender pursuant to this Interim Order and the DIP Documents (the "**DIP Obligations**") shall be deemed to have been extended, issued or made, as the case may be, in good faith within the meaning of, section 364(e) of the Bankruptcy Code and the DIP Lender shall have all of the protections thereunder.

H.    Based on the record before this Court, it appears that the terms of this Interim Order, including, without limitation, the terms of the DIP Financing and use of Cash Collateral, are fair and reasonable under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

I.    The Debtor has requested immediate entry of this Interim Order.  The permission granted herein to use Cash Collateral and obtain funds under the DIP Financing is necessary to

6

avoid immediate and irreparable harm to the Debtor. This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estates and creditors as its implementation will, among other things, enhance the Debtor's prospects for a successful completion of these cases.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED DETERMINED AND DECREED** that

1.     <u>Motion Granted</u>.  The Motion is granted, on an interim basis, and on the terms and conditions set forth in this Interim Order, with the foregoing findings incorporated herein by reference. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled. This Interim Order shall be valid and binding on all parties-in-interest and fully effective immediately upon entry.

2.     <u>Authorization</u>.  The Debtor is hereby authorized to execute and enter into the DIP Documents. The DIP Note, the other DIP Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtor by the DIP Lender as described herein; *provided* that in the event of a conflict between the DIP Documents and this Interim Order, this Interim Order shall control.

3.     The Debtor is hereby authorized to borrow money pursuant to the DIP Note on an interim basis up to an aggregate principal amount of $2,588,000.

4.     The DIP Financing may be used in accordance with the terms of this Interim Order and the DIP Note (and subject to the Budget (defined below)) to fund the day-to-day working capital needs and chapter 11 administrative expenses of the Debtor during the pendency of the Chapter 11 Case and to allow the Debtor, if subsequently approved by the Court, to

7

effectuate a sale of all or substantially all of Debtor's assets in accordance with the Sale Motion (the "**Sale Transaction**").

5.       In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), that may be reasonably required or necessary for the Debtor's performance of its obligations under the DIP Financing, including, without limitation:

(i)       the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Note, any security and pledge agreements, any mortgages contemplated thereby and the letter agreements referred to below;

(ii)       the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtor and the DIP Lender may agree; *provided,* that, the Debtor shall provide written notice of any material modification or amendment to the DIP Documents to counsel to any official committee appointed in the Chapter 11 Case (the "**Committee**"), and the U.S. Trustee, each of whom shall have five (5) days from the date of such notice within which to object in writing to such modification or amendment.  If any Committee or the U.S. Trustee timely objects to any such material modification or amendment to the DIP Credit Agreement, such modification or amendment shall only be effective pursuant to an order of this Court; and

(iii)       the performance of all other acts required under or in connection with the DIP Documents.

6.       Upon execution and delivery of the DIP Note and the other DIP Documents, such DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtor enforceable against the Debtor in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Case, any subsequently converted case of the Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any case.  No obligation, payment, transfer or grant of security under the DIP Note, the other DIP Documents

8

or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the

Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy

Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act,

Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any

defense, reduction, setoff, recoupment or counterclaim.

      7.    <u>Fast Pay Payoff; Reimbursement of Expenses; Indemnification</u>.

      (a)    Debtor is authorized to immediately pay off its obligations to **Fast Pay**

from the DIP Financing. Immediately upon Debtor's payoff of its obligations to Fast Pay as set

forth in the Budget (the "**Fast Pay Payoff**"), (a) the Fast Pay Agreement shall be deemed

terminated and of no further force and effect, except for the rights of Fast Pay reserved and the

obligations of Debtor as provided herein, (b) FastPay shall re-convey the "Purchased Accounts"

(as such term is defined in the FastPay Agreement) to the Debtor, and (c) all liens, claims and

interests of FastPay in the Purchased Accounts and in the "Collateral" (as defined in the FastPay

Agreement) shall be extinguished.   Further, FastPay will cooperate with the Debtor in

terminating (i) the Deposit Account Control Agreement by and among FastPay, the Debtor and

Silicon Valley Bank ("**SVB**") governing SVB bank account ending in numbers 3381, and (ii) the

Blocked Deposit Account Control Agreement by and among FastPay, Debtor and SVB

governing bank account ending in numbers 4003. FastPay will promptly turn over to the Debtor

any amounts FastPay receives that are otherwise subject to the DIP Lender's priority lien granted

hereunder or otherwise property of the Debtor.

      (b)    To the extent permitted under the Fast Pay Agreement and the Budget,

Fast Pay shall be entitled to reimbursement by the Debtor of all of Fast Pay's reasonable

attorneys' and other professional fees, as well as all reasonable costs and expenses, incurred in

9

connection with the actions of Fast Pay specified in, or otherwise required of Fast Pay in

connection with, this paragraph 7. The Fast Pay Payoff provided for in the Budget includes a

reserve in the amount of $50,000.00 (inclusive of $25,000 already withheld by Fast Pay) for

costs, expenses and legal fees (the "**Fast Pay Expense Reserve**"). To the extent such costs,

expenses and legal fees exceed the Fast Pay Expense Reserve, Fast Pay shall present such costs,

expenses and legal fees to the Debtor for payment and the Debtor, subject to the Budget, shall

pay such costs, expenses and legal fees. None of such amounts due for cost, expenses and

attorneys fees hereunder shall be subject to approval by this Court, and no recipient of any such

payment shall be required to file with respect thereto any fee application with this Court. Copies

of any such invoices shall be provided to counsel to the Debtor, counsel to any Committee, the

U.S. Trustee and counsel to the DIP Lender. Any excess of such reserve, if not so applied, shall

be returned to the Debtor on the date that is no more than 10 days after the Challenge Period

Termination Date. . If no objection to payment is made within ten (10) calendar days thereafter,

the Debtor shall promptly pay such invoices to Fast Pay or other applicable party. If an objection

to payment is timely made and such objection cannot be resolved within five (5) business days of

service of such objection, the objecting party shall file and serve on such professional an

objection with the Court limited to the issue of the reasonableness of the disputed fees and

expenses and whether such fees and expenses are authorized to be paid hereunder, provided,

further, that the Debtor shall timely pay in accordance with this Interim Order the undisputed

fees, costs and expenses reflected on any invoice to which such an objection has been timely

filed.

        (c)       To the extent permitted under the Fast Pay Agreement, Fast Pay shall be,

and hereby is, indemnified by the Debtor from and against any and all claims, debts, dues,

DOCS_LA:285302.4 36480/002
DOCS_LA:285332.2 36480/002

accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees and defense costs and other assertions of liability arising out of Fast Pay's good faith exercise of actions in connection with the actions of Fast Pay specified in, or otherwise required of Fast Pay in connection with, this paragraph 7.

(d)    Debtor shall remain liable for Avoidance Claims as defined in the Fast Pay Agreement and bounced checks. Debtor shall provide Fast Pay with, and the payoff amount will include the sum of $75,000.00 to be held as an Avoidance Claim Reserve as security for the Avoidance Claims and bounced checks.   At 120 days past payoff, Fast Pay shall search each Account Debtor who made payments on account during the 90 days prior to the payoff to see whether they filed bankruptcy. Fast Pay  will notify the Debtor of any account debtor that filed bankruptcy within 90 days of the payoff and hold in reserve the amount of the payments received from that account debtor from the Avoidance Claim Reserve. Additionally, Fast Pay shall be entitled to charge the Avoidance Claim Reserve for any checks returned because of non-sufficient funds or stop payment notices to the extent such funds were forwarded to the Debtor after Fast Pay received the payoff described herein.  Any unreserved remaining Avoidance Claims Reserve will be returned at 150 days after the payoff or sooner.  If the amount of payments received within 90 days of the Payoff is greater than the Avoidance Claim Reserve, Fsat Pay will notify the Debtor and Debtor will pay such amount to Past Pay to hold and use toward the Avoidance Claim liability.

(e)    Upon Debtor's receipt of a demand from Fast Pay for indemnity of any Avoidance Claim, Debtor shall have ten (10) days to either pay the amount of the demand or assume the defense of such Avoidance Claim at Debtor's expense.  Any amount not paid or defense not assumed shall become a priority administrative claim in favor of Fast Pay in the

DOCS_LA:285302.4 36480/002
DOCS_LA:285332.2 36480/002

Debtor's estate. Debtor's obligation to indemnify Fast Pay for Avoidance Claims shall be assumed by the purchaser of the Debtor's assets.

(f)    Nothing herein shall obligate the DIP Lender to fund any amounts in excess of the Budget related to Fast Pay's claims or otherwise.

8.    Borrowing; Use of Cash Collateral.  Subject to the budget attached to the DIP Note as Exhibit A (as modified from time to time in accordance with the DIP Note, the "**Budget**") and solely in compliance therewith and subject further to the terms and conditions of this Interim Order and the DIP Documents, (a) the DIP Lender will provide the DIP Financing in accordance with the terms of the DIP Documents, and (b) the Debtor is authorized to use Cash Collateral in accordance with the terms of this Interim Order.

9.    Subject to paragraph 12, the automatic stay under section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the DIP Lender to retrieve, collect and apply payments and proceeds in respect of the DIP Collateral (defined below), as applicable, in accordance with the terms and provisions of this Interim Order and the DIP Documents.

10.    Interest, Fees, Costs and Expenses.  The DIP Obligations shall bear interest at 13% per annum payable monthly as provided in the DIP Note. The DIP Lender shall be entitled to recover all of its reasonable attorneys' fees and other professional fees as well as all costs and expenses incurred in connection with the DIP Financing and this case. In consideration for providing the DIP Financing, the DIP Lender shall be paid all fees specified in the DIP Documents in accordance with the terms therein for such payment; provided, however, that none of such fees hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any final fee

12

application with this Court. Copies of any such invoices shall be provided to the U.S. Trustee, counsel to the Debtor, the DIP Lender, and counsel to any Committee. If no objection to payment is made within ten (10) calendar days thereafter, the Debtor shall promptly pay such invoices. If an objection to payment is timely made and such objection cannot be resolved within five (5) business days of service of such objection, the objecting party shall file and serve on such professional an objection with the Court (the "**Fee Objection**") limited to the issue of the reasonableness of the disputed fees and expenses and whether such fees and expenses are authorized to be paid hereunder, provided, further, that the Debtor shall timely pay in accordance with this Interim Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been timely filed.

11.    Event of Default.[2]    Each of the following events shall constitute an "**Event of Default**"):

(i)    Borrower (A) fails to pay any payment (whether principal, interest, or otherwise) when such amount becomes due and payable under this DIP Note or (B) Borrower defaults in the due performance or observance by it of any other term, covenant, or agreement contained in the DIP Note (and, if such default is capable of being remedied, it has not been remedied within the cure period set forth in the DIP Note or, if no such cure period is provided, it has not been remedied to the reasonable satisfaction of the DIP Lender) two (2) business days following the occurrence of such event of default);

(ii)    any representation, warranty, or statement made by or on behalf of Borrower herein or in the DIP Note or in any certificate delivered in connection with the DIP Note shall prove to be untrue in any material respect on the date on which made or deemed made;

(iii)    the security interest granted to the DIP Lender shall cease to be in full force and effect, or shall cease to create a perfected security interest in, and lien on, the Collateral purported to be created thereby;

---

[2] Capitalized but otherwise undefined terms used in this section shall have the meaning ascribed to such term in the DIP Note.

13

(iv)    the DIP Note is, or becomes, invalid or ineffective or unenforceable against Borrower, in whole or in part, or Borrower so asserts or at any time denies its liability or Obligations under the DIP Note;

(v)    prior to the closing of the Sale, the Bankruptcy Court shall enter an order with respect to Borrower dismissing its Chapter 11 Case or converting it to a case under chapter 7 or any other chapter of the Bankruptcy Code, or appointing a trustee in its Chapter 11 Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Borrower's business (beyond those set forth in sections 1106(a)(3) or (4)) under Bankruptcy Code section 1106(b), in each case, without the consent of the DIP Lender;

(vi)    prior to closing of the Sale, entry of any order of the Bankruptcy Court dismissing the Bankruptcy Case, unless as a condition thereto the Obligations are irrevocably paid in cash in full;

(vii)    the Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder of any lien (other than liens in favor of the DIP Lender) or any assets of Borrower having an aggregate value in excess of $50,000;

(viii)    the Borrower shall seek to, or shall support any other person's motion to, disallow in whole or in part the Obligations or to challenge the validity, priority, or enforceability of the DIP Lender's liens and superpriority claims hereunder;

(ix)    a DIP Order shall be entered in form and substance that is not acceptable to the DIP Lender in its sole discretion or, from and after the date of entry thereof, any DIP Order shall cease to be in full force and effect or shall have been vacated, stayed, reversed, modified or amended (or the Borrower shall take any step to accomplish any of the foregoing) without the consent of the DIP Lender;

(x)    prior to the closing of the Sale, the Borrower shall make any payments on any indebtedness which arose before the Petition Date other than as provided in any of the "first day" orders entered in the Chapter 11 Case or otherwise consented to by the DIP Lender;

(xi)    the Sale Motion shall have been withdrawn or is no longer being pursued or the Borrower shall be in breach or shall fail to comply with the terms of the DIP Order, the Bid Procedures Order or the Stalking Horse Agreement in any material respect;

(xii)    actual cash receipts from operations for any two consecutive week budget period are less than 80% of such receipts projected in the Budget or on a cumulative basis from the Petition Date; provided, that the Borrower shall

14

not be in default hereunder if the foregoing revenue test is not met during the first three calendar weeks of the Chapter 11 Case;

(xiii)    The (A) Bid Procedures Motion is not filed within five (5) days of the Petition Date, (B) the Sale Motion is not filed within seven (7) days of the Petition Date, (C) Bid Procedures Order is not entered within 22 days of the Petition Date, (D) the Sale Order is not entered within 50 days of the Petition Date, and (E) the Sale has not close by 15 days after the hearing on the Sale Motion;

(xiv)    one or more judgments or decrees shall be entered against Borrower involving in the aggregate a post-Petition Date liability (not paid or fully covered by insurance or otherwise considered permitted Indebtedness) of $50,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within the time required by the terms of such judgment;

(xv)    the DIP Note or any related document shall cease, for any reason, to be in full force and effect or the Borrower shall so assert in writing, or any such document shall cease to be effective to grant a perfected lien on any material item of Collateral described therein with the priority purported to be created thereby;

(xvi)    an application or motion shall be filed by the Borrower for the approval of a superpriority Claim in the Bankruptcy Case or the Bankruptcy Court shall have granted superpriority status to any claim in the Bankruptcy Case, in each case, that is senior to the claims of DIP Lender against Borrower hereunder, without the prior written consent of the DIP Lender; or

(xvii)    the final DIP Order shall not be entered by the Bankruptcy Court by the date that is 30 days from the Petition Date

12.    Upon the occurrence of an Event of Default and after five (5) days' written notice to the Debtor, any Committee and the U.S. Trustee (the **"Default Notice Period"**), the automatic stay shall terminate, and the DIP Lender shall be permitted to exercise any remedies permitted by law, or including any of the following actions, unless the Court determines during the Default Notice Period that an Event of Default has not occurred:

(i)    declare all or any portion of the outstanding Obligations due and payable, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower;

15

(ii)    enforce all liens and security interests in the Collateral;

(iii)   institute proceedings to enforce payment of such Obligations;

(iv)    terminate the obligation of the DIP Lender to make Loans; and

(v)     exercise any other remedies and take any other actions available to it at law, in equity, under the DIP Note, the Bankruptcy Code, other applicable law or pursuant to any DIP Order.

Notwithstanding the foregoing, the DIP Lender shall continue to fund the Debtor's operations, pursuant to the Budget, through the Default Notice Period.

13.     Termination of the DIP Financing and Use of Cash Collateral.   Except with respect to the payment of the Carve-Out (as defined herein), the DIP Lender's agreement to provide the DIP Financing in accordance with the DIP Documents and the Debtor's use of Cash Collateral shall immediately and automatically terminate (except as the DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Obligations shall be immediately due and payable in cash upon the earliest to occur of any of the following (each, a "**Termination Date**"):

(i)     April 3, 2015;

(ii)    One (1) Business Day following the Final Hearing Date (as defined below) if a Final Order (as defined below) has not been entered by the date that is thirty (30) days from the Petition Date;

(iii)   the date of final indefeasible payment and satisfaction in full in cash of the DIP Obligations;

(iv)    the entry of an order by the Court granting a motion by the Debtor to obtain additional financing from a party other than DIP Lender under section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash the DIP Obligations or unless such financing is subordinate to the DIP Obligations and consented to in writing by the DIP Lender;

(v)     the dismissal of any of the chapter 11 cases or the conversion of any of the chapter 11 cases into a case under chapter 7 of the Bankruptcy Code;

(vi)    upon and following the entry of an order authorizing the appointment in

16

any of the Debtor's chapter 11 cases of a trustee or an examiner with enlarged powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), relating to the operation of the business of the Debtor without the prior written consent of the DIP Lender (which consent may be withheld, or, if given revoked, by the DIP Lender in its sole discretion), or if any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion);

(vii)   this Interim Order or the Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion); or

(viii)   upon three (3) days written notice of any "Event of Default" under any of the DIP Documents or this Interim Order or the Final Order occurring after the date hereof.

14.    <u>Superpriority Claims</u>. Pursuant to Bankruptcy Code section 364(c)(l), all of the DIP Obligations shall constitute allowed senior administrative expense claims against the Debtor (the "**Superpriority Claims**") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 or 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b), and which shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, including, without limitation (subject to entry of the Final Order), the proceeds of all Avoidance Actions (as defined below), subject only to the Carve-Out to the extent specifically provided for herein.

17

15.    Carve-Out.  The liens and claims of or granted to the DIP Lender shall be subject and subordinate to the payment, without duplication, of the following fees and claims (the amounts set forth below, together with the limitations set forth therein, collectively, the "**Carve-Out**"):  (a) all allowed fees and expenses of attorneys, investment bankers and financial advisors (collectively, the "**Estate Professionals**") employed by the Debtor, and if applicable, the Committee, pursuant to sections 327, 328, 1102 and 1103 of the Bankruptcy Code and any disbursements of any member of the Committee which are incurred or accrued prior to the Termination Date of the Debtor's use of Cash Collateral to the extent set forth in (and limited by) the Budget; provided, that following the Termination Date of the Debtor's use of Cash Collateral, the payment of allowed fees and disbursements of Estate Professionals incurred or accrued after such Termination Date by the Estate Professionals in an aggregate amount not to exceed $100,000 plus the fees and expenses of Estate Professionals previously incurred or accrued in accordance with the Budget prior to termination of the Debtor's use of Cash Collateral but which are subsequently allowed, and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court or to the Debtor's appointed claims agent.

16.    Following entry of the Final Order and on a weekly basis thereafter, the Debtor shall be authorized to transfer funds to the Pachulski Stang Ziehl & Jones LLP Client Trust Account (the "**Expense Reserve Account**") in the amounts set forth in the Budget for fees and expenses of the Estate Professionals.  Such funds shall be held in the Expense Reserve Account for the benefit of the Estate Professionals, respectively, to be applied to the fees and expenses of such Estate Professionals approved for payment pursuant to one or more orders of the Bankruptcy Court (the "**Segregated Funds**"), provided, however, that for the avoidance of

18

doubt, fees and expenses payable to the Estate Professionals shall be paid first out of the Expense Reserve Account, and all amounts deposited in the Expense Reserve Account shall reduce, on a dollar for dollar basis, the obligation to fund the Carve-Out, and provided further that there shall be no requirement that any amounts in respect of any success fees that may be earned by any Estate Professional be deposited into the Expense Reserve Account.  Without in any way limiting the Debtor's ability to use the Segregated Funds to pay fees payable to the Office of the United States Trustee and the Clerk of the Court and the fees and expenses of the Estate Professionals, the Segregated Funds in the Expense Reserve Account shall remain encumbered by and subject to the DIP Liens, and the Superpriority Claim, in their respective order of priority; provided, however, that such liens and claims shall be subordinate to the Carve-Out.  Notwithstanding the foregoing, none of the Carve-Out, proceeds from the DIP Financing or Cash Collateral may be used (1) to investigate or challenge in any respect the validity, perfection, priority, extent or enforceability of the DIP Liens, (2) to delay, challenged or impede any rights of the DIP Lender under any of the DIP Documents or this Interim Order, or (3) to pursue any claims or causes of action of any kind against the DIP Lender.  Nothing herein shall restrict the ability of the Committee or any other party to investigate or object to the Bid Procedures Motion or Sale Transaction, *and the Carve-Out, proceeds from the DIP Financing and/or Cash Collateral may be used to pay approved fees and expenses*

17.    Subject to the terms of this Interim Order, the Debtor shall be permitted to pay *of Estate Professionals employed by the Committee in connection therewith.* compensation and reimbursement of reasonable fees and expenses of the Retained Professionals allowed and payable under sections 328, 330 or 331 of the Bankruptcy Code, as the same may be due and payable, that constitute pre-Termination Date expenses and such payments shall not reduce or be deemed to reduce the post-Termination Date fees and expenses.

19

18.    <u>Liens to Secure the DIP Obligations</u>.    As security for the DIP Obligations,

effective and perfected upon the date of this Interim Order and without the necessity of the

execution, recordation of filings by the Debtor or the DIP Lender of mortgages, security

agreements, control agreements, pledge agreements, financing statements or other similar

documents, or the possession or control by the DIP Lender of or over any DIP Collateral (as

defined below), the following security interests and liens are hereby granted by the Debtor to the

DIP Lender for its benefit (all property identified in clauses (a), (b) and (c) below being

collectively referred to as the "**DIP Collateral**"), subject, only in the event of the occurrence and

during the continuance of an Event of Default (as defined in the DIP Note), to the payment of the

Carve-Out (all such liens and security interests granted to the DIP Lender for its benefit pursuant

to this Interim Order and the DIP Documents, the "**DIP Liens**"):

(a)    *First Lien on Unencumbered Property*.    Pursuant to Bankruptcy Code section

364(c)(2), a valid, binding, continuing, enforceable, fully perfected first priority senior security

interest in and lien upon all pre- and post-petition property of the Debtor or its estate, whether

existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not

subject to valid, perfected and non-avoidable liens (collectively, "**Unencumbered Property**"),

including, without limitation, any such unencumbered cash of the Debtor and any investment of

such cash, inventory, accounts receivable, other rights to payment whether arising before or after

the Petition Date, contracts, properties, plants, equipment, general intangibles, documents,

instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names,

other intellectual property, commercial tort claims, equity interests, and the proceeds of all the

foregoing.    Subject only to and effective upon entry of the Final Order, Unencumbered Property

shall also include the proceeds of the Debtor's claims and causes of action under Bankruptcy

Code sections 502(d), 544, 545, 547, 548, 549, 550, and 553 and any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**").

(b)    *Liens Junior to Certain Other Liens.*  Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all pre- and post-petition property of the Debtor (other than the property described in clauses (a) or (c) of this paragraph 18, as to which the liens and security interests in favor of the DIP Lender will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b), which security interests and liens in favor of the DIP Lender are junior to such valid, perfected and unavoidable liens (collectively, the "**Permitted Liens**").

(c)    *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under Bankruptcy Code section 551, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor to the extent permitted by applicable non-bankruptcy law or (iii) any intercompany or affiliate liens of the Debtor.

19.    Perfection of DIP Liens.  The DIP Liens shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect

DOCS_LA:285302.4 36480/002
DOCS_LA:285332.2 36480/002

such perfection; provided, however, that notwithstanding the provisions of section 362 of the Bankruptcy Code, (i) the DIP Lender, may, at its sole option, file or record or cause the Debtor to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtor's expense, any such UCC financing statements, notices of liens and security interests, mortgages, amendments to mortgages and/or other similar documents or instruments as the DIP Lender may require, and (ii) the DIP Lender, may require the Debtor to deliver to the DIP Lender, any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtor is directed to cooperate and comply therewith. If the DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages, amendments to mortgages or other documents or instruments with respect to such security interests and liens, or if the DIP Lender, in accordance with the DIP Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements, mortgages, amendments to mortgages or similar documents or instruments or taking possession shall be deemed to have been filed or recorded or taken in these cases as of the commencement of these cases but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall constitute further evidence of the DIP Lender's interest in the DIP Collateral.

20.    Preservation of Rights Granted Under this Interim Order. No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Lender

22

shall be granted or allowed until the occurrence of (i) the payment in full in cash or immediately available funds of all of the DIP Obligations or the application of all of the DIP Obligations to the consideration paid by the DIP Lender to purchase the Debtor's assets, (ii) the termination or expiration of all commitments to extend credit to the Debtor under the DIP Documents, and (iii) the cash collateralization in respect of any asserted claims, demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, or damages for which the DIP Lender may be entitled to indemnification by the Debtor (**"Paid in Full"**).   While any portion of the DIP Financing (or any refinancing thereof) or the DIP Obligations remain outstanding and the commitments thereunder have not been terminated, the DIP Liens shall not be (x) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under Bankruptcy Code section 551 or (y) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise.

21.    Unless all DIP Obligations shall have indefeasibly been Paid in Full, the Debtor shall not seek, and it shall constitute an Event of Default (as defined in the DIP Note) and terminate the right of the Debtor to use Cash Collateral if the Debtor seeks, or if there is entered, (i) any modification or extension of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence, or (ii) an order converting or dismissing the Chapter 11 Case.

22.    If an order dismissing the Chapter 11 Case under Bankruptcy Code section 1112 or otherwise is entered at any time prior to the DIP Obligations being Paid in Full, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that (i) the Superpriority Claims, security interests and replacement security interests granted to the DIP Lender shall continue in full force and effect and shall maintain their priorities as provided in this

23

Interim Order until all DIP Obligations shall have been indefeasibly paid in cash in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

23.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations. To the extent permitted by applicable law, notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral or DIP Obligations incurred by the Debtor to the DIP Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in Bankruptcy Code section 364(e), this Interim Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral and the DIP Obligations.

24.    Except as expressly provided in this Interim Order or in the DIP Documents, or until the DIP Obligations are Paid in Full, the DIP Liens, the Superpriority Claims, and all other rights and remedies of the DIP Lender granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7, or dismissing the Chapter

24

11 Case or (ii) the entry of an order confirming a plan of reorganization in the Chapter 11 Case and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtor has waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Case, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, and the Superpriority Claims and all other rights and remedies of the DIP Lender granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are Paid in Full.

25.    Limitation on Use of DIP Financing Proceeds and Collateral.  Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, Cash Collateral, DIP Collateral, DIP Indebtedness, or proceeds of the DIP Financing or any part of the Carve-Out may be used for any of the following without the prior written consent of the DIP Lender:  (a) to object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, or the liens or claims granted under this Interim Order, the DIP Documents, (b) investigate any claims, defenses or causes of action that may exist under law, equity or otherwise against the DIP Lender or its respective agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Documents or this Interim Order, (d) seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Documents, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted to be paid under the DIP Documents. Nothing herein shall restrict the ability of the Committee or any other party to investigate or object to the Bid Procedures Motion or Sale Transaction, *and the Carve-Out, proceeds from the DIP Financing and/or Cash Collateral may be used to pay approved fees and expenses of Estate Professionals employed by the Committee in connection therewith.*    25

26.    <u>Right to Credit Bid</u>.  Subject to Section 363(k) of the Bankruptcy Code and entry of the Final Order, the DIP Lender shall have the right to "credit bid" the full amount of its claims in connection with any sale of all or any portion of the Debtor's assets, including, without limitation, the Sale Transaction or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code; <u>provided</u>, that in the event the DIP Lender is also the purchaser of the Debtor's assets and agrees to assume the DIP Financing, the DIP Financing shall not be double counted as purchase consideration.

27.    <u>Admissions/Releases Relating to Fast Pay</u>.  The Admissions/Releases set forth in paragraphs D and E above shall be deemed effective upon entry of the Interim Order, subject only to the rights set forth in paragraph 28 below.  The Debtor forever and irrevocably releases, discharges, and acquits the Releasees as set forth in paragraph E above.

28.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims Against Fast Pay</u>.  Notwithstanding any other provision herein, the Admissions/Releases set forth in paragraphs D and E and 27 above, shall be binding upon the Debtor upon entry of the Interim Order and upon each other party in interest, including any Committee, if any, unless such Committee or any such other party in interest having standing (or if this chapter 11 case is converted to a case under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such successor case), *first*, commences, by the earlier of (x) with respect to any Committee, sixty (60) calendar days from the formation of such Committee, and (y) solely if no Committee is formed, with respect to other parties in interest with requisite standing other than the Debtor or any Committee, seventy five (75) calendar days following the date of entry of this Interim Order (such time period established by the earlier of clauses (x) and (y), shall be referred to as the **"Challenge Period,"** and the date that is the next calendar day

26

after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly and timely file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the **"Challenge Period Termination Date"**):

      (A)    a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) (i) challenging or otherwise objecting to any of the Admissions/Releases, or (ii) otherwise seeking to avoid or challenge (whether pursuant to chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtor to or for the benefit of Fast Pay prior to the Petition Date; or

      (B) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) against any Releasee relating to any pre-Petition Date act, omission or aspect of the relationship between such Releasee and the Debtor ((A) and (B) being, collectively, the **"Challenges"** and, each individually, a **"Challenge"**),

and, *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action. Upon the Challenge Period Termination Date and for all purposes in this chapter 11 case and any successor case, (i) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred and (ii) the Admissions/Releases set forth in paragraphs E and 27 above shall be binding on all parties in interest, including any Committee.

      29.   <u>Effect of Stipulations on Third Parties</u>.   Each stipulation, admission and agreement contained in this Interim Order, shall be binding upon the Debtor and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for the Debtor) under all circumstances and for all purposes, and the Debtor is deemed to have

27

irrevocably waived and relinquished all claims against the DIP Lender as of the date of entry of this Interim Order. Subject to paragraphs 27 and 28, each stipulation, admission and agreement contained in this Interim Order shall also be binding upon all other parties in interest, including, without limitation, any Committee (if appointed), under all circumstances and for all purposes.

30.    Upon approval of the Final Order, notwithstanding anything to the contrary herein, upon written notice to the landlord of any of Debtor's leased premises that an Event of Default has occurred and is continuing, the DIP Lender shall be entitled to the Debtor's rights and privileges under such lease(s) without interference from such landlord, including, if applicable, the right to enter upon such leased premises for the purpose of exercising any right or remedy with respect to the collateral located thereon; *provided* that such DIP Lender shall pay to such landlord rent first accruing after the above referenced written notice and during the period of occupancy by such DIP Lender, calculated on a per diem basis and any such amount paid shall be deemed to be DIP Obligations, as applicable.

31.    Financial Reporting. The Debtor shall provide any reporting provided for under the DIP Facility.

32.    Covenants. Unless otherwise modified pursuant to this Interim Order, the Debtor acknowledges and agrees that the Debtor shall timely comply with all of the covenants set forth in this Interim Order and the DIP Documents.

33.    Effect of Modification of Order. The Debtor shall not, without the DIP Lender's prior written consent (which shall be given or refused in their sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Documents. If any provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without the prior written consent of the DIP Lender (which consent may be given or refused in

DOCS_LA:285302.4 36480/002
DOCS_LA:285332.2 36480/002

its sole discretion), then such event shall constitute an immediate Termination Date under this Interim Order and an Event of Default under the DIP Documents.

34.    <u>Binding Effect on Successors and Assigns</u>.    The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the DIP Lender and any Committee appointed and the Debtor and its successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to Bankruptcy Code section 1104 or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the DIP Lender and the Debtor and its successors and assigns, *provided, however*, that the DIP Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtor.  In determining to make any loan (whether under the DIP Credit Agreement, promissory notes or otherwise) or permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Lender shall not (i) be deemed to be in control of the operations of the Debtor, (ii) owe any fiduciary duty to the Debtor, its creditors, shareholders or estate or (iii) subject only to entry of the Final Order, be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

35.    <u>Effectiveness</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date

immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

36.    <u>Objections Overruled or Withdrawn</u>. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

37.    <u>Controlling Effect of Order</u>. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document the provisions of this Interim Order shall control.

38.    <u>Order Effective</u>. This Interim Order shall be effective as of the date of signature by the Court notwithstanding the possible application of Bankruptcy Rules 4001(a)(3), 6004(h), 7062, 9014 or otherwise.

39.    <u>Subsequent Hearing; Procedure for Objections and Entry of Final Order</u>. The Motion is set for a final hearing ("**Final Hearing**") before this Court at 2:00 pm. on [February 11, 2015] (such date or such later date to which the Final Hearing is adjourned or continued with DIP Lender's consent, the "**Final Hearing Date**"), at which time any party in interest may present any timely filed objections to the entry of the Final Order. The Debtor shall promptly serve a copy of this Interim Order, by regular mail upon (i) the United States Trustee; (ii) all affected state and federal taxing authorities; (iii) the creditors holding the 20 largest unsecured claims against the Debtor, or the Committee, if appointed; and (iv) any other party which theretofore has filed in the chapter 11 cases a request for special notice with this Court and served such request upon Debtor's counsel. Any objections to this Interim Order and the entry of a Final Order on the Motion shall be in writing and shall be filed with the Court and served so

that they not later than five (5) business days before the date scheduled for the Final Hearing and served so that they are received on or before 4:00 p.m. (Eastern Time) of such date by (i) Debtor's counsel, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899, Attn: James O'Neill, joneill@pszjlaw.com; Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn: Ira Kharasch, ikharasch@pszjlaw.com; (ii) Fast Pay, 9300 Wilshire Blvd., Suite 500 Beverly Hills, CA 90212, Attn: Harold Lee, Esq., and counsel to Fast Pay as follows: Scott H. Siegel, Levinson, Arhsonsky & Kurtz, 15303 Ventura Blvd., Suite 1650, Sherman Oaks, CA 91403 and Deirdre M. Richards, The LAMM Group, 1608 Walnut Street, Suite 703, Philadelphia, PA 19103; (iii) counsel to the DIP Lender, Greenberg Traurig, LLP, 200 Park Avenue, New York, NY 10166, Attn:    Matthew Hinker and Joseph Gangitano, hinkerm@gtlaw.com and gangitanoj@gtlaw.com; (iv) Office of the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (v) counsel to any Official Committee of Unsecured Creditors appointed in this case; and (vi) all parties requesting notice in these cases pursuant to Bankruptcy Rule 2002.  Any objections by creditors or other parties in interest to any of the provisions of this Interim Order shall be deemed waived unless filed and served in accordance with this paragraph.

DATED: January 23, 2015

Honorable Laurie Selber Silverstein
United States Bankruptcy Judge

31

# <u>EXHIBIT A</u>

## SENIOR SECURED SUPER-PRIORITY
## DEBTOR-IN-POSSESSION PROMISSORY NOTE

**Original Principal Amount: U.S. $3,500,000**                    **January 23, 2015**

For value received, Hipcricket, Inc., a Delaware corporation (the "**Borrower**"), promises to pay to the order of SITO Mobile, Ltd., a Delaware limited liability company (the "**DIP Lender**"), the lesser of (a) $3,500,000 (the "**Stated Principal Amount**") or (b) the amount of advances from time to time outstanding hereunder together with interest and other amounts as provided herein.

WHEREAS, on January 20, 2015 (the "**Petition Date**"), the Borrower filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") a voluntary petition for relief (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

WHEREAS, the Borrower will file a motion (the "**Sale Motion**") no later than five (5) days after the Petition Date pursuant to which it intends to effectuate a sale (the "**Sale**") of all or substantially all of its assets to the DIP Lender or one of its affiliates, (the "**Purchaser**") or an alternative successful bidder, pursuant to section 363 of the Bankruptcy Code, on the terms and conditions described therein;

WHEREAS, the Borrower has requested that the DIP Lender provide it with a secured multiple draw term loan credit facility of up to $3,500,000 (the "**DIP Facility**") to fund the day-to-day operating working capital needs and chapter 11 administrative costs of the Borrower during the pendency of the Chapter 11 Case and to allow the Borrower to effectuate the Sale, and the Lender is willing to extend such financing to the Borrower on the terms and subject to the conditions set forth herein; and

NOW, THERFORE, the Borrower has made this Debtor-in-Possession Promissory Note (this "**DIP Note**") in favor of the DIP Lender to evidence the DIP Facility and pursuant to the *Interim Order (I) Authorizing The Debtor To (A) Obtain Post-Petition Secured Financing; (B) Utilize Cash Collateral; And (C) Pay Certain Related Fees And Charges; and (II) Scheduling A Final Hearing* [Docket No. TBD] (together with any final order approving the DIP Facility, the "**DIP Order**"). Capitalized terms not otherwise defined herein have the meanings given thereto in the DIP Order.

1.     **Advances; Increase in Principal Amount.**

(a)     Subject to the terms and conditions set forth in this DIP Note, the DIP Lender shall make advances to the Borrower as follows (each individually a "**Loan**" and collectively, the "**Loans**"):

(i)     On the date hereof, in the amount of $2,200,000.

(ii)    Thereafter, on every Monday beginning on February 2, 2015 (unless such date is

1

not a business day at which point funding shall occur on the next succeeding business day) (each, a "**Funding Date**") in an amount equal to (A) the sum of (I) actual cash on hand as of the close of business on the immediately preceding business day plus (II) an amount equal to the "Estimated Collections" set forth in the cash forecast attached hereto as <u>Exhibit A</u> (as modified from time to time with the consent of the DIP Lender in its sole discretion, the "**DIP Budget**") for the week in which the Funding Date occurs less (B) the positive amount of "Cash Outflows" that are projected in the DIP Budget for the week in which the Funding Date occurs (the "**DIP Formula Borrowing Amount**"); provided, that (x), if the DIP Formula Borrowing Amount is a negative number, then the Borrower may borrow an amount equal to the amount by which the DIP Formula Borrowing Amount is negative plus $250,000, (y) if the DIP Formula Borrowing Amount is greater than $250,000 then the Borrower may not borrow, and (z) if the DIP Formula Borrowing Amount is positive but less than $250,000, then the Borrower may borrow an amount up to the difference between $250,000 and the DIP Formula Borrowing Amount. Each Loan hereunder shall be subject to the terms and conditions set forth in this DIP Note and the aggregate outstanding principal amount of the Loans shall not exceed the Stated Principal Amount. Any sums advanced pursuant to this DIP Note and subsequently repaid may not be re-borrowed.

(b)    By noon prevailing eastern time on the business day immediately prior to a Funding Date, Borrower shall give the DIP Lender written notice of its request for a Loan and shall specify the Funding Date (which must be the immediately subsequent business day) and the amount of the requested Loan (a "**Borrowing Notice**"). The Borrowing Notice (beginning with the Borrowing Notice provided on or before January 30, 2015) shall include (a) a calculation of the requested Loan amount including reasonable detail regarding the cash on hand included in the calculation and the projected Estimated Receipts for the weekly borrowing period, (b) an updated DIP Budget including actuals for prior periods, and (c) a calculation of any variance from the Budget. The Borrowing Notice shall also be accompanied by a comparison of actual weekly receipts to those set forth in the DIP Budget. The obligation of DIP Lender to fund is subject to compliance with the terms and conditions of this DIP Note and the DIP Order. The DIP Lender shall make each properly authorized Loan in immediately available funds by wire transfer to an account designated by Borrower, as soon as practicable, but in no event later than the noon prevailing eastern time on the applicable Funding Date.

(c)    The DIP Lender shall not be obligated to make any Loan (including the initial Loan hereunder), or to take, fulfill, or perform any other action hereunder, unless the following conditions are satisfied as of the making of such Loan, in DIP Lender's reasonable discretion, or waived in writing by DIP Lender in its sole discretion:

(i)    This DIP Note and any necessary or appropriate related documents shall have been executed and delivered to DIP Lender in form and substance acceptable to DIP Lender and shall be in full, force and effect.

(ii)    The consummation of the transactions contemplated hereby or entered into in contemplation hereof shall not contravene, violate or conflict with, nor involve the DIP Lender in a violation of applicable law or regulation.

(iii)    The applicable DIP Budget shall have been approved in writing by the DIP Lender.

NY 244926468v11

(iv)     All consents, authorizations and filings, if any, required in connection with the execution, delivery and performance by the Borrower, and the validity and enforceability against the Borrower, of the DIP Note, shall have been obtained or made, and such consents, authorizations and filings shall be in full force and effect.

(v)     Prior to the making of the initial Loan, the DIP Lender shall have received a schedule describing all insurance maintained by the Borrower and a loss payee endorsement with respect thereto and for any subsequent Loan such insurance shall be in full force and effect.

(vi)     The DIP Lender shall have received a copy of the applicable DIP Order, and such DIP Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the DIP Lender in its sole discretion, and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(vii)     The Petition Date shall have occurred and the "first day" orders sought by the Borrower shall have been entered by the Bankruptcy Court and shall have been in form and substance reasonably satisfactory to the DIP Lender. As to the initial Loan, the Borrower shall have filed the Sale Motion, and all pleadings related thereto, including the proposed Bid Procedures, shall be satisfactory to the DIP Lender.

(viii)     The Stalking Horse Agreement shall have been executed and delivered and shall not have been terminated.

(ix)     No event shall have occurred and be continuing, or would result from the Loan requested thereby, which, with the giving of notice or the passage of time or both, would constitute an Event of Default and no Event of Default shall be continuing.

(x)     The Borrower shall have timely delivered a Borrowing Notice related to such Loan, which was in form and substance satisfactory to the DIP Lender and consistent with the DIP Budget.

(xi)     The aggregate principal and amount of all DIP Loans extended shall not exceed the Stated Principal Amount.

(xii)     The Sale Motion shall not have been withdrawn, revoked, amended or appealed and shall be in full force and effect pending its approval.

(xiii)     All information, approvals, documents or other instruments as DIP Lender may reasonably request shall have been received by DIP Lender.

(xiv)     The Borrower shall be in compliance with its obligations under the Stalking Horse Agreement and the Bid Procedures Order, after it is entered.

2.     **Interest; Payments**.

(a)     The Loans shall bear interest on the unpaid principal amount thereof plus all obligations owing to, and rights of, the Lender pursuant to the DIP Note, including without

3

limitation, all interest, fees, and costs accruing thereon (collectively, the "**Obligations**") from the date hereof (the "**Effective Date**") to and including the Maturity Date (defined below), at a fixed rate per annum equal to thirteen percent (13%), calculated on the basis of a 360-day year for the actual number of days elapsed.

(b)    Accrued, unpaid interest on the Loans shall be compounded on the last day of each calendar month. After the Maturity Date and/or after the occurrence and during the continuance of an Event of Default (defined below), the Obligations shall bear interest at a rate equal to fifteen percent (15%) per annum, calculated on the basis of a 360-day year for the actual number of days elapsed (the "**Default Rate**").

(c)    Interest shall be payable, in cash, on the last day of each calendar month, upon prepayment of any portion of the Obligations, on the Maturity Date, and upon payment in full of the Loan.

(d)    Notwithstanding anything to the contrary set forth in this Section 2, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "**Maximum Lawful Rate**"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

(f)    The Obligations shall be due and payable on the earlier to occur of (i) the date the Sale is consummated; (ii) April 3, 2015; (iii) upon acceleration of the DIP Note pursuant to the terms hereof; and (iv) the Termination Date (the "**Maturity Date**"). On the Maturity Date, the DIP Lender's obligation to provide Loans shall terminate.

(g)    This Note may be prepaid in whole or in part at any time without penalty or premium. The DIP Lender may apply any such prepayments and any payments made hereunder in any order of priority determined by the DIP Lender in its exclusive judgment.

3.    **Covenants** Unless otherwise agreed to by the DIP Lender in writing, the Borrower covenants and agrees that it will:

(a)    Use the proceeds of the Loans solely for operating working capital purposes and chapter 11 administrative costs in the amounts and otherwise in accordance with and for the purposes provided for in the DIP Budget. Notwithstanding the then applicable DIP Budget, the Borrower may exceed the budgeted amount for any line item (other than professional fees) during any weekly budget period by 10% (the "**Permitted Variance**") excluding any timing difference resulting from the roll-forward of budgeted expenses from previously weekly periods that were unpaid and which may rolled forward to subsequent periods; provided, that (i) the total amount of the DIP Loans do not exceed the Stated Principal Amount, (ii) none of the proceeds of the DIP Loans shall be used by any party-in-interest to take any action or to otherwise assert any claims or causes of action against the DIP Lender in any capacity, and (iii) the Permitted Variance shall not apply to the line items related to professional fees for any party-in-interest.

(b)    Keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and property and all legal requirements; and, upon the reasonable request of the DIP Lender, provide copies of, or access

4

to, its books and records, and to discuss the business, operations, assets and financial and other condition of Borrower with officers and employees thereof and with their independent certified public accountants.

(c)    Promptly give written notice to the DIP Lender: (i) of the occurrence of any Default or Event of Default; (ii) of any (A) default or event of default under any instrument or other material agreement, guarantee or document of Borrower or (B) litigation, investigation or proceeding which may exist at any time between Borrower and any governmental authority; and (iii) of the commencement of any litigation or proceeding against Borrower for acts occurring after the Petition Date (A) in which more than $50,000 of the amount claimed is not covered by insurance or (B) in which injunctive or similar relief is sought.

(d)    Use the proceeds of the Loans solely for the purposes permitted by this DIP Note.

(e)    At all times, cause all of the Collateral (defined below) to be subject to a first priority perfected security interest in favor of the DIP Lender in accordance with the DIP Order, subject only to the Carve Out and any Permitted Liens (as defined in the DIP Order/Stalking Horse Agreement).

(g)    Promptly, from time to time, deliver such other information regarding the operations, business affairs and financial condition of the Borrower as the DIP Lender may request.

(h)    If reasonably practicable, at least two (2) business days prior to the date when the Borrower intends to file any such pleading, motion or other document (and, if not reasonably practicable, as soon as reasonably practicable), provide copies of all material pleadings, motions, applications, judicial information, financial information and other documents to be filed by the Borrower in the Chapter 11 Case.

(i)    Promptly execute and deliver such documents, instruments and agreements, and take or cause to be taken such acts and actions, as the Lender may reasonably request from time to time to carry out the intent of this DIP Note and the DIP Order.

(k)    Not create, incur, assume or suffer to exist any indebtedness other than (i) indebtedness outstanding on the Effective Date; (ii) indebtedness in connection with the Loans; (iii) indebtedness in respect of fees and expenses owed to professionals retained by the Borrower or any official committee in the Chapter 11 Case up to the amounts set forth in the Budget; and (vi) other unsecured indebtedness of Borrower which does not exceed $50,000 in the aggregate at any time outstanding.

(l)    Not create, incur, assume or suffer to exist any lien upon any of its assets, whether now owned or hereafter acquired, except for liens that are permitted by the DIP Order.

(m)    Not enter into any merger or consolidation or amalgamation or other change of control transaction or engage in any type of business other than of the same general type now conducted by it.

(n)    Other than as provided in the Sale Motion, not convey, sell, lease, assign, transfer

5

or otherwise dispose of any assets or property (including, without limitation, tax benefits), other than the sale of inventory or the licensing of intellectual property in the ordinary course of business.

(o)    Not make any advance, investment, acquisition, loan, extension of credit or capital contribution to, in or for the benefit of any person.

(p)    Subject in all respects to the DIP Budget and other than the key employee incentive plan contemplated thereby to the extent approved by the Bankruptcy Court, not enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any affiliate.

(q)    Not incur or apply to the Bankruptcy Court for authority to incur, or suffer to exist, any indebtedness having the priority afforded by section 364(c) or (d) of the Bankruptcy Code (including any superpriority claims) other than the financing provided for under this Agreement, unless the Obligations hereunder are to be irrevocably paid in full, in cash with the proceeds thereof.

(r)    Not limit, affect or modify, or apply to the Bankruptcy Court to limit, affect or modify any of the rights of the DIP Lender with respect to the Obligations, including rights with respect to Collateral and the priority thereof.

(s)    Except for the Carve Out, not incur, create, assume, suffer or permit any claim to exist or apply to the Bankruptcy Court for the authority to incur, create, assume, suffer or permit any claim to exist against the Borrower or any of its assets which is to be pari passu with, or senior to, the Obligations, unless the Obligations are being irrevocably repaid in full, in cash with the proceeds thereof.

4.    **Event of Default**.

(a)    Each of the following events shall constitute an "**Event of Default**":

(i)    Borrower (A) fails to pay any payment (whether principal, interest, or otherwise) when such amount becomes due and payable under this DIP Note or (B) Borrower defaults in the due performance or observance by it of any other term, covenant, or agreement contained in this DIP Note (and, if such default is capable of being remedied, it has not been remedied within the cure period set forth herein or, if no such cure period is provided, it has not been remedied to the reasonable satisfaction of the DIP Lender) two (2) business days following the occurrence of such event of default);

(ii)    any representation, warranty, or statement made by or on behalf of Borrower herein or in any certificate delivered in connection herewith shall prove to be untrue in any material respect on the date on which made or deemed made;

(iii)    the security interest granted to the DIP Lender hereunder shall cease to be in full force and effect, or shall cease to create a perfected security interest in, and lien on, the Collateral purported to be created thereby;

6

(iv)    this DIP Note is, or becomes, invalid or ineffective or unenforceable against Borrower, in whole or in part, or Borrower so asserts or at any time denies its liability or Obligations under this DIP Note;

(v)    prior to the closing of the Sale, the Bankruptcy Court shall enter an order with respect to Borrower dismissing its Chapter 11 Case or converting it to a case under chapter 7 or any other chapter of the Bankruptcy Code, or appointing a trustee in its Chapter 11 Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Borrower's business (beyond those set forth in sections 1106(a)(3) or (4)) under Bankruptcy Code section 1106(b), in each case, without the consent of the DIP Lender;

(vi)    prior to closing of the Sale, entry of any order of the Bankruptcy Court dismissing the Bankruptcy Case, unless as a condition thereto the Obligations are irrevocably paid in cash in full;

(vii)    the Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder of any lien (other than liens in favor of the DIP Lender) or any assets of Borrower having an aggregate value in excess of $50,000;

(viii)    the Borrower shall seek to, or shall support any other person's motion to, disallow in whole or in part the Obligations or to challenge the validity, priority, or enforceability of the DIP Lender's liens and superpriority claims hereunder;

(ix)    a DIP Order shall be entered in form and substance that is not acceptable to the DIP Lender in its sole discretion or, from and after the date of entry thereof, any DIP Order shall cease to be in full force and effect or shall have been vacated, stayed, reversed, modified or amended (or the Borrower shall take any step to accomplish any of the foregoing) without the consent of the DIP Lender;

(x)    prior to the closing of the Sale, the Borrower shall make any payments on any indebtedness which arose before the Petition Date other than as provided in any of the "first day" orders entered in the Chapter 11 Case or otherwise consented to by the DIP Lender;

(xi)    the Sale Motion shall have been withdrawn or is no longer being pursued or the Borrower shall be in breach or shall fail to comply with the terms of the DIP Order, the Bid Procedures Order or the Stalking Horse Agreement in any material respect;

(xii)    actual cash receipts from operations for any two consecutive week budget period are less than 80% of such receipts projected in the Budget or on a cumulative basis from the Petition Date; provided, that the Borrower shall not be in default hereunder if the foregoing revenue test is not met during the first three calendar weeks of the Chapter 11 Case;

(xiii)    The (A) Bid Procedures Motion is not filed within five (5) days of the Petition Date, (B) the Sale Motion is not filed within seven (7) days of the Petition Date,

7

(C) Bid Procedures Order is not entered within 22 days of the Petition Date, (D) the Sale Order is not entered within 50 days of the Petition Date, and (E) the Sale has not closed by 15 days after the hearing on the Sale Motion;

(xiv)     one or more judgments or decrees shall be entered against Borrower involving in the aggregate a post-Petition Date liability (not paid or fully covered by insurance or otherwise considered permitted Indebtedness) of $50,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within the time required by the terms of such judgment;

(xv)     this DIP Note or any related document shall cease, for any reason, to be in full force and effect or the Borrower shall so assert in writing, or any such document shall cease to be effective to grant a perfected lien on any material item of Collateral described therein with the priority purported to be created thereby;

(xvi)     an application or motion shall be filed by the Borrower for the approval of a superpriority Claim in the Bankruptcy Case or the Bankruptcy Court shall have granted superpriority status to any claim in the Bankruptcy Case, in each case, that is senior to the claims of DIP Lender against Borrower hereunder, without the prior written consent of the DIP Lender; or

(xvii)     the final DIP Order shall not be entered by the Bankruptcy Court by the date that is 30 days from the Petition Date.

(b)     Upon the occurrence of an Event of Default and after three (3) days' notice to the Debtor, if any Event of Default shall then be continuing, DIP Lender may, in its sole discretion at any time during the continuance of such Event of Default, take any of the following actions:

(i)     declare all or any portion of the outstanding Obligations due and payable, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrower;

(ii)     enforce all liens and security interests in the Collateral;

(iii)     institute proceedings to enforce payment of such Obligations;

(iv)     terminate the obligation of the DIP Lender to make Loans; and

(v)     exercise any other remedies and take any other actions available to it at law, in equity, under this DIP Note, the Bankruptcy Code, other applicable law or pursuant to the DIP Order.

(c)     In addition to the foregoing, if any Event of Default shall occur and be continuing, but subject only to any required notice hereunder or under the DIP Order, the DIP Lender may exercise in addition to all other rights and remedies granted to it in this DIP Note and the DIP Order, all rights and remedies of a secured party under the UCC or other applicable law. Without limiting the generality of the foregoing, the Borrower expressly agrees that in any such event the DIP Lender, without demand of performance or other demand, advertisement or notice of any

8

kind (except the notice required by the DIP Order or the notice specified below of time and place of public or private sale) to or upon the Borrower or any other person (all and each of which demands, advertisements and/or notices (except the notice required by the DIP Order or the notice specified below of time and place of public or private sale) are hereby expressly waived to the maximum extent permitted by the UCC and other applicable law), may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of the DIP Lender's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The DIP Lender shall have the right upon any such public sale or sales to purchase for cash or by credit bidding all or a part of the Obligations the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption the Borrower hereby releases. The Borrower further agrees, at the DIP Lender's request, to assemble the Collateral constituting movable tangible personal property make it available to the DIP Lender at places which the DIP Lender shall reasonably select. The DIP Lender shall apply the proceeds of any such collection, recovery, receipt, appropriation, realization or sale to the Obligations in the order reasonably deemed appropriate by the DIP Lender, Borrower remaining liable for any deficiency remaining unpaid after such application, and only after so paying over such net proceeds and after the payment by the Lender of any other amount required by any provision of law, including Section 9-504(l)(c) of the UCC, shall the DIP Lender account for and pay over the surplus, if any, to the Borrower. To the maximum extent permitted by applicable law, the Borrower waives all claims, damages, and demands against the DIP Lender arising out of the repossession, retention or sale of the Collateral except such as arise out of the gross negligence or willful misconduct of the DIP Lender. The Borrower agrees that the DIP Lender need not give more than five (5) days' notice to the Borrower (which notification may run concurrently with any notice require when the DIP Order) shall be deemed given when mailed, electronically delivered or delivered on an overnight basis, postage prepaid, addressed to the Borrower at its address set forth below) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters. The Borrower shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which the DIP Lender is entitled.

(d)    Except as otherwise expressly provided herein and in the DIP Order, the Borrower hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this DIP Note or any Collateral. Borrower shall also pay DIP Lender's costs of collection if any Obligations are not paid when due, including without limitation court costs, collection expenses, and reasonable out-of-pocket attorneys' fees and other expenses which DIP Lender may incur or pay in the prosecution or defense of its rights hereunder, whether in judicial proceedings, including bankruptcy court and appellate proceedings, or whether out of court.

5.    **Security**.

(a)    To induce the DIP Lender to make the Loans, the Borrower hereby grants to the DIP Lender, as security for the full and prompt payment when due (whether at stated maturity,

9

by acceleration or otherwise) of the Obligations, a continuing first priority lien and security interest (subject only to the Carve-Out) in and to all assets of the Borrower, including all of the following presently existing or hereafter acquired property, whether owned, leased or otherwise possessed, to which the Borrower now has or at any time in the future may acquire any right, title or interest (capitalized terms used in clause (i) through (xviii) shall have the meanings provided for such term in the Uniform Commercial Code in effect on the date hereof in the State of Delaware (the "**UCC**")):

    (i)     all Accounts;

    (ii)    all Chattel Paper;

    (iii)   all Deposit Accounts, including any monies or other property held therein;

    (iv)   all Documents;

    (v)    all Equipment;

    (v)    all General Intangibles, including all intellectual property, including any trademarks or tradenames, and any licenses;

    (vi)   all Instruments;

    (vii)  all Inventory;

    (viii) all Investment Property;

    (ix)   all Letter of Credit Rights;

    (x)    all real property;

    (xi)   all motor vehicles;

    (xii)  all Commercial Tort Claims;

    (xiii) all books and records pertaining to the Borrower, its business and any property described herein;

    (xiv) all other goods and personal property of the Borrower, whether tangible or intangible, wherever located, including money, letters of credit and all rights of payment or performance under letters of credit;

    (xv)  to the extent not otherwise included, all causes of action and all monies and other property of any kind received therefrom including Avoidance Actions (as defined in the DIP Order);

    (xvi)  to the extent not otherwise included, all monies and other property of any kind which is received by the Borrower in connection with any refunds with respect to taxes, assessments and other governmental charges;

10

(xvii)   all insurance claims; and

(xviii)   to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any proceeds of insurance, indemnity, warranty or guaranty payable to the Borrower from time to time with respect to any of the foregoing.

(b)     The granting clause herein is intended to supplement (not supersede) that which is provided for in the DIP Order and the Loans and any other indebtedness or obligations, contingent or absolute (including, without limitation, the principal thereof, interest thereon, and costs and expenses owing in connection therewith) which may now or from time to time hereafter be owing by the Borrower to the DIP Lender under the DIP Note shall be secured as set forth herein, in the DIP Order.

(c)     The DIP Order provides for the perfection, maintenance, protection, and enforcement of the DIP Lender's security interest in the Collateral. Upon the request of the DIP Lender, the Borrower shall place notations on the Borrower's books of account to disclose the DIP Lender's security interest therein, and to the extent requested by the DIP Lender, the Borrower shall deliver to the Lender all documents, certificates and Instruments necessary or desirable to perfect the DIP Lender's lien in letters of credit on which the Borrower is named as beneficiary and all acceptances issued in connection therewith. The Borrower shall take such other reasonable steps as are deemed necessary or desirable to maintain the DIP Lender's security interest in the Collateral.

(d)     The Borrower hereby authorizes the DIP Lender to execute and file financing statements or continuation statements, and amendments thereto, on the Borrower's behalf covering the Collateral. The DIP Lender may file one or more financing statements disclosing the DIP Lender's security interest under this DIP Note without the signature of the Borrower appearing thereon. The DIP Lender shall pay the costs of, or incidental to, any recording or filing of any financing statements concerning the Collateral. The Borrower agrees that a carbon, photographic, photostatic, or other reproduction of this DIP Note or of a financing statement is sufficient as a financing statement. Until all Obligations have been irrevocable fully satisfied in cash and the DIP Lender shall have no further obligation to make any Loans hereunder, the DIP Lender's security interest in the Collateral, and all Proceeds and products thereof, shall continue in full force and effect.

(e)     Notwithstanding the preceding two paragraphs, or any failure on the part of the Borrower to take any of the actions set forth therein, the liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the interim DIP Order and the final DIP Order, as the case may be. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the liens and security interests granted by or pursuant to this DIP Note and the DIP Order.

(f)     Except as specifically provided in the DIP Order with respect to Permitted Liens, the priority of the DIP Lender's liens on the Collateral shall be senior to all liens existing as of the Petition Date, and for so long as any Obligations shall be outstanding, the Borrower hereby

11

irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, unless otherwise permitted or provided for in the DIP Order or effective upon the granting of any such lien or priority, the Obligations shall be irrevocably paid in full in cash and the obligation to make Loans hereunder terminated.

(g)    Upon entry of, subject to and in accordance with the DIP Order, the Obligations of the Borrower hereunder and under the other Loan Documents and the DIP Order, shall at all times constitute allowed superpriority claims pursuant to Section 364(c)(1) of the Bankruptcy Code.

(h)    It is expressly agreed by the Borrower that, anything herein to the contrary notwithstanding, the Borrower shall remain liable under its post-petition contractual obligations to observe and perform all the conditions and obligations to be observed and performed by it thereunder, and the Lender shall not have any obligation or liability under any contractual obligations by reason of or arising out of this DIP Note unless otherwise agreed to in writing by the DIP Lender, and the DIP Lender shall not be required or obligated in any manner to perform or fulfill any of the obligations of the Borrower under or pursuant to any contractual obligations, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any contractual obligations, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(i)    Borrower hereby constitutes and appoints DIP Lender, or any other person whom DIP Lender may designate, as Borrower's attorney-in-fact (such appointment being coupled with an interest and being irrevocable until DIP Lender's liens and claims shall have been satisfied), at Borrower's sole cost and expense, at any time after the occurrence and during the continuance of an Event of Default, (a) to do any act which Borrower is obligated to do hereunder, or (b) to exercise any of the rights and remedies available under the UCC or other applicable law upon an Event of Default to a secured party with a lien having the same priority as the DIP Lender's lien on the Collateral (and all acts of such attorney-in-fact or designee taken pursuant to this Section are hereby ratified and approved by Borrower, and said attorney or designee shall not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law); provided, however, that Lender shall provide prior or contemporaneous telephonic and electronic notice to Borrower and any creditor or Borrower entitled to notice with respect to any affected Collateral of the exercise of any or all of the stated rights and powers.

6.    **Miscellaneous**.

(a)    Borrower hereby waives presentment, demand (except as expressly required herein), notice, protest and all other demands or notices in connection with the delivery, acceptance, performance, default or enforcement of this Note. No course of action or delay or omission of DIP Lender in exercising any right or remedy hereunder or under any other agreement or undertaking securing or related hereto shall constitute or be deemed to be a waiver of any such right or remedy, and a waiver on the one occasion shall not operate as a bar to or

12

waiver of any such right or remedy on any future occasion. The rights and remedies of DIP Lender as provided herein shall be cumulative and concurrent and may be pursued singularly, successively or together at the sole discretion of DIP Lender, and may be exercised as often as occasion therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same.

(b)     Borrower agrees to pay or reimburse the DIP Lender for all of its costs and expenses incurred in connection with the collection or enforcement of or preservation of any rights under this DIP Note, including, without limitation, the fees and disbursements of counsel for the DIP Lender, including attorneys' fees out of court, in trial, on appeal, in bankruptcy proceedings, or otherwise.

(c)     This Note shall be binding upon and inure to the benefit of Borrower and DIP Lender and their respective administrators, personal representatives, legal representatives, heirs, successors and assigns, except that Borrower shall not assign or transfer any of its rights and/or obligations hereunder, and any such assignment or transfer purported to be made by Borrower shall be null and void. DIP Lender may at any time transfer or assign (or grant a participation in) any or all of its rights and/or obligations hereunder without the consent of Borrower.

(d)     If any provision of this DIP Note is invalid, illegal, or unenforceable, the balance of this DIP Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.

(e)     This DIP Note shall be governed by and construed in all respects under the laws of the State of Delaware, without reference to its conflict of laws rules or principles. Each of the parties submits to the exclusive jurisdiction of any state or federal court sitting in the State of Delaware, in any action or proceeding arising out of or relating to this Note, agrees that all claims in respect of the action or proceeding may be heard and determined in any such court and agrees not to bring any action or proceeding arising out of or relating to this Note in any other court. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto. Each party agrees that service of summons and complaint or any other process that might be served in any action or proceeding may be made on such party by sending or delivering a copy of the process to the party to be served at the address of the party and in the manner provided for the giving of notices in Section 8(h). Each party agrees that a final, non-appealable judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law.

(f)     **THE DIP LENDER AND THE BORROWER HEREBY KNOWINGLY VOLUNTARILY, INTENTIONALLY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREIN, OR ARISING OUT OF UNDER OR IN CONNECTION WITH THIS DIP NOTE.**

(g)     Borrower at its expense shall take any lawful actions and execute, deliver, file and register any documents which DIP Lender may in its discretion deem reasonably necessary or appropriate in order to further the purposes of this DIP Note.

13

(h)    All notices or other communications required or permitted hereunder shall be in writing and shall be delivered personally, by facsimile, electronic mail (including PDF format copies) or sent by certified, registered or express air mail, postage prepaid, and shall be deemed given when so delivered personally, or by facsimile, or if mailed, two (2) days after the date of mailing, as follows:

If to Borrower:

HipCricket, Inc.
110 110th Ave. NE,
Suite 410
Bellevue, WA 98005
Attention: Chief Executive Officer
Email: twilson@hiopcricket.com

with a copy to (which shall not constitute notice):

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., Suite 1300
Los Angeles, CA 90067
Attn: Ira D. Kharasch, Esq.
Email: ikharasch@pszjlaw.com
Facsimile: (310) 201-0760

and

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Attn: Faith M. Wilson, Esq.
Email: fwilson@perkinscoie.com
Facsimile: (206) 359-4237

If to the DIP Lender:

SITO Mobile, Ltd.
100 Town Square Place
Jersey City, NJ 07310
Attention: Mr. Jerry Hug
Email: jhug@SITOMobile.com
Facsimile: 602-561-8987

with a copy to (which shall not constitute notice):

14

> Greenberg Traurig, LLP
> 200 Park Avenue
> New York, 10166
> Attention:  Matthew Hinker, Esq.
> Email: hinkerm@gtlaw.com
> Facsimile: (212) 801-6400
>
> and
>
> Greenberg Traurig, LLP
> 200 Park Avenue
> New York, 10166
> Attention:  Joseph C. Gangitano, Esq.
> Email: gangitanoj@gtlaw.com
> Facsimile: (212) 309-9572

or to such other address as any party hereto shall notify the other parties hereto (as provided above) from time to time.

[Signature page is next page]

NY 244926468v11

**IN WITNESS WHEREOF**, Borrower has executed this DIP Note as of the date first written above.

**<u>BORROWER</u>**

HipCricket, Inc.


By:_____
Name:
Title:

16

*NY 244926468v11*

<u>EXHIBIT A</u>

<u>BUDGET</u>

17

NY 244926468v11

# WEEKLY CASH FORECAST

| | Week Of | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week of | 1/23-1/23 | 1/26-1/30 | 2/2-2/6 | 2/9-2/13 | 2/16-2/20 | 2/23-2/27 | 3/2-3/6 | 3/9-3/13 | 3/16-3/20 | 3/23-3/27 | 3/30-4/3 |
| **Beginning Cash Balance** | | 34,893.31 | 340,930.18 | 402,430.18 | 406,883.57 | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 | 479,883.57 | 634,883.57 |
| **_Tier 1_** | | | | | | | | | | | |
| Payroll | | (425,250.00) | | (407,750.00) | | (492,750.00) | | (407,750.00) | | | (647,750.00) |
| 401K Funding | | (20,000.00) | (20,000.00) | | (15,000.00) | | | | | | (25,000.00) |
| Rent | | (70,000.00) | (70,000.00) | (70,000.00) | | (70,000.00) | (70,000.00) | (70,000.00) | (70,000.00) | | (25,000.00) |
| Health Insurance (wire) | | | | | (18,000.00) | | (42,000.00) | | | | |
| Business Insurance (wire) | | | | | (5,116.43) | | | | (5,116.43) | | |
| American Express | | (100,000.00) | (13,500.00) | (13,500.00) | | (30,000.00) | | | (15,000.00) | (25,000.00) | |
| SVB CC | | (40,000.00) | (10,000.00) | | (10,000.00) | (25,000.00) | | | | | |
| Perkins | | (25,000.00) | | | | (30,000.00) | | | | | |
| CannaZeed | | | | | (30,000.00) | | | | | | |
| Pechulski | | (100,000.00) | (75,000.00) | (100,000.00) | (35,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) |
| Creditor committee counsel | | | (100,000.00) | (100,000.00) | (50,000.00) | (50,000.00) | (50,000.00) | (80,000.00) | (80,000.00) | | |
| DIP Lender Legal Fees | | | (10,000.00) | (10,000.00) | (10,000.00) | (10,000.00) | (10,000.00) | (35,000.00) | (35,000.00) | | |
| DIP Interest (estimate) | | | | | | | (25,000.00) | (10,000.00) | (10,000.00) | | (32,500.00) |
| **_Tier 2_** | | | | | | | | | | | |
| Publishers | | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) | (75,000.00) |
| Other Expenses | | | (50,000.00) | (275,000.00) | | | | (275,000.00) | | | |
| Taxes | | | | (23,500.00) | | | | | | | |
| **Total Cash Outflows** | — | (835,250.00) | (313,500.00) | (914,750.00) | (218,116.43) | (782,750.00) | (397,000.00) | (832,750.00) | (95,116.43) | (170,000.00) | (805,250.00) |
| Estimated Cash Receipts from AR | 450,000.00 | 375,000.00 | 375,000.00 | 375,000.00 | 375,000.00 | 350,000.00 | 350,000.00 | 350,000.00 | 325,000.00 | 325,000.00 | 325,000.00 |
| **Estimated Collections to the Company** | 450,000.00 | 375,000.00 | 375,000.00 | 375,000.00 | 375,000.00 | 350,000.00 | 350,000.00 | 350,000.00 | 325,000.00 | 325,000.00 | 325,000.00 |
| **Total Cash Receipts** | | 375,000.00 | 375,000.00 | 375,000.00 | 375,000.00 | 350,000.00 | 350,000.00 | 350,000.00 | 325,000.00 | 325,000.00 | 325,000.00 |
| Estimated DIP Loan Flows | (1,833,713.13) | 366,286.87 | | 387,319.82 | | 275,866.43 | 47,000.00 | 482,750.00 | | | |
| Estimated Fast Pay Collections Remitted post-filing | 1,833,713.13 | 400,000.00 | | 387,319.82 | | 275,866.43 | | | | | |
| **DIP Loan Balance** | (1,833,713.13) | (2,200,000.00) | (2,200,000.00) | (2,587,319.82) | (2,587,319.82) | (2,863,186.25) | (2,910,186.25) | (3,392,936.25) | (3,392,936.25) | (3,392,936.25) | (3,392,936.25) |
| Fast Pay Beginning Balance | 1,733,713.13 | | | | | | | | | | |
| Fast Pay Payoff | (1,833,713.13) | | | | | | | | | | |
| Fast Pay Fees/Costs/Reserves | 100,000.00 | | | | | | | | | | |
| Fast Pay Funding | — | | | | | | | | | | |
| Fast Pay Ending Balance | — | | | | | | | | | | |
| AR Beginning Balance | 3,665,550.20 | 3,215,550.20 | 3,740,550.20 | 3,765,550.20 | 3,790,550.20 | 3,015,550.20 | 3,565,550.20 | 3,615,550.20 | 3,665,550.20 | 2,940,550.20 | 2,615,550.20 |
| AR Billings | — | 900,000.00 | 400,000.00 | 400,000.00 | | 900,000.00 | 400,000.00 | 400,000.00 | | | 1,300,000.00 |
| AR Collections | (450,000.00) | (375,000.00) | (375,000.00) | (375,000.00) | (375,000.00) | (350,000.00) | (350,000.00) | (350,000.00) | (325,000.00) | (325,000.00) | (325,000.00) |
| AR Ending Balance | 3,215,550.20 | 3,740,550.20 | 3,765,550.20 | 3,790,550.20 | 3,015,550.20 | 3,565,550.20 | 3,615,550.20 | 3,665,550.20 | 2,940,550.20 | 2,615,550.20 | 3,590,550.20 |

* For the week of 1/19, cash balance represents cash balance immediately post filing