IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIPCRICKET, INC.,[1] | ) | Case No. 15-10104 (LSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**Hearing Date:  TBD**
**Objection Deadline:  TBD**

**MOTION FOR ORDER (A) APPROVING
ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF DEBTOR'S ASSETS OUTSIDE THE ORDINARY
COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER
INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b),
363(f) AND 363(m); (C) ASSUMING AND ASSIGNING CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
AND (D) GRANTING RELATED RELIEF**

Hipcricket, Inc., the above-captioned debtor and debtor in possession (the "Debtor"),

files this motion (this "Sale Motion") for entry of an order:  (a) approving the *Asset Purchase*

*Agreement* dated January 20, 2015 between the Debtor, as Debtor, and SITO Mobile, Ltd. (the

"Purchaser" or "Stalking Horse Bidder"), as buyer (the "Stalking Horse Agreement," a copy of

which is attached hereto as **Exhibit A**),[2] (b) authorizing the sale (the "Sale") of substantially all

of the Debtor's assets (the "Acquired Assets") (including the sale of the Assumed Contracts);

(c) authorizing the sale of the Acquired Assets free and clear of all liens, claims, rights,

encumbrances, and other interests pursuant to sections 105, 363(b), 363(f), and 363(m) of the

---

[1]  The last four digits of the Debtor's tax identification number are 2076.  The location of the Debtor's
headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Stalking Horse Agreement.

Bankruptcy Code; (d) authorizing the assumption and assignment of certain executory

contracts and unexpired leases of the Debtor pursuant to sections 363 and 365 of the

Bankruptcy Code; and (e) granting related relief.

On January 21, 2015, the Debtor filed the *Motion for Order: (A) Approving*

*Bid Procedures for the Sale of Substantially All of Debtor's Assets Outside the Ordinary*

*Course of Business; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve*

*the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee*

*And Expense Reimbursement; and (D) Granting Related Relief* [Docket No. 12], and

subsequently the *Notice of Errata Re: Bid Procedures* [Docket No. 58] (collectively, the "Bid

Procedures Motion"), which seeks approval of certain sale and bid procedures for the Sale, as

more particularly set forth therein (the "Bid Procedures").  A hearing on the Bid Procedures

Motion is currently set for February 11, 2015.

In support of this Sale Motion, the Debtor respectfully states as follows:

### Preliminary Statement

1.      By this Sale Motion, the Debtor seeks approval of the sale (the "Sale") of the

Acquired Assets of the Debtor to the Purchaser pursuant to the Stalking Horse Agreement or to

the highest and best bidder(s) for such assets at the auction provided for in the Bid Procedures

Motion and the Bid Procedures (the "Auction"), to take place in accordance with the order to

be entered by the Court on the Bid Procedures Motion (the "Bid Procedures Order").  The

Stalking Horse Agreement contemplates that the Acquired Assets will be sold free and clear of

liens, claims, encumbrances, rights, and other interests other than those liens and interests expressly permitted thereunder.

2.    As discussed below, the Debtor's sale process is in the best interests of the Debtor and its estate and creditors. As described further below, the Debtor and its investment banker engaged in an extensive, comprehensive prepetition marketing process, which began in early 2014, with adjustments made during 2014 as, among other things, an initial bidding process yielded no viable offers in the spring, corporate changes were made, and the Debtor's exploratory processes were relaunched, culminating in the Stalking Horse Agreement in mid-January 2015. The proposed Sale, under the Stalking Horse Agreement, will provide the following consideration: (i) an amount equal to (a) $4,500,000 in cash, plus (b) an amount equal to the Cure Amounts, up to the Cure Cap of $500,000, plus (c) the amounts approved by the Bankruptcy Court with respect to the KEIP up to the KEIP Limit, less (ii) the sum of (a) the amount of Assumed DIP Obligations plus (b) the amount of Cure Amounts that are required to be paid in excess of the Cure Cap up to a maximum of $50,000. The Sale is expected to yield sufficient proceeds to fund a distribution to general unsecured creditors under a confirmed plan. Further, given the financial condition of the Debtor including the lack of sufficient working capital, a Sale under these conditions is in the best interest of the Debtor, its estate and creditors.

## Jurisdiction

3.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), (N) and (O).

4.      Venue of these proceedings and this Sale Motion is proper in this District

pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105, 362, 363,

365, 503, 507, 1107, and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules").

## Background

6.      On January 20, 2015, the Debtor commenced this case by filing a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued in the

possession of its property and assets and has continued to operate and manage its business as a

debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      The factual background relating to the commencement of the Debtor's chapter

11 case (the "Chapter 11 Case") is set forth in detail in the *Declaration of Todd E. Wilson in*

*Support of First Day Motions* (the "First Day Declaration") [Docket No. 2] and incorporated

herein by reference.

## Sale of the Acquired Assets

8.    The Debtor seeks approval of the sale of substantially all of its assets used in the operation of its business.  As discussed further in the First Day Declaration, the Debtor is in the business of providing end-to-end, data-driven mobile advertising and marketing solutions through its proprietary AD LIFE® software-as-a service platform (the "AD LIFE Platform" or "Platform") - a proprietary, mobile engagement platform for businesses to communicate with customers through cellphones, tablets and other mobile devices.  The Platform powers mobile marketing and mobile advertising campaigns using proprietary data, along with data from key strategic partners, to provide more informed mobile marketing and advertising solutions to customers.

9.    More specifically, the AD LIFE Platform provides a single, scalable, self-service access point and creates measurable, real-time, one-to-one relationships between companies and their current or prospective customers, using text messages, multimedia messages, mobile web sites, mobile applications, mobile coupons, quick response codes and via mobile advertising. This Platform enables the Debtor's customers to quickly plan, create, test, deploy, monitor, measure and optimize interactive mobile marketing and advertising programs across nearly every major mobile channel.  Using patented device-detection and proprietary mobile content adaptation software, the AD LIFE Platform addresses the mobile marketing industry problem of disparate operating systems, device types, and on-screen mobile content rendering; the Debtor also provides business-to-consumer utilities, including national mobile couponing solutions, strategic mobile healthcare tools, custom mobile application development, and

consumer data tracking and analytics. The Debtor has been involved with over 400,000 campaigns since 2004, across hundreds of customers including Fortune 100 and other established brand clients. The Debtor's software and other products serve marketers, brands, and agencies in many vertical markets, including automotive, retail, consumer products, food and beverage, media and broadcast, pharmaceutical and restaurant brands.

10.    The Debtor's mobile marketing product line is a software platform primarily used by the Debtor's customers to engage and interact with their customers through SMS (text messages). In general, the Debtor's mobile marketing products are sold directly to large brands under contracts lasting 12-36 months. This mobile marketing revenue primarily represents software licensing fees paid monthly. The Debtor's mobile advertising product is a tool that allows advertisers to create, manage and optimize their mobile advertising campaign. This product is generally sold through advertising agencies on a campaign-by-campaign basis.

11.    In light of (i) the extensive marketing process already undertaken (discussed further below), (ii) the additional efforts that will be made during the proposed sale process, and (iii) the current liquidity issues facing the Debtor, the proposed prompt and orderly Sale of the Acquired Assets is in the best interest of the Debtor, the bankruptcy estate and its creditors. Pursuant to the Stalking Horse Agreement and the Debtor's DIP financing facility (provided by the Stalking Horse Bidder), the Debtor must obtain an order approving the Bid Procedures Motion (the "Bid Procedures Order") no later than 23 days after the Petition Date, conduct an auction (if applicable) no later than three business days prior to the sale hearing, have set a sale

hearing no later than 40 days after the Petition Date, and obtain a sale order no later than 45 days after the Petition Date.

**Marketing Process**

12.     In late 2013, the Company was approached by a number of suitors about potential strategic partnerships.  Given this inbound interest and concerns over liquidity, in January 2014, the Company retained the advisory services of Canaccord Genuity ("Canaccord") to explore and evaluate potential strategic alternatives with a focus of selling the business or raising capital.  In connection therewith, an online data room was created, marketing materials were prepared or circulated including a detailed Confidential Information Memorandum, and a number of management meetings or calls were conducted with potential interested parties.

13.     Starting in February 2014, and over a number of months, Canaccord reached out to approximately 96 potential interested parties (strategic and financial parties, domestic and international) as to potential strategic opportunities.  The Company itself announced in mid-February 2014 (through a press release and other public filings) that it was exploring potential strategic alternatives, resulting in various parties contacting the Company and Canaccord as to potential interest in the Company's business and assets.  Of the numerous parties with whom Canaccord had discussions about a potential strategic transaction, at that juncture, approximately 28 parties executed nondisclosure agreements and received confidential information.  The Company requested offers to be submitted by April 23, 2014; no bids for the Company were submitted.  Based on discussions with Canaccord, the Debtor believes no bids

were submitted because of the lack of revenue growth in FY 2014, significant operating losses over the prior several years, and continued inability of the Company to meet its prior financial forecasts, among other factors.

14.    Based on the lack of interest from potential buyers and concern over the Company's financial viability, in May 2014, the Company's Board of Directors elected to make several changes to management and the Company's strategy.  On May 31, 2014, Todd Wilson was appointed Interim CEO and Doug Stovall was promoted from COO to President/COO.  Additionally, Mr. Wilson made a number of changes to the Company's strategy to focus the business more acutely on operating profitability and cash flow.  Based on the revised operating strategy, with Canaccord's assistance, the Company re-launched the exploratory and marketing process.  Ultimately, in total, Canaccord contacted or recontacted approximately 108 potential interested parties regarding strategic options (of which 32 parties in total provided nondisclosure agreements).  During this subsequent stage, three parties expressed significant interest in the entire company, while two additional parties indicated interest in only certain assets and aspects of the business.  Discussions among the parties continued over a number of months, and four non-binding indications of interest (two in respect to the entire business and two in relation to certain assets) were submitted in the late September / early October 2014 timeframe.

15.    On a separate but related track, before and after the changes to strategy and personnel, Canaccord reached out to approximately 33 parties regarding potentially financing (equity and/or debt) the Company's business (as opposed to a business combination, asset sale

or other transaction). Approximately nine parties executed nondisclosure agreements and received confidential information; however, no viable offer emerged from those financing-related efforts.

16.     During October/November 2014, the Company and Canaccord continued discussions with certain parties, including two of the parties who had expressed interest in the entire business and the two parties who had indicated interest in certain assets. During this time, three of the parties conducted substantial due diligence into the Debtor's business and operations. This led to the submission to the Company of three non-binding indications of interest or letters of intent – two for the entire business and one for select assets. The Company subsequently executed a non-binding letter of interest with the party interested in select assets. The Company and Canaccord spent significant time discussing, negotiating and documenting these potential transactions. As of early December 2014, all three of these indications of interest were still being analyzed and negotiated.

17.     Unfortunately, the inability to resolve a shareholder lawsuit gave potential purchasers of the business significant concern. Additionally, the Company's financial condition continued to deteriorate and given the prolonged public strategic process, employee morale suffered. As such, the Company's financial performance weakened and all three interested parties rescinded or modified their offers. At that time, with Canaccord's assistance, the Company broadened its efforts to gauge interest specifically in a potential § 363 sale. Approximately fifteen parties were contacted in this specific regard, of which nine parties executed nondisclosure agreements and received confidential information. While described

above as separate exploratory tracks, the Company's efforts regarding a potential sale or other transaction and debt/equity financing were interrelated components of an overall comprehensive and fluid process, with some overlap among potential interested parties and the development and regauging of parties' potential interest, designed to maximize value for the Company.

18.    Ultimately, only one party –the Stalking Horse Bidder– continued to further progress with the negotiations resulting in a final and definitive Asset Purchase Agreement dated as of January 20, 2015, for the purchase of substantially all of the Debtor's assets, which agreement is attached hereto as **Exhibit A**.

19.    The Purchaser is also the Debtor's postpetition lender, providing a $3.4 million DIP financing facility (the "DIP Facility") to the Debtor, as described in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion") [Docket No. 11].  The DIP Facility was approved on an interim basis, with certain modifications, pursuant to an order entered on January 23, 2015 (the "Interim DIP Order") [Docket No. 43].

### Continued Sale Process

20.    While the prepetition marketing and sale process was thorough, as discussed above, the Debtor will send, or will have sent, notice of the Sale Motion and Bid Procedures Motion, and will send the Bid Procedures after approval thereof by the Court, to all parties that

the Debtor believes may be potentially interested in acquiring the Acquired Assets. The

Debtor will also maintain its electronic data room with key documents and Debtor-specific

information in order to streamline the due diligence process going forward. The data room has

been, and will be, available to interested parties who have, or will, execute confidentiality

agreements acceptable to the Debtor and meet the other applicable requirements set forth in the

Bid Procedures. The Debtor will continue to respond to inquiries from prospective buyers

through the bid deadline approved by the Court for alternative bidders to bid on the Acquired

Assets. The Debtor will also continue to use Canaccord as its investment banker to solicit any

further offers for the Acquired Assets.

      21.     The Debtor believes that the consummation of the Sale to the Purchaser or other

Successful Bidder will provide its creditors and other stakeholders with the best opportunity

possible for maximizing the value of the Acquired Assets.

      22.     The material terms of the Stalking Horse Agreement with the Purchaser are set

forth below. Pursuant to the terms of the Stalking Horse Agreement and subject to entry by the

Court of an order substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), the

Purchaser, subject to higher or better bids, will purchase all of, or substantially all of, the

Debtor's assets.

## Agreement With Purchaser[3]

      23.     The key terms of the Stalking Horse Agreement and the Sale Order are

summarized below. The description below only summarizes certain provisions of the Stalking

---

[3] Unless otherwise noted, capitalized terms used in this section have the meanings ascribed in the Stalking Horse Agreement.

Horse Agreement and the Sale Order as a convenience to the Court and parties in interest, and the terms of the Stalking Horse Agreement and the Sale Order, as applicable, control in the event of any inconsistency.

      a.    **Purchase Price.**  The Purchase Price is (i) an amount equal to the sum of $4,500,000 in cash, *plus* (II) an amount equal to the Cure Amounts up to the Cure Cap ($500,000), *plus* (III) the amounts approved by the Court with respect to the KEIP up to the KEIP Limit ($255,000[4]), *less* (ii) the sum of (I) the amount of Assumed DIP Obligations *plus* (II) the amount of Cure Amounts that are required to be paid in excess of the Cure Cap up to a maximum of $50,000.  Agreement, § 3.1.

      b.    **Purchased Assets.**  Purchaser shall purchase and acquire all of Debtor's right, title and interest in all of Debtor's tangible and intangible assets, rights and claims, to the extent owned, leased, used or relating to the Business, other than the Excluded Assets, including (a) all accounts receivable, notes receivable, negotiable instruments, chattel paper and other receivables, (b) all Intellectual Property related to the Business, (c) all scheduled PP&E, (d) all Cash, (e) all deposits, prepayments, vendor rebates and other refunds, rights under warranties and guaranties, rights of setoff and recoupment, and similar assets relating to the Business or Acquired Assets, (f) all Transferred Leased Real Property, (g) all Assumed Contracts, (h) all Documents related to the Business or Acquired Assets, to the extent permitted by applicable law, (i) all Permits to the extent transferable, (j) except to the extent that it is an Excluded Asset, all rights under all insurance policies relating to the Acquired Assets, (k) any claim or interest in and to all tax refunds, credits and similar items relating to any period beginning on or after the Closing Date, to the extent relating to the Business or Acquired Assets post-Closing, (l) all rights and claims of Debtor for any action under the Bankruptcy Code including avoidance actions against non-insiders of the Debtor, (m) all rights and claims to the corporate name "Hipcricket" and certain other corporate names in connection with the Business, and (n) certain other specified and scheduled assets.  Excluded Assets include, without limitation, (1) tax records, work papers and other files, documents, and records as they pertain solely to Excluded Assets and/or ownership and organization of the Debtor; (2) nontransferable Permits; (3) all rights under insurance policies not relating to the Acquired Assets; (4) subject to Section 2.5, all Contracts that are not Assumed Contracts; (5) any causes of action and claims arising from or in connection with the Business and operation of the Acquired Assets, relating to any pre-Closing period; (6) all claims for any action under the Bankruptcy Code against any insider of the Debtor; (7) all Employee Benefit Plans and trust funds and Contracts related thereto; (8) all rights to any Tax refunds (otherthan as set

---

[4] This $255,000 figure is based on a Cash Purchase Price of $4,500,000.  If the Cash Purchase Price of the ultimate prevailing bid is higher than $4,500,000, the actual aggregate payout to KEIP participants would be higher than $255,000, subject to the terms of an approved KEIP, although such additional amount over $255,000 would be paid out of the net sale proceeds of the estate, rather than directly by the Successful Bidder as a component of the Purchase Price.

forth in Section 2.1(k)), tax loss or other attribute; (9) the goodwill of the Debtor relating to the Business; and (10) certain other specified and scheduled assets. Agreement, §§ 2.1, 2.2.

     c.    **Assumed Liabilities.** The Assumed Liabilities exclude any Excluded Liabilities and include: (i) all Cure Amounts owing under any Assumed Contracts up to the Cure Cap of $500,000; (ii) all of Debtor's Liabilities under the Assumed Contracts arising after the Closing Date; (iii) the Assumed DIP Obligations (provided that the sum of all cash of the Business as of the Closing Date will reduce the amount of such Obligations; (iv) Liabilities arising under the KEIP, to the extent the KEIP is approved by the Court, up to the KEIP Limit ($255,000); (v) Assumed WARN Obligations; and (vi) certain other specified and scheduled liabilities. Agreement, §§ 2.3, 2.4

     d.    **Closing.** The Closing shall take place on a Business Day mutually acceptable to the parties, provided such date is no later than 15 days following the entry of the Sale Order. Agreement, 10.1. Either party may terminate the Agreement if the Closing shall not have occurred by April 15, 2015. Agreement, § 11.1.

     e.    **Deposit.** Purchaser has provided Debtor with a $200,000 Deposit. Agreement, § 3.2.

     f.    **Identity of Purchaser.** A publicly held company, the Purchaser is SITO Mobile, Ltd. (f/k/a Single Touch Systems, Inc.), a leading mobile engagement platform provider for businesses, advertisers and brands primarily in the United States. The Purchaser is the Debtor's DIP lender, providing a DIP facility up to a maximum of $3.4 million. The Purchaser is not an insider of the Debtor, and it has no other affiliation with the Debtor. Publicly held

     g.    **Assumption of Executory Contracts and Unexpired Leases.** Schedule 2.5(a) set forth the Assumed Contracts, provided that Purchaser may add or delete contracts to that schedule until five business days prior to the Sale Hearing. At Closing, Debtor shall assume and assign to Purchaser each of the Assumed Contracts that are capable of being assumed and assigned, and Purchaser shall pay promptly all Cure Amounts (if any) in connection with such assumption and assignment (as agreed to by Debtor and Purchaser or as determined by the Court). Debtor and Purchaser will use their commercially reasonable efforts to obtain any Necessary Consents with respect to any Assumed Contract or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as it may reasonably request. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such Necessary Consent is not obtained, neither Debtor nor Purchaser shall be in breach of the Agreement nor shall the Purchase Price be adjusted nor (but subject to Purchaser's termination right set forth in Section 11.1(d)(iii)) shall the Closing be delayed in respect of the Assumed Contracts, with such matters subject to further terms and conditions as set forth in the Agreement. Agreement, § 2.5

     h.    **Break-Up Fee / Expense Reimbursement.** So long as Purchaser shall not be in material violation of its obligations under the Agreement, if the Agreement shall be terminated pursuant to Section 11.1(b)(ii) or 11.1(b)(iii), then, the Expense Reimbursement (up

to $100,000) shall immediately become due from Seller to Buyer, and a $225,000 Break-Up Fee shall immediately become due from Debtor to Purchaser upon the consummation of an Alternate Transaction. The Break-Up Fee and Expense Reimbursement may be paid from the proceeds of an Alternate Transaction. So long as Purchaser shall not be in material violation of its obligations under the Agreement, if the Agreement shall be terminated pursuant to Section 11.1(d), then the Expense Reimbursement shall immediately become due. In the event that the Break-Up Fee and Expense Reimbursement is earned by Purchaser pursuant to Section 11.3(a), the agreement evidencing the Alternate Transaction shall provide that the Successful Bidder shall pay the Expense Reimbursement and the Break-Up Fee directly to Purchaser by wire transfer to an account specified by Purchaser at the Closing of the Alternate Transaction. If for any reason such Successful Bidder fails to pay the Break-Up Fee and Expense Reimbursement directly to Purchaser, Debtor is authorized and directed to pay the Break-Up Fee and Expense Reimbursement from the gross cash proceeds of the Alternate Transaction. Agreement, § 11.3.

      i.     **Representations, Warranties and Covenants**. The Debtor made various representations customary for a transaction of this kind including, but not limited to, those relating to organization and good standing, authorization and validity, title to assets, contracts, litigation, intellectual property, and other matters. The Purchaser has made certain representations, among others, relating to organization, good standing, and financial ability. *See* Agreement, Arts. 4 and 5. The Debtor and Purchaser also agreed to various covenants including, but not limited to, Debtor's conduct of business, access to information, and certain employee matters. Agreement, Art. 6. With regard to employee matters, Purchaser has agreed, prior to the Closing, to offer to employ, commencing immediately following the Closing, all employees of Debtor at their salaries or hourly wage, as the case may be, applicable to their employment by Debtor immediately prior to the Closing, and on other terms and conditions as Purchaser shall determine in its sole discretion. Effective as of the Closing Date, Purchaser shall assume all obligations relating to, and give full credit for, all unused vacation and paid time off, in the aggregate, of each Transferred Employee accrued as of the Closing Date. Further, Debtor shall, in accordance with applicable laws, terminate effective on the Closing Date all of its employees engaged with respect to the Acquired Assets, and pay all costs associated with such terminations; provided, however, that Purchaser agrees to assume, and indemnify and hold Debtor harmless from all obligations, if any, arising under WARN as a result of Debtor's termination of the employment of Terminated Employees on or after the Closing Date, except and to the extent that any such WARN Liabilities are avoided as a result of Purchaser's offer of employment to any of the Terminated Employees. Agreement, § 6.3.

      j.     **Taxes**. Debtor and Purchaser each shall be responsible for and timely pay 50% of all Transaction Taxes. Agreement, Art. 7.

      k.     **Conditions/Termination**. The Closing is conditioned upon the occurrence of certain events customary for transactions of this kind, including the truthfulness of all representations and warranties and all consents and approvals, including approvals of the Bankruptcy Court, having been obtained. Agreement, Art. 9. The Agreement may be or shall be, as applicable, terminated by the parties in the case of certain events. Among other events, the Agreement may be terminated by either party if the Closing does not occur by April 15,

2015, and by the Purchaser if the Sale Milestones are not met. Agreement, Art. 11. The
Agreement further provides for certain Sale Milestones including the following: (i) the entry of
the Bid Procedures Order within 23 days after the Petition Date, (ii) the Sale Hearing no later
than 40 days after the Petition Date, and (iii) the entry of the Sale Order within 45 days after
the Petition Date. Agreement, § 8.1.

        l.    **Rule 6004/6006 Waiver**.  The proposed Sale Order provides that, upon
entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004
and 6006. Sale Order ¶ 29.

        m.    **Successor Liability Findings**.  The Sale Order provides that the
Purchaser shall not have any successor liability.  Sale Order, ¶¶ Q, 5 and 6.

        n.    **Record Retention**.  The Debtor will have access to the books and
records transferred to the Purchaser, to enable the Debtor to administer its chapter 11 case, for
a period of three years after the Closing.  Agreement, § 6.8.

    24.    The Debtor believes that the sale of the Acquired Assets as a going concern to
the Successful Bidder is in the best interests of the Debtor's estate.  The Debtor further believes
that proceeding with the Purchaser, marketing the Acquired Assets with the assistance of its
advisors, and holding the Auction on the date specified by the Court, will result in the highest
or otherwise best consideration for the Acquired Assets and the maximization of the value
thereof for the benefit of the estate and its creditors.

    25.    The Debtor has examined the alternatives to a Sale of the Acquired Assets and
has determined that, in light of the Debtor's financial situation, liquidity needs, and value of
the Acquired Assets, a more viable alternative to sale of the Assets does not exist.  The Debtor
determined that the Sale of the Acquired Assets optimizes value for the estate and its creditors,
which value includes $4.5 million in cash, payment of the Court-approved KEIP, and the
assumption of substantial liabilities including potentially hundreds of thousands of dollars in
cure claims.

26.     For the reasons stated above, and in light of the clear benefits to the estate, the Debtor has determined, in the exercise of its business judgment, to consummate the proposal submitted under the Stalking Horse Agreement with the Purchaser or, if applicable, another bidder in the event that the Debtor receives a higher or otherwise better bid to the transaction set forth in the Stalking Horse Agreement.

### **Relief Requested**

27.     The Debtor is requesting that this Court, *inter alia*, (a) authorize the sale of the Acquired Assets (including the sale of the Assumed Contracts), to the Purchaser pursuant to the Stalking Horse Agreement, or alternatively, to the other Successful Bidder pursuant to such competing agreement(s) with such other Successful Bidder entered into in accordance with the Bid Procedures Order, (b) authorize such sale of the Acquired Assets to be free and clear of all liens, claims, rights, encumbrances or other interests pursuant to sections 105, 363(b), 363(f) and 363(m) and 365 of the Bankruptcy Code, with such liens, claims, rights, encumbrances and interests (collectively, the "Liens, Claims and Encumbrances") attaching to the sale proceeds of the Acquired Assets (the "Sale Proceeds") with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; (c) authorize the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or other Successful Bidder, as applicable, pursuant to sections 363 and 365, and (d) grant such other relief as may be necessary or appropriate.

## **Basis for Relief**

28.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice

and a hearing, may use, sell or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a).

29.     A sale of the debtor's assets should be authorized pursuant to section 363 of the

Bankruptcy Code if a sound business purpose exists for doing so.  *See, e.g., Meyers v. Martin*

*(In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re*

*Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986);

*In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396

(W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

circumstances" standard, finding the "sound business purpose" standard applicable and,

discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if
> there is a sound business purpose for the sale include:  the
> proportionate value of the asset to the estate as a whole; the
> amount of elapsed time since the filing; the likelihood that a plan
> of reorganization will be proposed and confirmed in the near
> future; the effect of the proposed disposition of the future plan of
> reorganization; the amount of proceeds to be obtained from the
> sale versus appraised values of the Property; and whether the
> asset is decreasing or increasing in value.  124 B.R. at 176.

30.    The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

31.    The Debtor has proposed the sale of the Acquired Assets after thorough consideration of all viable alternatives and has concluded that the Sale is supported by sound business reasons. The Debtor has extensively marketed the Acquired Assets as described above and has proposed Bid Procedures designed to maximize the purchase price realized from the Sale of the Acquired Assets.

32.    Given the Debtor's difficult financial condition and the lack of adequate working capital for continued operations, the Debtor's need for a prompt and orderly sale process is also necessary to preserve the business as a going concern. As set forth in the Stalking Horse Agreement, the Debtor is required to obtain an order approving the Bid Procedures within 23 days after the Petition Date and obtain a sale order no later than 45 days after the Petition Date. The Debtor believes that the prepetition and postpetition marketing of the Debtor up to the proposed deadline to submit competing bids for the Acquired Assets will provide a sufficient opportunity to generate any potential overbids, and that resulting Sale will serve to maximize the value of the estate's assets.

33.    The Debtor has articulated sound business reasons, set forth above, for a sale of the Acquired Assets on the proposed schedule. *See, e.g., In re Tempo Tech.*, 202 B.R. 363,

369-70 (D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after the

petition date, where the debtor faced a cash shortfall, operated in an industry where there were

few potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy

estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy court's

approval of a sale of substantially all of the debtor's assets where the debtor would have been

"in liquidation mode if required to delay a sale until after filing a disclosure statement and

obtaining approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400

(granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of

the debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus.,*

*Inc.)*, 63 B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to

section 363(b) five weeks after the petition date where the debtor was suffering operating

losses).

34.    The Debtor believes that, as a result of the marketing efforts that have been

undertaken and that it will continue to undertake, the highest or otherwise best offer obtained

through the proposed Bid Procedures and Auction will provide maximum value to the Debtor

under the current circumstances.  Other potential buyers and parties that have expressed

interest in the acquisition of the Acquired Assets will be served with the Sale Motion and/or

notice thereof.  The fairness and reasonableness of the consideration to be paid by the

Purchaser or other Successful Bidder is demonstrated by the marketing efforts that the Debtor

has undertaken, and will continue to undertake, followed by a fair and reasonable sale process

including a potential auction, and culminating in the Sale of the Acquired Assets.  As noted

herein, notice of this Sale Motion, as well as of the Bid Procedures Motion, has been or will

shortly be served by the Debtor on potential bidders, as well as known putative lienholders.

35.     The Sale of the Acquired Assets is supported by sound business reasons and is

in the best interests of the Debtor and its estate.  Accordingly, the Debtor requests approval

under Bankruptcy Code section 363(b) of the Sale to the Purchaser or other Successful Bidder,

as set forth herein.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the
Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests**

36.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section
> free and clear of any interest in such Property of an entity other than the
> estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and
> clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be
> sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to
> accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and

clear of any interests."  The term "any interest," as used in section 363(f), is not defined

anywhere in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209

F.3d 252, 259 (3d Cir. 2000).  In *Folger Adam*, the Third Circuit specifically addressed the

scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the Property." *Id.* at *258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

38.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Acquired Assets free and clear of all of the applicable Liens, Claims and Encumbrances, except with respect to any Liens, Claims and Encumbrances permitted under the Stalking Horse Agreement. *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtor submits that each Lien, Claim and Encumbrance that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Lien, Claim or Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the Sale Proceeds, subject to any claims and defenses the Debtor may possess with respect thereto. The Debtor accordingly requests authority to convey the Acquired Assets to the Purchaser or other Successful Bidder(s), free and clear of all Liens,

Claims and Encumbrances except for the Liens, Claims and Encumbrances that expressly

permitted under the terms of the Stalking Horse Agreement, with such Liens, Claims and

Encumbrances to attach to the Sale proceeds, with the same validity (or invalidity), priority and

perfection as existed immediately prior to the Sale, subject to the terms of the Stalking Horse

Agreement and the Sale order.

39.    The Debtor has conducted a UCC search and other lien searches of purported

lienholders in conjunction with the proposed sale of the Acquired Assets.  The Debtor has

served such purported lienholders with notice of this Sale Motion, and will serve notice of the

Sale Order if and when such order is entered by the Court.  The Debtor's prepetition secured

factor, Fast Pay, has been paid in full on account of its prepetition claims and its liens released,

as provided in the Interim DIP Order.  The Debtor does not believe there is any other secured

creditor with a material claim against the estate (the Debtor notes UCC-1 financing statements

were filed prepetition by certain equipment lessors or similar parties and that such parties'

collateral is limited to the applicable equipment or other personal property).  Out of an

abundance of caution, if and to the extent there are any other valid secured creditors, (a)

applicable nonbankruptcy law permits sale of the Acquired Assets free and clear of such

creditors' claims, or (b) such creditors could be compelled, in a legal or equitable proceeding,

to accept a money satisfaction of their claims.

40.    Accordingly, this Court should approve the Sale of the Acquired Assets to the

Stalking Horse Bidder or other Successful Bidder, as applicable, free and clear of Liens,

Claims and Encumbrances under Bankruptcy Code section 363(f), and any potential claimants

should be compelled to look exclusively to the proceeds of the Sale for satisfaction of their

claims.

**Good Faith Under Section 363(m) of the Bankruptcy Code;**
**Sale Not In Violation of Section 363(n) of the Bankruptcy Code**

41.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of Property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such Property
> in good faith, whether or not such entity knew of the pendency of
> the appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders as the sale.  *See* 11 U.S.C. § 363(n).  Although the

Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good
> faith status at a judicial sale involves fraud, collusion between
> the Buyer and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

42.    The Stalking Horse Agreement is a negotiated, arms' length transaction, in

which the Purchaser has acted in good faith, without collusion or fraud of any kind, and in

compliance with the *Abbotts Dairies* standards.  Neither the Debtor nor the Purchaser (to the

best of the Debtor's knowledge) has engaged in any conduct that would prevent the application

of section 363(m) of the Bankruptcy Code or otherwise implicate section 363(n) of the

Bankruptcy Code with respect to the consummation of the Sale or the transfer of the Acquired

Assets to the Purchaser.  In addition, if a party other than the Purchaser is the Successful

Bidder, the Debtor intends to make an appropriate showing at the Sale Hearing that the

purchase agreement with the other Successful Bidder is a negotiated, arms' length transaction,

in which the Successful Bidder at all times has acted in good faith under and otherwise in

accordance with such standards.

43.    The Debtor thus requests that the Court find that the Purchaser or the Successful

Bidder has purchased the Acquired Assets in good faith within the meaning of section 363(m)

of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the

Bankruptcy Code.

### Authorization of Assumption and Assignment of Assumed Contracts

44.    As required by the Stalking Horse Agreement, and in order to enhance the value

to the Debtor's estate, the Debtor requests approval of the potential assumption and assignment

of the Assumed Contracts to Purchaser or the other Successful Bidder upon the closing of the

transactions contemplated under the Stalking Horse Agreement.

45.    Pursuant to the Stalking Horse Agreement, the Purchaser (or Successful Bidder)

is responsible for payment of all cure amounts required to be paid to the counterparties to the

Assumed Contracts assumed and assigned (each a "Counterparty" and collectively, the

"Counterparties") under section 365(b)(1) of the Bankruptcy Code, up to a Cure Cap of

$500,000. The Stalking Horse Agreement further provides that the Purchaser may elect to delete or add agreements to list of Assumed Contracts at any time up until five business days prior to the Sale Hearing.

46.    The Assumed Contracts are those contracts or leases that are to be assumed by the Debtor and assigned to the Purchaser or the other Successful Bidder as part of the Sale transaction under the Stalking Horse Agreement. The Debtor further requests that the Sale Order provide that the Assumed Contracts will be assigned to, and remain in full force and effect for the benefit of, the Purchaser or the other Successful Bidder, notwithstanding any provisions in the Assumed Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

47.    Pursuant to the Bid Procedures Motion, the Debtor proposes that an initial list of Assumed Contracts be served on all counterparties to such contracts and leases no later than three (3) business days after the entry of the Bid Procedures Order.

48.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

49.    Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision.  *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977).  A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors.  *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986).  The potential assumption and assignment of the Assumed Contracts, or any of them, set forth in the Stalking Horse Agreement, will be a necessary part of the deal that Debtor has struck with the Successful Bidder and, as stated above, will benefit the estate of Debtor.

50.      As set forth above with respect to Assumed Contracts to be potentially assumed and assigned pursuant to the Sale Hearing, the Debtor will send the Cure Notices to all Counterparties, thereby notifying such Counterparties of the potential assumption by the Debtor and assignment to the Purchaser or the Successful Bidder of the Assumed Contracts at the Sale Hearing. The Cure Notices set forth the "cure" amounts owing on each of the Assumed Contracts, according to the Debtor's books and records and, in accordance with the provisions set forth in the Bid Procedures, shall be the amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure Amounts"). The Bid Procedures Motion proposes that objections, if any, to either the Cure Amounts or the assumption or assignment of their Assumed Contracts to the Purchaser or adequate assurance of future performance by the Purchaser be filed by a certain deadline. Objections to the adequate assurance of future performance of a Successful Bidder (other than the Purchaser) may be raised at the Sale Hearing.

51.      Counterparties to the Assumed Contracts will have a sufficient opportunity to file an objection to the proposed Cure Amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the applicable contract or lease Counterparty. The payment of the Cure Amounts specified in the Cure Notices (or a different amount either agreed to by the Purchaser, or the Successful Bidder, or resolved by the Court as a result of a timely-filed objection filed by a contract or lease Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant

to section 365(b)(1) of the Bankruptcy Code, unless the Debtor determines (with the consent of

the Purchaser or Successful Bidder) that a particular lease or contract is not truly executory,

and does not need to be cured to transfer the lease or contract to the Purchaser or Successful

Bidder.

52.     Cure Amounts disputed by any Counterparty will either be considered by the

Court either at the Sale Hearing or at some later date as may be scheduled by the Court to

determine contested objections regarding Cure Amounts, which have not been resolved in

advance or at the Sale Hearing.  With respect to payment of Cure Amounts, the Purchaser or

Successful Bidder shall bear and pay the entire amount of such cure costs subject to the Cure

Cap (any amounts owed to Counterparties above the Cure Cap will be paid by the Purchaser

but in that case, the aggregate cash purchase price to be paid by the Purchaser to the Debtor

will be decreased dollar-for-dollar up to $50,000).

53.     The Purchaser or Successful Bidder is responsible for providing evidence of

"adequate assurances of future performance" to the extent required in connection with the

assumption and assignment of any Assumed Contract.  The meaning of "adequate assurance of

future performance" for the purpose of the assumption of executory contracts and unexpired

leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances

of each case, but should be given "practical, pragmatic construction."  See *Carlisle Homes, Inc.*

*v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  *See also In re*

*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re*

*Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). If necessary, the Purchaser or the other Successful Bidder shall provide evidence of its ability to provide adequate assurances to Counterparties to the Assumed Contracts prior to or at the Sale Hearing (pursuant to the Bid Procedures, the Stalking Horse Bidder will also prepare adequate assurance related information for service upon applicable Counterparties at the same time as the service of the Cure Notice). Moreover, any Successful Bidder will be required to provide to the Debtor evidence that the bidder can provide adequate assurance of future performance with respect to the Assumed Contracts at the time it submits its bid.

### Sale and Transfer of Consumer Related Information in This Case Does Not Require the Appointment of an Ombudsman

54.     As part of the Sale, possession of certain individuals' personal information will be transferred by the Debtor to the Purchaser (or other Successful Bidder). Under Code section 363(b)(1), a debtor may sell or lease its consumer customer list and related customer personal information under certain circumstances including where such sale or lease is consistent with the debtor's prepetition policy relating to the transfer of "personally identifiable information" ("PII").[5] If such circumstances are not met, section 332 provides for the appointment of a consumer privacy ombudsman.

---

[5]  Section 363(b)(1) provides:

The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

55.    The Debtor believes that the appointment of an ombudsman is not required in
this case because, as set forth in the proposed Sale Order (paragraph V), the Purchaser has
agreed that it will adhere to any privacy policies applicable to the Debtor ("Privacy Policies").
*See, e.g., In re THQ Inc.*, 2013 Bankr. LEXIS 770, *43 (Bankr. D. Del. Jan. 24, 2013) ("the
sale or lease proposed by this motion is consistent with [Debtors' privacy] policy because
[buyer] has agreed to comply with the Debtors' privacy policy as applicable to personally
identifiable information collected by the Acquired Business prior to the Closing"). If an
Auction is held and a Successful Bidder other than the Stalking Horse Bidder is selected, such
Successful Bidder will be required by the Debtor to similarly agree to abide by and adhere to
the Privacy Policies.

56.    In addition to the Purchaser's agreement to abide by the Privacy Policies, the
Debtor believes other factors further make clear that no ombudsman is needed in this case.
The Debtor obtains some individuals' names, phone numbers, email addresses and similar
information through the Debtor's website (www.hipcricket.com) (the "Website Personal
Information"). Such individuals generally provide such information to obtain more
information about the Debtor and/or sign up for the Debtor's newsletters and emails, and
typically do so to learn about investment opportunities or the Debtor's products/services that
may be of use to the Debtor of which the individual is an employee or agent. The transfer of at
least some such Website Personal Information in the Debtor's possession to the Purchaser in

---

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable
nonbankruptcy law.

connection with the Sale is consistent with the Debtor's prepetition privacy policy (the

"Privacy Policy"), which provides in pertinent part:

> Hipcricket does not share personal information with third parties; provided, however,
> Hipcricket may sell, transfer or otherwise disclose personal information provided by
> individuals to Hipcricket (excluding personal information collected by Hipcricket as a
> service provider for its clients), in connection with a sale of substantially all of
> Hipcricket's assets, corporate merger or consolidation...

*See* http://hipcricket.com/privacy-policy.

57.    Moreover, even if the proposed transfer of some Website Personal Information

as part of the Sale were not arguably consistent with the Privacy Policy, this information does

not constitute PII for purposes of section 363(b)(1).  Section 101(41A) defines PII as:

> (A)    if provided by an individual to the debtor in connection with *obtaining a*
> *product or a service from the debtor primarily for personal, family, or household*
> *purposes*-- (i) the first name (or initial) and last name of such individual, whether given
> at birth or time of adoption, or resulting from a lawful change of name; (ii) the
> geographical address of a physical place of residence of such individual; (iii) an
> electronic address (including an e-mail address) of such individual; (iv) a telephone
> number dedicated to contacting such individual at such physical place of residence;
> (v) a social security account number issued to such individual; or (vi) the account
> number of a credit card issued to such individual; or
>
> (B)    if identified in connection with 1 or more of the items of information specified
> in subparagraph (A)-- (i) a birth date, the number of a certificate of birth or adoption, or
> a place of birth; or (ii) any other information concerning an identified individual that, if
> disclosed, will result in contacting or identifying such individual physically or
> electronically.

(emphases added).  As explained above, individuals submitting Website Personal Information

generally provide this information to obtain more information about the Debtor and potential

investment opportunities and/or the Debtor's products/services that may be of use to the

company of which the individual is an employee or agent.  In other words, such individuals

typically provide to the Debtor Website Personal Information for business and similar

purposes, and not for "personal, family, or household purposes" as required in section 101(41A). Thus, in respect to this group of individuals' personal information in the Debtor's possession, such information does not constitute PII for purposes of the Bankruptcy Code.

58.     In addition to the Website Personal Information, the Debtor is in possession of or has access to certain other personal information of consumers. Generally, the Debtor's customers are corporate clients (as opposed to individual customers), who utilize the Debtor's Platform and/or other products/services (such as website building) and who, through such means, reach out and communicate with their respective customers, and in connection therewith obtain personal information from customers or potential customers. At the direction of the applicable corporate client, the Debtor may also send communications (like marketing text messages) to the client's consumer customers, but the Debtor does so at its client's request and in respect to the customers of the Debtor's client. Such personal information ("Client Customer Information") is and remains the property of the Debtor's clients, and is not the Debtor's property, and thus cannot and will not be sold (or leased) by the Debtor to the Purchaser. Accordingly, section 363(b)(1)'s PII related restrictions are not applicable to such Client Customer Information. *See* 11 U.S.C. § 363(b)(1) ("if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee *may not sell or lease* personally identifiable information to any person unless [certain requirements are met]" (emphasis added)).

59.    Based on the foregoing, the Debtor submits that the appointment of a consumer

privacy ombudsman is not mandated by the Bankruptcy Code and unnecessary in this case.

## Notice

60.    Notice of this Motion and a copy of this Motion will be provided to (i) the

Office of the United States Trustee, Attn: Jane Leamy, Esq.; (ii) the twenty largest unsecured

creditors of the Debtor; (iii) all parties who are known by the Debtor to assert liens with respect

to the Acquired Assets, if any; (iv) all entities who executed non-disclosure agreements with

the Debtor in connection with a potential acquisition of any or all of the Acquired Assets or

whom the Debtor believes may have an interest in bidding; (v) all counterparties to the

Assumed Contracts; (vi) the Purchaser and its counsel; (vii) all taxing authorities having

jurisdiction over any of the Acquired Assets, including the Internal Revenue Service; (viii) the

state/local environmental agencies in the jurisdictions where the Debtor leases real property;

(ix) all Attorneys General for the states in which the Debtor conducts business; (x) all state,

local or federal agencies having jurisdiction over any aspect of the Debtor's business

operations; and (xi) all parties who have timely filed requests for notice under Rule 2002 of the

Federal Rules of Bankruptcy Procedure.  Upon approval of the Bid Procedures Motion, the

Debtor will serve notice of this Sale Motion (as proposed in the Bid Procedures Motion,

subject to Court approval) on all other known creditors of the Debtor, and serve supplemental

notice including of applicable deadlines and hearing dates to the parties previously served with

notice of the Sale Motion (as proposed in the Bid Procedures Motion, subject to Court

approval).  The Debtor respectfully submits that such notice is sufficient, and request that the

Court find that no further notice of the relief requested herein is required.

61.    The Debtor requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that

the order approving this Sale Motion become effective immediately upon its entry.

### Conclusion

62.    The Debtor's proposed sale of the Acquired Assets as described in this Sale

Motion is supported by sound business reasons, as set forth herein.  The proposed Sale is

proper, necessary and serves the best interests of the Debtor, its estate and creditors and all

parties in interest.  The Debtor thus requests that the Court approve the proposed Sale of the

Acquired Assets free and clear of all interests, liens, claims, and encumbrances, as requested,

to the Purchaser or other Successful Bidder.

### No Prior Request

63.    No prior request for the relief sought in this Sale Motion has been made to this

or any other court.

WHEREFORE, the Debtor respectfully requests that this Court (i) grant this Sale Motion and authorize the sale and transfer of the Acquired Assets (including the Assumed Contracts) to the Purchaser or other Successful Bidder and approve the Stalking Horse Agreement, pursuant to the attached proposed order; (ii) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments of the Assumed Contracts; and (iii) grant such other and further relief as is just and proper.

Dated: January 27, 2015

PACHULSKI STANG ZIEHL & JONES LLP

_James E O'Neill_

Ira D. Kharasch (CA Bar No. 109084)
Linda F. Cantor (CA Bar No. 153762)
James O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:        ikharasch@pszjlaw.com
                   lcantor@pszjlaw.com
                   joneill@pszjlaw.com

[Proposed] Counsel to Debtor and
Debtor in Possession