# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re

HIPCRICKET, INC.,

Debtor.

Chapter 11

Case No. 15-10104 (LSS)

## DECLARATION OF IVAN BRAIKER

My name is Ivan Braiker. I have personal knowledge of the matters set forth in this declaration. If called to testify to these matters, I could do so competently.

1.      I was formerly employed by Augme Technologies, Inc. n/k/a Hipcricket, Inc. in various capacities, including employment as President and employment as Chief Executive Officer. I was also a board member.

2.      I was a party to an Employment Agreement dated August 25, 2011. A true and correct copy of that Employment Agreement (with typed signatures) is attached as Exhibit A to this declaration.

3.      I agreed to amend the Employment Agreement on four occasions. True and correct copies of the four amendments to the Employment Agreement are attached as Exhibit B to this declaration. I could not locate a signed version of the Fourth Amendment, but the version attached to this declaration reflects the agreement between the parties.

4.      As part of the fourth amendment to my Employment Agreement, Hipcricket ratified and confirmed the terms of the Employment Agreement.

5.      Hipcricket terminated my employment, effective May 30, 2014. The termination was without "Just Cause," as defined in Section 15(b)(ii) of the Employment Agreement, because I did not commit any of the acts defined as giving rise to "Just Cause," and I received no written notice from Hipcricket describing any "Just Cause."

6.      After my termination, Hipcricket continued to pay my base salary of $350,000 per annum, payable twice a month, as it was required to do under Section 15(a)(ii) of the Employment Agreement. Hipcricket was also obligated to pay health and disability insurance premiums of $1,474.86 per month.

7.      Hipcricket's obligation to pay my base salary, insurance, and benefits continues through August 25, 2015, which is the end of the "Subsequent Term."

8.      I received my last payment of base salary from Hipcricket on January 20, 2015. Hipcricket breached its obligation to make subsequent payments, apparently because of its bankruptcy filing.

9.      From January 21, 2015 through February 19, 2015, Hipcricket owes me $29,097 in unpaid base salary, as well as another $2,439.19 in unpaid insurance premiums.

10.     From February 20, 2015 through August 25, 2015, Hipcricket will owe me base salary of $179,626.96, as well as another $13,952.62 for insurance.

11.     I have attached as Exhibit C to this declaration a true and correct copy of the calculations I relied on to determine the aggregate amount of base salary owed to me.

12.     Gay Gabrilska was a party to a Commission Plan-Sales Agreement dated March 1, 2014 with Hipcricket. I have not attached a copy because the agreement states it is confidential.

13.     Kim Donaldson was a party to a Commission Plan-Sales Agreement dated March 1, 2014. I have not attached a copy because the agreement states it is confidential.

14.     I received a Notice of Counterparties to Executory Contracts and Unexpired Leases That May Be Assumed and Assigned dated February 11, 2015. A true and correct copy of that notice is attached as Exhibit D to this declaration.

15.     The notice refers to a "Confidentiality and Non-Solicitation Agreement." Hipcricket may be referring to my Employment Agreement, which includes certain terms regarding confidentiality and non-solicitation issues.

2

16.    I understand that Gay Gabrilska and Kim Donaldson each received similar notices. True and correct copies of excerpts of those notices are attached as Exhibit E to this declaration.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 23, 2015.

IVAN BRAIKER

# EXHIBIT A

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement"), effective August 25, 2011, is entered into by and between Augme Technologies, Inc. ("the Company"), a Delaware corporation, (the 'Employer" or the "Company"), and Ivan Braiker (the "Employee").

## WITNESSETH:

**WHEREAS**, Employer is engaged in the interactive media technology business and related businesses, including but not limited to Internet and mobile communications advertising services, hardware and software development and sales, and information technology (the "Technologies"); and conducts research, experimentation, development, and exploitation of related technologies and engages in other businesses; and

**WHEREAS**, Employer desires to employ Employee to serve as President of the Company, and Employee desires to be employed by Employer in such capacity pursuant to the terms and conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the foregoing and the mutual promises and covenants herein contained, it is agreed as follows:

1. ## EMPLOYMENT: DUTIES AND RESPONSIBILITIES

Employer hereby employs Employee as President of the Company. Subject at all times to the direction of the Chief Executive Officer and the Board of Directors of the Employer, Employee's responsibilities shall include supervision of the overall operations of the Company and engaging in public relations on behalf of the Company, and such other duties as the Chief Executive Officer and the Board of Directors may prescribe from time to time. Employee's job sites shall be in the Kirkland, Washington metropolitan area. Employee shall serve, by mutual consent, in such other positions and offices of the Employer and its affiliates, if selected, without any additional compensation.

Employee shall confer with the Directors and other officers of the Company regarding ideas and proposals with respect to the overall direction and operation of the Company.

2. ## FULL TIME EMPLOYMENT

Employee hereby accepts employment by Employer, upon the terms and conditions contained herein, and agrees that during the term of this Agreement the Employee shall devote substantially all of his business time, attention, and energies to the business of the Employer. Employee, during the term of this Agreement, will not perform any services for any other business entity, whether such entity conducts a business which is competitive with the business of Employer or is engaged in any other business activity; provided, however, that nothing herein contained shall

1

be construed as (a) preventing Employee from investing his personal assets in any business or businesses which do not compete directly or indirectly with the Employer, provided such investment or investments do not require any services on his part in the operation of the affairs of the entity in which such investment is made and in which his participation is solely that of an investor, (b) preventing Employee from purchasing securities in any corporation whose securities are regularly traded, if such purchases shall not result in his owning beneficially, at any time, more than 5% of the equity securities of any corporation engaged in a business which is competitive, directly or indirectly, to that of Employer, (c) preventing Employee from (i) engaging in charitable activities, (ii) serving on corporate, advisory, civil or charitable boards or committees, or (iii) delivering lectures, or teaching at educational institutions, so long as such activities, individually or in aggregate, do not adversely affect the Employee's performance of his duties hereunder, which determination shall be made at the discretion of the Board, or (d) engaging in any other activities, if he receives the prior written approval of the Board of Directors of the Company with respect to his engaging in such activities.

3.    **RECORDS**

In connection with his engagement hereunder, Employee shall accurately maintain and preserve all notes and records generated by Employer which relate to Employer and its business and shall make all such reports, written if required, as Employer may reasonably require.

4.    **TERM**

Employee's employment hereunder shall be for three twelve month periods (the "Initial Term"), to commence on August 25, 2011 and end thirty-six months from the date of this Agreement. Thereafter, the Company may elect to extend employment to Employee for one or more additional twelve-month periods (the "Subsequent Term"), commencing thirty-six months from the date hereof. A twelve-month period shall be deemed a Contract Year. For all compensation and benefit purposes, other than those specifically addressed herein, the Employee shall be deemed to have been continually employed with the Employer from August 25, 2011.

5.    **SALARY**

As full compensation ("Base Salary") for the performance of his duties on behalf of Employer, Employee shall be compensated as follows:

(i)    Base Salary. Employer, (x) during the first-year of the term hereof, shall pay Employee a base salary at the rate of $270,000 per annum, payable semi-monthly; (y) during the subsequent second-year of the term, Employer agrees to pay Employee a base salary at the rate of $297,000 per annum, payable semi-monthly; and (z) during the subsequent third-year of the term, Employer agrees to pay Employee a base salary at the rate of $326,700 per annum, payable semi-monthly. If this Agreement is renewed for a subsequent term or terms, base salary shall be increased a) by a minimum of Ten-Percent (10%) (the "Minimum Increase") over the base salary in

effect on the renewal date; or b) as the Board of Directors shall determine if in excess of the Minimum Increase. Future salary increases will be subject to mutual agreement.

(ii)    _Annual Bonus._ In addition to the Base Salary, Employee will be eligible for an annual performance bonus, consistent with the annual performance bonus afforded to other senior management employees, to be payable upon achievement of performance goals and objectives to be mutually agreed upon by the Employee and the Company's Board of Directors in advance of the relevant performance period.

(iii)    _Other Meritorious Adjustments._ The Board of Directors may, in its sole and absolute discretion, consider other meritorious adjustments in compensation, or a bonus, under appropriate circumstances, including the conception of valuable or unique inventions, processes, discoveries or improvements capable of profitable exploitation by the Company.

6.    **EQUITY**

(i)    _Incentive Stock Options._ Employee shall receive options during the Term of this Agreement as determined by the Employer's Board of Directors from time to time, subject to subsections 6(ii) and (iii) below.

(ii)    _Initial Stock Option Grant._ Upon execution of this Agreement, Employee shall be granted an aggregate of 235,000 stock options from the Augme Technologies Inc. 2010 Incentive Stock Option Plan. The options shall have an exercise price of $3.04 per share (which exercise price is not less than the closing price on the date of Board approval) and a five year term. The options shall vest in accordance with the following schedule:

a.    47,000 of the stock options shall vest immediately.

b.    188,000 of the stock options shall vest in equal monthly increments over a three-year period ($1/36^{th}$ per month) starting at the date of this Agreement.

c.    In the event of (A) a merger, acquisition or sale transaction by the Company which causes a change of control of the Company (the "Control Change"), any unvested common stock, options to purchase common stock or similar securities held beneficially by you shall automatically become fully vested. For purposes of this section, Control Change shall mean the occurrence of any of the following events: (i) a majority of the outstanding voting stock of the Company shall have been acquired or beneficially owned by any person or any two or more persons acting as a partnership, limited partnership, syndicate or other group, entity or association acting in concert for the purpose of voting, acquiring, holding, or disposing of voting stock of the Company; or (ii) a merger or a consolidation of the Company with or into another corporation, other than (A) a merger or consolidation with a subsidiary of the Company, or (B) a merger or consolidation in which the holders of voting stock of the Company immediately prior to the merger as a class hold immediately after the merger at least a majority of all outstanding voting power of the surviving or resulting corporation or its parent; or (iii) a statutory exchange of shares of one or more classes or

3

series of outstanding voting stock of the Company for cash, securities, or other property, other than an exchange in which the holders of voting stock of the Company immediately prior to the exchange as a class hold immediately after the exchange at least a majority of all outstanding voting power of the entity with which the Company stock is being exchanged; or (iv) the sale or other disposition of all or substantially all of the assets of the Company, in one transaction or a series of transactions, other than a sale or disposition in which the holders of voting stock of the Company immediately prior to the sale or disposition as a class hold immediately after the exchange at least a majority of all outstanding voting power of the entity to which the assets of the Company are being sold; or (B) a transaction relating to a litigation settlement, exclusive licensing fee arrangement or sale of intellectual property wherein the Company receives cash proceeds, in which case the remaining amount of unvested stock options held by you shall be immediately vested according to the following terms;

| Net Amount Received by Company | Percentage of Remaining Stock Options to be Vested |
|---|---|
| | |
| Over $10,000,000 to $24,999.99 | 50% |
| | |
| Over $25,000,000 | 100% |

7. **BUSINESS EXPENSES**

The Employer also shall reimburse the Employee for all reasonable business expenses incurred by Employee in the performance of his duties hereunder including, but not limited to, travel on business, attending technical and business meetings, professional activities, and customer entertainment, such reimbursement to be made in accordance with regular Company policy and within a reasonable period following Employee's presentation of the details of, and proof of, such expenses.

8. **FRINGE BENEFITS**

(i)      During the term of this Agreement, Employer shall provide to Employee, at its sole expense, health insurance and other fringe benefits on the same terms and conditions as it shall afford other senior management employees.

(ii)      During the term of this Agreement, Employer shall provide paid vacation to Employee which accrues monthly from the date of execution of this Agreement. The annual paid vacation earned for each Contract Year is: (i) three (3) weeks per Contract Year for the first three (3) Contract Years of full-time employment; (ii) four (4) weeks per Contract Year for more than three (3) and up to seven (7) Contract Years of full-time employment; and (iii) five (5) weeks per Contract Year for more than seven (7) Contact Years of full-time employment.

9.    **SUBSIDIARIES**

For the purposes of this Agreement all references to business products, services and sales of Employer shall include those of Employer's affiliates.

10.    **INVENTIONS**

All systems, inventions, discoveries, apparatus, techniques, methods, know-how, formulae or improvements made, developed or conceived by Employee during Employee's employment by Employer, whenever or wherever made, developed or conceived, and whether or not during business hours, which constitute an improvement, on those heretofore, now or at any time during Employee's employment, developed, manufactured or used by Employer in connection with the manufacture, process or marketing of any product heretofore or now or hereafter developed or distributed by Employer, or any services to be performed by Employer or of any product which shall or could reasonably be manufactured or developed or marketed in the reasonable expansion of Employer's business, shall be and continue to remain Employer's exclusive property, without any added compensation or any reimbursement for expenses to Employee, and upon the conception of any and every such invention, process, discovery or improvement and without waiting to perfect or complete it, Employee promises and agrees that Employee will immediately disclose it to Employer and to no one else and thenceforth will treat it as the property and secret of Employer.

Employee will also execute any instruments requested from time to time by Employer to vest in it complete title and ownership to such invention, discovery or improvement and will, at the request of Employer, do such acts and execute such instruments as Employer may require, but at Employer's expense to obtain Letters of Patent, trademarks or copyrights in the United States and foreign countries, for such invention, discovery or improvement and for the purpose of vesting title thereto in Employer, all without any reimbursement for expenses (except as provided in Section 7 or otherwise) and without any additional compensation of any kind to Employee.

**Any assignment of Inventions required by this Agreement does not apply to an Invention for which no equipment, supplies, facility, intellectual property or trade secret information of Employer was used and which was developed entirely on the Employee's own time, unless (a) the Invention relates (i) directly to the business of Employer or (ii) to Employer's actual or demonstrably anticipated research or development or (b) the Invention results from any work performed by Employee for Employer.**

11.    **CONFIDENTIAL INFORMATION and TRADE SECRETS**

(i)    All Confidential Information shall be the sole property of Employer. Employee will not, during the period of his employment and for a period ending two years after termination of his employment for any reason, disclose to any person or entity or use or otherwise

5

exploit for Employee's own benefit or for the benefit of any other person or entity any Confidential Information which is disclosed to Employee or which becomes known to Employee in the course of his employment with Employer without the prior written consent of an officer of Employer except as may be necessary and appropriate in the ordinary course of performing his duties to Employer during the period of his employment with Employer. For purposes of this Section 11(i), "Confidential Information" shall mean any data or information belonging to Employer, other than Trade Secrets, that is of value to Employer and is not generally known to competitors of Employer or to the public, and is maintained confidential by Employer, including but not limited to non-public information about Employer's clients, executives, key contractors and other contractors and information with respect to its products, designs, services, strategies, pricing, processes, procedures, research, development, inventions, improvements, purchasing, accounting, engineering and marketing (including any discussions or negotiations with any third parties). Notwithstanding the foregoing, no information will be deemed to be Confidential Information unless such information is treated by Employer as confidential and shall not include any data or information of Employer that has been voluntarily disclosed to the public by Employer (except where such public disclosure has been made without the authorization of Employer), or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

(ii)    All Trade Secrets shall be the sole property of Employer. Employee agrees that during his employment with Employer and after its termination, Employee will keep in confidence and trust and will not use or disclose any Trade Secret or anything relating to any Trade Secret, or deliver any Trade Secret, to any person or entity outside Employer without the prior written consent of the Board of Directors. For purposes of this Section 11(ii), "Trade Secrets" shall mean any scientific, technical and non-technical data, information, formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan or list of actual or potential customers or vendors and suppliers of Employer or any portion or part thereof, whether or not copyrightable or patentable, that is of value to Employer and is not generally known to competitors of Employer or to the public, and whose confidentiality is maintained, including unpatented and un-copyrighted information relating to Employer's products, information concerning proposed new products or services, market feasibility studies, proposed or existing marketing techniques or plans and customer consumption data, usage or load data, and any other information that constitutes a trade secret, as such term as defined under New York law, in each case to the extent that Employer, as the context requires, derives economic value, actual or potential, from such information not being generally known to, and not being readily ascertainable by proper means by, other persons or entities who can obtain economic value from its disclosure or use.

## 12.   **NON-SOLICITATION OF EMPLOYEES**

During the term of Employee's employment and for one year thereafter, Employee will not cause or attempt to cause any employee of Employer to cease working for Employer. However, this obligation shall not affect any responsibility Employee may have as an employee of Employer with respect to the bona fide hiring and firing of Employer's personnel.

13.    **NON-SOLICITATION OF CUSTOMERS AND PROSPECTIVE CUSTOMERS**

Employee will not, during the period of his employment and for a period ending one year after the termination of his employment for any reason, directly or indirectly, solicit the business of any customer for the purpose of, or with the intention of, selling or providing to such customer any product or service in competition with any product or service sold or provided by Employer during the 12 months immediately preceding the termination of Employee's employment with Employer.

14.    **NON-COMPETITION**

Employee agrees that during his employment with Employer, Employee will not engage in any employment, business, or activity that is in any way competitive with the business or proposed business of Employer, and Employee will not assist any other person or organization in competing with Employer or in preparing to engage in competition with the business or proposed business of Employer. The provisions of this paragraph shall apply both during normal working hours and at all other times including, without limitation, nights, weekends and vacation time, while Employee is employed with Employer.

15.    **TERMINATION**

Employee's employment with Employer may be terminated as follows:

(a)    Termination Without Just Cause.

(i)    Employer, in its sole discretion, may terminate Employee's employment hereunder for any reason without Just Cause (as defined below), at any time, by giving written notice to Employee of such intent at least 30 days in advance of the effective date of termination; provided, during all that 30 day notice period, Employer, in its sole discretion, may modify, reduce or eliminate Employee's duties hereunder.

(ii)    If Employer terminates Employee's employment hereunder without Just Cause Employer shall continue to pay to Employee his then-current base salary, in accordance with customary payroll practices, plus accrued but unpaid vacation time, accrued but unpaid benefits (as described in Section 8(i) above) and reimbursement of all unpaid business expenses (in each case, as of the date of termination) (collectively the "Continued Benefits") for a period of the greater of (a) six months; or (b) the remainder of the Initial Term or Subsequent Term, whichever the case may be (the "Continuation Period"). Employee shall be entitled to continued participation in all medical and disability plans, to the extent such plans are provided by Employer, on the same terms and conditions as if his employment had not terminated until the expiration of the Continuation Period. Further, Employee shall be entitled to exercise any unvested stock option rights and stock purchase rights granted to him and outstanding at the effective date of the termination of this Agreement.

(b)    <u>Termination With Just Cause</u>.

(i)    Employer may immediately terminate Employee's employment hereunder for Just Cause (as defined below) at any time upon delivery of written notice to Employee.

(ii)    For purposes of this Agreement, the phrase "Just Cause" means: (A) Employee's material fraud, gross malfeasance, gross negligence, or willful misconduct done in bad faith, with respect to Employer's business affairs; (B) Employee's refusal or repeated failure to follow Employer's established reasonable and lawful policies; (C) Employee's material breach of this Agreement; or (D) Employee's conviction of a felony or crime involving moral turpitude.  A termination of Employee for Just Cause based on clause (A), (B) or (C) of the preceding sentence will take effect 30 days after Employer gives written notice of its intent to terminate Employee's employment and Employer's description of the alleged cause, unless Employee, in the good-faith opinion of Employer, during such 30-day period, remedies the events or circumstances constituting Just Cause.

(iii)    If Employee's employment hereunder is terminated by Employer for Just Cause, Employer will be required to pay to Employee only that portion of his Base Salary, accrued but unused vacation pay, and to the extent required under the terms of any benefit plan or this Agreement, the vested portion of any benefit under such plan, all as earned through the date of termination, including, without limitation, the right to exercise any vested stock option rights and stock purchase rights granted to him and outstanding at the effective date of the termination of this Agreement.

(c)    <u>For Good Reason</u>.

(i)    Employee may terminate employment hereunder For Good Reason (as defined below), at any time, by giving written notice to Employer of such intent at least 30 days in advance of the effective date of termination.

(ii)    For purposes of this Agreement, the phrase "For Good Reason" means (A) any material reduction in Employee's duties, responsibility, position or compensation, without the consent of Employee; (B) relocation of the Employee's position from the Kirkland, Washington metropolitan area; (C) Employer's material breach of this Agreement; or (D) Employer's refusal or failure to establish and follow lawful policies and practices that are material to Employee's position or job responsibilities.

(iii)    If Employee terminates employment hereunder For Good Reason, Employer shall continue to pay to Employee the Continued Benefits for the Continuation Period.  Employee shall be entitled to continued participation in all medical and disability plans, to the extent such plans are provided by Employer, at the same benefit level at which he was participating on the date of termination of the Employee's employment until the expiration of the Continuation Period.  Further, Employee shall be entitled to exercise any unvested stock option rights and stock purchase rights granted to him and outstanding at the effective date of the termination of this Agreement.

(d) <u>Without Good Reason</u>.

(i) Employee may terminate employment hereunder without Good Reason, at any time, by giving written notice to Employer of such intent at least 30 days in advance of the effective date of termination.

(ii) If Employee terminates employment hereunder without Good Reason, Employer will be required to pay to Employee only that portion of his Base Salary, accrued but unused vacation pay, and to the extent required under the terms of any benefit plan or this Agreement, the vested portion of any benefit under such plan, all as earned through the date of termination, including, without limitation, the right to exercise any vested stock option rights and stock purchase rights granted to him and outstanding at the effective date of the termination of this Agreement.

(e) <u>Disability and Death.</u>

Employee's employment hereunder will be terminated immediately upon his Disability (as defined below) or his death. If Employee's employment is terminated due to such disability or death, Employer will be required to pay to Employee or Employee's estate, as the case may be, unrelated to any amounts that Employee may receive pursuant to Employer's short-term and long-term disability plans or life insurance plans (as applicable), only his base salary and accrued but unpaid vacation pay, earned through the date of termination, and to the extent required under the terms of any benefit plan or this Agreement, the vested portion of any benefit under such plan. Employee or Employee's estate, as the case may be, will not by operation of this provision forfeit any rights in which Employee is vested at the time of Employee's disability or death, including, without limitation, the right to exercise any vested stock option rights and stock purchase rights granted to him and outstanding at the effective date of the termination of this Agreement.

The term "Disability" means Employee's inability, due to physical or mental ill health, to perform the essential functions of his job, with or without a reasonable accommodation, for a period in excess of 120 consecutive days or in excess of 180 days in any consecutive 12 month period. In the event of any dispute under this paragraph, Employee shall submit to a physical and/or psychological examination by a licensed physician mutually satisfactory to Employer and Employee, the cost of such examination to be paid by Employer, and the determination of such physician shall be determinative.

16. **INJUNCTION**

(i) Should Employee at any time reveal, or threaten to reveal, any Confidential Information or Trade Secret of Employer, or during any restricted period engage, or threaten to engage, in any business in competition with that of Employer, or perform, or threaten to perform, any services for anyone engaged in such competitive business, or in any way violate, or threaten to violate, any of the provisions of this Agreement, Employer shall be entitled to an injunction restraining Employee from doing, or continuing to do, or performing any such acts; and Employee

9

hereby consents to the issuance of such an injunction without any requirement that Employer post a bond.

(ii)     In the event that a proceeding is brought in equity to enforce the provisions of this Paragraph, Employee shall not argue as a defense that there is an adequate remedy at law, nor shall Employer be prevented from seeking any other remedies which may be available.

(iii)     The existence of any claim or cause of action by Employer against Employee, or by Employee against Employer, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by Employer of the foregoing restrictive covenants but shall be litigated separately.

17.     **ARBITRATION**

(i)     In the event that there shall be a dispute (a "Dispute") among the parties arising out of or relating to this Agreement, or the breach thereof, the parties agree that such dispute shall be resolved by final and binding arbitration before a single arbitrator in the metropolitan area in which the Employee was primarily performing services at the time the Dispute arose, administered by the American Arbitration Association (the "AAA"), in accordance with AAA's Employment ADR Rules.  The arbitrator's decision shall be final and binding upon the parties, and may be entered and enforced in any court of competent jurisdiction by either of the parties.  The arbitrator shall have the power to grant temporary, preliminary and permanent relief, including without limitation, injunctive relief and specific performance.

(ii)     The Company will pay the direct costs and expenses of the arbitration, including arbitration and arbitrator fees.  Except as otherwise provided by statute, Employee and the Company are responsible for their respective attorneys' fees incurred in connection with enforcing this Agreement.  Employee and the Company agree that, to the extent permitted by law, the arbitrator may, in his or her discretion, award reasonable attorneys' fees to the prevailing party.

18.     **SECTION 409A COMPLIANCE**

(i)     This Agreement is intended to comply with the requirements of Section 409A of the Code and regulations promulgated thereunder ("Section 409A").  To the extent that any provision in this Agreement is ambiguous as to its compliance with Section 409A, the provision shall be read in such a manner so that no payments due under this Agreement shall be subject to an "additional tax" as defined in Section 409A(a)(1)(B) of the Code.  For purposes of Section 409A, each payment made under this Agreement shall be treated as a separate payment.  In no event may Employee, directly or indirectly, designate the calendar year of payment.  Notwithstanding anything contained herein to the contrary, Employee shall not be considered to have terminated employment with Employer for purposes of Section 15 hereof unless he would be considered to have incurred a "termination of employment" from Employer within the meaning of Treasury Regulation §1.409A-1(h)(1)(ii).

(ii)    Notwithstanding the foregoing, if necessary to comply with the restriction in Section 409A(a)(2)(B) of the Internal Revenue Code of 1986, as amended (the "Code") concerning payments to "specified employees," any payment on account of Employee's separation from service that would otherwise be due hereunder within six months after such separation shall nonetheless be delayed until the first business day of the seventh month following Employee's date of termination and the first such payment shall include the cumulative amount of any payments that would have been paid prior to such date if not for such restriction, together with interest on such cumulative amount during the period of such restriction at a rate, per annum, equal to the applicable federal short-term rate (compounded monthly) in effect under Section 1274(d) of the Code on the date of termination.  For purposes of Section 15 hereof, Employee shall be a "specified employee" for the 12-month period beginning on the first day of the fourth month following each "Identification Date" if he is a "key employee" (as defined in Section 416(i) of the Code without regard to Section 416(i)(5) thereof) of Employer at any time during the 12-month period ending on the "Identification Date."  For purposes of the foregoing, the Identification Date shall be December 31."

(iii)    All reimbursements provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during Employee's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement is not subject to liquidation or exchange for another benefit.

19.    **MISCELLANEOUS**

If any provision of this Agreement shall be declared, by a court of competent jurisdiction, to be invalid, illegal or incapable of being enforced in whole or in part, the remaining conditions and provisions or portions thereof shall nevertheless remain in full force and effect and enforceable to the extent they are valid, legal and enforceable, and no provision shall be deemed dependent upon any covenant or provision so expressed herein.

The parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein. The provisions of this Agreement may not be amended, supplemented, waived, or changed orally, but only in writing and signed by the party against whom enforcement of any such amendment, supplement, waiver, or modification is sought and making specific reference to this Agreement.

The rights, benefits, duties and obligations under this Agreement shall inure to, and be binding upon, the Employer, its successors and assigns, and upon the Employee and his legal representatives, heirs and legatees. This Agreement constitutes a personal service agreement, and the

performance of the Employee's obligations hereunder may not be transferred or assigned by the Employee.

The failure of either party to insist upon the strict performance of any of the terms, conditions and provisions of this Agreement shall not be construed as a waiver or relinquishment of future compliance therewith, and said terms, conditions and provisions shall remain in full force and effect. No waiver of any term or condition of this Agreement, on the part of either party, shall be effective for any purpose whatsoever unless such waiver is in writing and signed by such party.

This Agreement shall be construed and governed by the laws of the State of New York.

**[The remainder of this page has been intentionally left blank.]**

**IN WITNESS WHEREOF,** this employment agreement is dated as of the 25th day of August 2011.

On Behalf of Employer:

AUGME TECHNOLOGIES, INC.

By:/s/ Paul R. Arena
          Paul R. Arena, Chief Executive Officer

By:/s/ Ivan Braiker
          Ivan Braiker, Employee

# EXHIBIT B

**AMENDMENT TO**
**IVAN BRAIKER'S MEMBERSHIP TO**
**THE BOARD OF DIRECTORS**
**OF AUGME TECHNOLOGIES, INC.**


The Agreement dated August 25, 2011 between Ivan Braiker and Augme Technologies, Inc. ("Augme" or the "Company") is hereby amended:

The language enclosed below shall be added to Mr. Braiker's Agreement specially, under section 6 Equity:

- you will receive one-percent (1%) Transaction Fee for your participation in the realization of the monetization of the Company's intellectual property either through: a) a settlement agreement; b) license agreement (except for licenses entered into in the ordinary course of the Company's business); or c) asset sale during the period of directorship and extending six months thereafter.

IN WITTNESS WHEREOF, the parties have executed this Amendment to Ivan Braiker's Membership to the Board of Directors of Augme Technologies, Inc. as of November 28, 2011.


ACCEPTED BY:                                    ACCEPTED BY:

_____                        _____
Name: Paul Arena                               Name: Ivan Braiker

Title: Chairman                                Title: Director

## SECOND AMENDMENT TO EMPLOYMENT AGREEMENT

The Employment Agreement, (the "Agreement") dated August 25, 2011, by and between Augme Technologies, Inc., a Delaware corporation, with its principal office at 350 7th Ave, 2nd Floor, New York, NY 10010, (the "Company") and Ivan Braiker ("Employee") is hereby amended as follows with the remaining provisions of the Agreement remaining in full force and effect.

## AMENDMENTS

**NOW, THEREFORE,** in consideration of the foregoing recitals and the covenants and conditions herein set forth, the parties hereto amend the Agreement as follows:

1. Paragraph 1. Employment: Duties and Responsibilities, shall be replaced to read as follows:

Employer hereby employs Employee as Chief Executive Officer of the Company. Subject at all times to the direction of the Board of Directors of Employer, Employee shall have direct responsibility over operations, sales marketing, financial accounting and SEC reporting, operational budgeting, sales costing analysis, billing, and auditor interfacing. Employee will also perform other services and duties, as the Board of Directors shall determine. Employee's permanent job sites shall be in Kirkland, Washington and New York, New York. Employee shall serve, by mutual consent, in such other positions and offices of the Employer and its affiliates, if selected, without any additional compensation. Employer agrees that as long as Employer employs Employee, Employer will use its best efforts to cause Employee to be elected as Director of Employee.

2. Paragraph 5. Salary: (i) Base Salary, shall be replaced to read as follows:

As full compensation ("Base Salary") for the performance of his duties on behalf of Employer, Employee shall be compensated as follows:

(i) Base Salary: Employer shall pay Employee a base salary at the rate of $320,000 per annum, payable semi-monthly, (ii) base salary shall increase to $350,000 on the one year anniversary of this amendment..

3. Paragraph 5. Salary: (iv) Sales Bonus, shall be added

(iv) Sales Bonus: In the event of a Control Change, you will receive a flat fee of 1.0% of Aggregate Consideration above $75MM. For purposes of the previous sentence: (A) "Control Change" and (B) "Aggregate Consideration" are defined below.

For the purposes of this section: (A) "Control Change" shall have the same meaning as defined in Section 6 hereof. (B) "Aggregate Consideration" shall mean (i) the amount of all consideration (whether in the form of cash, securities, or other property) directly or indirectly received or receivable by the Company or its shareholders in connection with any Control Change, including any amounts committed by any party to a transaction to be paid to the Company after any closing date, plus (ii) the amount of all consideration directly or indirectly received by the Company as a result of the exercise of any options, warrants or other securities conferring the option to invest additional capital in the Company that were issued in connection with a Control Change, plus (iii) without duplication, the total amount of Company indebtedness assumed by, repaid, refinanced or otherwise transferred (or for which a commitment to assume, pay, refinance or accept Company

indebtedness was made) in connection with a Control Change, minus (iv) any costs incurred by the Company in connection with the Control Change.

4.  Paragraph 5, Salary (v): Discretionary bonus, shall be added

The Board of Directors will have the discretion to award Employee a discretionary bonus of up to twenty thousand dollars ($20,000) per quarter.

5. Paragraph 8, Fringe Benefits (i) shall be replaced to read as follows:

(i) During the term of this Agreement, Employer shall provide to Employee, at its sole expense, health insurance including disability insurance up to $267 a month and other fringe benefits on the same terms and conditions as it shall afford other senior management employees.

**IN WITNESS WHEREOF,** this amendment is dated as of the _7_ day of _May_ 2013.

On Behalf of the Employer

By: _____
Todd E. Wilson, Chairman of the Board

Employee:

By: _____
Ivan Braiker, Employee

2

**Third Amendment to Employment Agreement**

This Third Amendment to Employment Agreement (the "Third Amendment") is entered into on July __5__ , 2013 (the "Effective Date"), by and between Ivan Braiker (the "Executive") and Augme Technologies, Inc., a Delaware corporation (the "Company").

WHEREAS, on August 25, 2011, the Executive and the Company entered into an Employment Agreement (the "Original Agreement"); and

WHEREAS, on November 28, 2011, the Executive and the Company entered into an Amendment to the Original Agreement (the "First Amendment"); and

WHEREAS, on May 7, 2013, the Executive and the Company entered into an Amendment to the Original Agreement (the "Second Amendment"); and

WHEREAS, the Executive and the Company have agreed to enter into this Third Amendment to further amend the Original Agreement, as amended, effective March 22, 2013, the date of Board approval.

NOW, THEREFORE, the Executive and the Company agree as follows:

**1.     Amendment to Section 6.**  The following paragraph included at Section 6 of the Original Agreement, as amended by the First Amendment, which states:

> you will receive one-percent (1%) Transaction Fee for your participation in the realization of the monetization of the Company's intellectual property either through: a) a settlement agreement; b) license agreement (except for licenses entered into in the ordinary course of the Company's business); or c) asset sale during the period of directorship and extending six months thereafter.

shall be deleted in its entirety and nothing shall appear in its place.

**2.     Affirmation of Remaining Terms and Conditions.**  The Company and the Executive affirm that all of the other terms and conditions of the Original Agreement, as amended, shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Third Amendment as of the date first set forth above.

COMPANY
AUGME TECHNOLOGIES, INC.

By: _____

Todd Wilson, Chairman of the Board

EXECUTIVE

_____

Ivan Braiker

## AMENDMENT NO. 4 TO EMPLOYMENT AGREEMENT

This AMENDMENT NO. 4 TO EMPLOYMENT AGREEMENT (this "*Amendment*") is made as of April 1, 2014, by and between Hipcricket, Inc., a Delaware corporation (the "*Company*"), and Ivan Braiker (the "*Employee*").

## RECITALS

WHEREAS, the Company and the Employee have entered into that certain Employment Agreement, effective August 25, 2011, as amended by Amendments dated November 28, 2011, May 7, 2013 and July 5, 2013 (together the "*Employment Agreement*"); and

WHEREAS, the Company and the Employee desire to amend the Employment Agreement as set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## Definitions and Amendments

**1.1    Definitions**.  For purposes of this Amendment, terms used but not defined herein have the meanings ascribed to such terms in the Employment Agreement.

**1.2    Amendments.**

(a)    Paragraph 4 of the Employment Agreement shall be amended by deleting Paragraph 4 in its entirety and replacing it with the following:

> "Employee's employment hereunder commenced on August 25, 2011 and shall end on August 25, 2014 (the "Initial Term"). Thereafter, the Employee's employment hereunder automatically shall be extended for one additional twelve-month period (the "Subsequent Term"), commencing August 26, 2014 and ending August 25, 2015.  For all compensation and benefit purposes, other than those specifically addressed herein, the Employee shall be deemed to have been continually employed with the Employer from July 6, 2004."

(b)    Paragraph 5(iv), Sales Bonus, of the Employment Agreement shall be amended by deleting Paragraph 5(iv) in its entirety and replacing it with the following:

"(iv) <u>Transaction Bonus</u>.  Employee will be eligible to participate in the Company's Transaction Bonus Plan ("Bonus Plan") with a bonus opportunity equal to 1.0% of the Net Consideration with respect to a Transaction.  The terms and conditions of the bonus opportunity are set forth in the Bonus Plan."

(c)    Paragraph 5(v), Discretionary Bonus, of the Employment Agreement shall be amended by deleting Paragraph 5(v) in its entirety and replacing it with the following:

> "(v)  <u>Incentive Bonus</u>.  In addition to the Base Salary, Employee will be eligible to participate in the Company's 2014 Incentive Compensation Plan with a target bonus

opportunity for fiscal year 2015 equal to 50% of Base Salary. Bonuses may be earned based on targeted achievement of GAAP Revenue for fiscal year 2015, subject to a minimum gross margin percentage and maximum Adjusted EBITDA loss amount. Additional details about the bonus opportunity are set forth in the Incentive Compensation Plan. Bonus opportunities for fiscal year 2016 and beyond will be determined in the discretion of the Board of Directors."

(d)    Section 15(a)(ii) of the Employment Agreement shall be amended by deleting Section 15(a)(ii) in its entirety and replacing it with the following:

"(ii)   If Employer terminates Employee's employment hereunder without Just Cause Employer shall continue to pay to Employee his then-current base salary, in accordance with customary payroll practices, plus accrued but unpaid vacation time, accrued but unpaid benefits (as described in Section 8(i) above) and reimbursement of all unpaid business expenses (in each case, as of the date of termination) (collectively the "Continued Benefits") for a period of the greater of (a) six months; or (b) the remainder of the Initial Term and the Subsequent Term, whichever the case may be (the "Continuation Period"). Employee shall be entitled to continued participation in all medical and disability plans, to the extent such plans are provided by Employer, on the same terms and conditions as if his employment had not terminated until the expiration of the Continuation Period."

## ARTICLE II
### Miscellaneous

**2.1    Entire Agreement.** This Amendment and the Employment Agreement constitute the entire agreement between the parties and shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.

**2.2    Counterparts.** This Amendment may be executed in multiple counterparts and by facsimile, each of which shall be deemed to be an original, and all such counterparts shall constitute but one instrument. This Amendment, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including .pdf files), shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

**2.3    Reference to and Effect on the Employment Agreement.**

(a)    Except as specifically amended by this Amendment, the Employment Agreement shall remain in full force and effect and is hereby ratified and confirmed.

(b)    The execution and delivery of this Amendment and performance hereof shall not, except as expressly provided herein, constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of any party hereto under, the Employment Agreement.

2

(c)     This Amendment  shall be governed under the laws of the State of New York and shall be construed with the Employment Agreement as one instrument, and the Employment Agreement shall, where the context requires, be read and construed throughout so as to incorporate this Amendment.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

3

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first above written.

**COMPANY**

**HIPCRICKET, INC.**

By:_____
    Name:  Todd Wilson
    Title:  Executive Chairman of the Board of Directors

**EMPLOYEE**

_____
    Ivan Braiker

# EXHIBIT C

**Ivan Braiker**

|  |  | Salary | Medical | Disability |
|---|---|---|---|---|
| Salary |  | 350,000.00 |  |  |
| Bankruptcy | January 20, 2015 |  |  |  |
| End Date of Agreement | August 25, 2015 |  |  |  |
| Paid through for second Jan. pay period | January 20, 2015 | 4,557.29 |  |  |
| Calculation (Note 1) | (350000/24)*5/16) |  |  |  |
| (Calculated as Half month salaray time 5 of 16 days in pay period) |  |  |  |  |
|  |  |  |  |  |
| January 21 - February 19 |  |  |  |  |
| January unpaid after January 21 | Half month pay | 14,583.33 |  |  |
|  | Less Paid | 4,557.29 |  |  |
|  | Unpaid | 10,026.04 | 1,185.86 | 289.00 |
| Feb 15th | Half month pay | 14,583.33 | 592.93 | 144.50 |
| Days since Feb 15 | 4 | 4,487.18 | 182.44 | 44.46 |
| Total owed January 21 - Feb 19 |  | 29,096.55 | 1,961.23 | 477.96 | 31,535.75 |
|  |  |  |  |  |
| Total Owed through August 25, 2014 |  |  |  |  |
| January Unpaid | January unpaid | 10,026.04 | 1,185.86 | 289.00 |
| February through July--6 Months |  | 175,000.00 | 7,115.16 | 1,734.00 |
| August first half month |  | 14,583.33 |  |  |
| August 16 - 25 (10 of 16 days) | 10 | 9,114.58 |  |  |
| August Benefits 25 of 31 days |  |  | 956.34 | 233.06 |
|  |  | 208,723.96 | 13,179.82 | 3,211.99 | 225,115.76 |

Note 1 - actual calculation used by Hipcricket

# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIPCRICKET, INC.,[1] | ) | Case No. 15-10104 (LSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**Deadline for Submitting Bids: February 23, 2015 at 4:00 p.m. (Eastern Time)**
**Auction Date and Time: February 25, 2015 at 10:00 a.m. (Eastern Time)**
**Deadline for Objections to Sale Motion: February 20, 2015 at 4:00 p.m. (Eastern Time)**
**Sale Hearing Date and Time: February 27, 2015 at 2:30 p.m. (Eastern Time)**

## NOTICE OF COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED

**PLEASE TAKE NOTICE** that on January 21, 2015, Hipcricket, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), filed the *Motion for Order (A) Approving Bid Procedures for the Sale of Substantially All of Debtor's Assets; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee and Expense Reimbursement; and (D) Granting Related Relief* (as modified as set forth in the *Notice of Errata Re: Bid Procedures* [Docket No. 58], the "Bid Procedures Motion").[2]  On February 11, 2015, the Court entered an order (the "Bid Procedures Order") granting the Bid Procedures Motion and approving the bidding procedures annexed thereto (the "Bidding Procedures") to be used in connection with the auction (the "Auction") of substantially all of the assets (the "Acquired Assets").  The Acquired Assets are being sold free and clear of all liens, claims, encumbrances and interests, provided that section 363(f) of the Bankruptcy Code has been satisfied (other than those liens and interests

---

[1]  The last four digits of the Debtor's tax identification number are 2076.  The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Bid Procedures Motion.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the Cure Amount shown for the Assigned Contract on **Exhibit A** hereto and/or object to the assumption and assignment of the Assigned Contract with respect to the Stalking Horse Bidder's ability to provide adequate assurances of future performance under the Assigned Contract, you must file in writing with the United States Bankruptcy Court for the District of Delaware, Marine Midland Plaza, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, an objection on or before 4:00 p.m. Eastern Time on February 20, 2015, provided, however, that if the Stalking Horse Bidder, the proposed assignee of a Counterparty's Assigned Contract, is not the Successful Bidder, any Counterparty may raise at the hearing (the "Sale Hearing") to consider the *Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of Debtor's Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) And 363(m); (C) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "Sale Motion"), an objection to the assumption and assignment of the Assigned Contract solely with respect to the Successful Bidder's ability to provide adequate assurances of future performance under the Assigned Contract. In addition, any objection must set forth the specific default or defaults alleged and set forth any cure amount as alleged by you.

**PLEASE TAKE FURTHER NOTICE** that if you have any other objection to the Debtor's assumption and assignment of the Assigned Contract to which you are a party, to the successful bidder at the Auction, or to any of the other relief requested, you also must file that objection in the manner and by the date and time stated above.

ANY NON-DEBTOR PARTY TO ANY ASSIGNED CONTRACT WHO DOES NOT FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR SUCH ASSIGNED CONTRACT IS DEEMED TO HAVE CONSENTED TO SUCH CURE AMOUNT.

Dated:  February 11, 2015          PACHULSKI STANG ZIEHL & JONES LLP

                                   */s/ James O'Neill*
                                   _____
                                   Ira D. Kharasch (CA Bar No. 109084)
                                   Linda F. Cantor (CA Bar No. 153762)
                                   James O'Neill (DE Bar No. 4042)
                                   919 North Market Street, 17th Floor
                                   P.O. Box 8705
                                   Wilmington, DE 19899-8705 (Courier 19801)
                                   Telephone:  (302) 652-4100
                                   Facsimile:  (302) 652-4400
                                   E-mail:      ikharasch@pszjlaw.com
                                                lcantor@pszjlaw.com
                                                joneill@pszjlaw.com

                                   Counsel to Debtor and Debtor in Possession

| Counterparty | Contract | Cure Amount |
|---|---|---|
| Ivan Braiker | Confidentiality and Non-Solicitation Agreement | $0.00 |

*The contract identified above includes any and all applicable amendments and modifications thereof and/or supplements thereto, if any.

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                    )    Chapter 11
                                          )
HIPCRICKET, INC.,[1]                      )    Case No. 15-10104 (LSS)
                                          )
                          Debtor.         )
                                          )

**Deadline for Submitting Bids:  February 23, 2015 at 4:00 p.m. (Eastern Time)**
**Auction Date and Time:  February 25, 2015 at 10:00 a.m. (Eastern Time)**
**Deadline for Objections to Sale Motion:  February 20, 2015 at 4:00 p.m. (Eastern Time)**
**Sale Hearing Date and Time:  February 27, 2015 at 2:30 p.m. (Eastern Time)**

## NOTICE OF COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED

**PLEASE TAKE NOTICE** that on January 21, 2015, Hipcricket, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), filed the *Motion for Order (A) Approving Bid Procedures for the Sale of Substantially All of Debtor's Assets; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee and Expense Reimbursement; and (D) Granting Related Relief* (as modified as set forth in the *Notice of Errata Re: Bid Procedures* [Docket No. 58], the "Bid Procedures Motion").[2]  On February 11, 2015, the Court entered an order (the "Bid Procedures Order") granting the Bid Procedures Motion and approving the bidding procedures annexed thereto (the "Bidding Procedures") to be used in connection with the auction (the "Auction") of substantially all of the assets (the "Acquired Assets").  The Acquired Assets are being sold free and clear of all liens, claims, encumbrances and interests, provided that section 363(f) of the Bankruptcy Code has been satisfied (other than those liens and interests

---

[1]  The last four digits of the Debtor's tax identification number are 2076.  The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Bid Procedures Motion.

permitted by the Stalking Horse Agreement with the proposed purchaser of the Acquired Assets, SITO Mobile, Ltd. (the "Purchaser" or the "Stalking Horse Bidder")) or, alternatively, to a party who submits a higher and better offer for the Acquired Assets. The proposed sale of the Acquired Assets will provide for the following consideration: (i) an amount equal to the sum of (a) $4,500,000 in cash (the "Cash Purchase Price"), plus (b) an amount equal to the Cure Amounts up to the Cure Cap ($500,000), plus (c) the amounts approved by the Bankruptcy Court with respect to the KEIP up to the KEIP Limit ($255,000), less (ii) the sum of (a) the amount of Assumed DIP Obligations plus (b) the amount of Cure Amounts that are required to be paid in excess of the Cure Cap up to a maximum of $50,000.

The Acquired Assets may include some or all of those executory contracts and leases listed on **Exhibit A** (the "Assigned Contracts") attached hereto.[3]

**PLEASE TAKE FURTHER NOTICE** that the amount shown on **Exhibit A** attached to this Notice as the "Cure Amount" for the Assigned Contract listed on **Exhibit A** is the amount, based upon the Debtor's books and records, which the Debtor asserts are owed to cure any defaults existing under the Assigned Contract as of the Petition Date to which you are a counterparty (the "Counterparty"). Information prepared by the Stalking Horse Bidder relating to adequate assurance of future performance by the Stalking Horse Bidder, for purposes of section 365 of the Bankruptcy Code, is enclosed herewith.

**PLEASE TAKE FURTHER NOTICE** that the Debtor will deliver a copy of the Sale Motion to you by facsimile, email or overnight delivery if you fax a written request for such delivery to Kathe Finlayson, kfinlayson@pszjlaw.com, at Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801.

---

[3] Such Assigned Contracts may or may not be assumed and assigned to the Successful Bidder, and nothing contained herein or otherwise shall be deemed as an assumption or assumption and assignment of any such contracts or leases.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the Cure Amount shown for the Assigned Contract on **Exhibit A** hereto and/or object to the assumption and assignment of the Assigned Contract with respect to the Stalking Horse Bidder's ability to provide adequate assurances of future performance under the Assigned Contract, you must file in writing with the United States Bankruptcy Court for the District of Delaware, Marine Midland Plaza, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, an objection on or before 4:00 p.m. Eastern Time on February 20, 2015, provided, however, that if the Stalking Horse Bidder, the proposed assignee of a Counterparty's Assigned Contract, is not the Successful Bidder, any Counterparty may raise at the hearing (the "Sale Hearing") to consider the *Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of Debtor's Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) And 363(m); (C) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "Sale Motion"), an objection to the assumption and assignment of the Assigned Contract solely with respect to the Successful Bidder's ability to provide adequate assurances of future performance under the Assigned Contract. In addition, any objection must set forth the specific default or defaults alleged and set forth any cure amount as alleged by you.

**PLEASE TAKE FURTHER NOTICE** that if you have any other objection to the Debtor's assumption and assignment of the Assigned Contract to which you are a party, to the successful bidder at the Auction, or to any of the other relief requested, you also must file that objection in the manner and by the date and time stated above.

**PLEASE TAKE FURTHER NOTICE** that any objection so filed must be served so as to be received by that same date and time upon the parties below: (i) the Debtor, Hipcricket, Inc. c/o Todd Wilson, Chief Executive Officer, 110 110th Avenue NE, Suite 410, Bellevue, Washington 98005, facsimile: 425-449-4286; (i) Debtor's counsel, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899, Attn: James O'Neill, joneill@pszjlaw.com; Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn:   Ira Kharasch and Linda Cantor, ikharasch@pszjlaw.com and lcantor@pszjlaw.com; (ii) counsel to the Stalking Horse Bidder, Greenberg Traurig, LLP, 200 Park Avenue, New York, NY 10166, Attn:  Matthew Hinker and Joseph Gangitano, hinkerm@gtlaw.com and gangitanoj@gtlaw.com; (iii) counsel to the Official Committee of Unsecured Creditors appointed in this case, (a) Cooley LLP, The Grace Building, 1114 Avenue of the Americas, New York, NY   10036-7798, Attn:   Jay Indyke, Esq., jindyke@cooley.com; and (b) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE  19899-1709, Attn: Donald J. Detweiler, Esq., detweilerd@pepperlaw.com and Henry J. Jaffe, Esq, jaffeh@pepperlaw.com; and (iv) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 N. King Street, Suite 2207, Lock Box 35, Wilmington, DE 19801, Attn: Jane M. Leamy, Esq., jane.m.leamy@usdoj.gov (collectively, the "Notice Parties"), so as to be received by February 20, 2015, at 4:00 p.m. (Eastern Time).

PLEASE TAKE FURTHER NOTICE THAT IF YOU DO NOT TIMELY FILE AND SERVE AN OBJECTION AS STATED ABOVE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE SALE MOTION WITH NO FURTHER NOTICE.

ANY NON-DEBTOR PARTY TO ANY ASSIGNED CONTRACT WHO DOES NOT

FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR SUCH ASSIGNED

CONTRACT IS DEEMED TO HAVE CONSENTED TO SUCH CURE AMOUNT.

Dated: February 11, 2015               PACHULSKI STANG ZIEHL & JONES LLP

                                       */s/ James O'Neill*
                                       Ira D. Kharasch (CA Bar No. 109084)
                                       Linda F. Cantor (CA Bar No. 153762)
                                       James O'Neill (DE Bar No. 4042)
                                       919 North Market Street, 17th Floor
                                       P.O. Box 8705
                                       Wilmington, DE 19899-8705 (Courier 19801)
                                       Telephone: (302) 652-4100
                                       Facsimile:  (302) 652-4400
                                       E-mail:       ikharasch@pszjlaw.com
                                                     lcantor@pszjlaw.com
                                                     joneill@pszjlaw.com

                                       Counsel to Debtor and Debtor in Possession

**EXHIBIT A**

| Counterparty | Contract | Cure Amount |
|---|---|---|
| Kimberly Donaldson | Confidentiality and Non-Solicitation Agreement | $0.00 |

*The contract identified above includes any and all applicable amendments and modifications thereof and/or supplements thereto, if any.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                    )        Chapter 11
                                          )
HIPCRICKET, INC.,[1]                      )        Case No. 15-10104 (LSS)
                                          )
                    Debtor.               )
                                          )

**Deadline for Submitting Bids:  February 23, 2015 at 4:00 p.m. (Eastern Time)**
**Auction Date and Time:  February 25, 2015 at 10:00 a.m. (Eastern Time)**
**Deadline for Objections to Sale Motion:  February 20, 2015 at 4:00 p.m. (Eastern Time)**
**Sale Hearing Date and Time:  February 27, 2015 at 2:30 p.m. (Eastern Time)**

## NOTICE OF COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED

**PLEASE TAKE NOTICE** that on January 21, 2015, Hipcricket, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), filed the *Motion for Order (A) Approving Bid Procedures for the Sale of Substantially All of Debtor's Assets; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee and Expense Reimbursement; and (D) Granting Related Relief* (as modified as set forth in the *Notice of Errata Re: Bid Procedures* [Docket No. 58], the "Bid Procedures Motion").[2]  On February 11, 2015, the Court entered an order (the "Bid Procedures Order") granting the Bid Procedures Motion and approving the bidding procedures annexed thereto (the "Bidding Procedures") to be used in connection with the auction (the "Auction") of substantially all of the assets (the "Acquired Assets").  The Acquired Assets are being sold free and clear of all liens, claims, encumbrances and interests, provided that section 363(f) of the Bankruptcy Code has been satisfied (other than those liens and interests

---

[1]  The last four digits of the Debtor's tax identification number are 2076.  The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Bid Procedures Motion.

permitted by the Stalking Horse Agreement with the proposed purchaser of the Acquired Assets, SITO Mobile, Ltd. (the "Purchaser" or the "Stalking Horse Bidder")) or, alternatively, to a party who submits a higher and better offer for the Acquired Assets.  The proposed sale of the Acquired Assets will provide for the following consideration:  (i) an amount equal to the sum of (a) $4,500,000 in cash (the "Cash Purchase Price"), plus (b) an amount equal to the Cure Amounts up to the Cure Cap ($500,000), plus (c) the amounts approved by the Bankruptcy Court with respect to the KEIP up to the KEIP Limit ($255,000), less (ii) the sum of (a) the amount of Assumed DIP Obligations plus (b) the amount of Cure Amounts that are required to be paid in excess of the Cure Cap up to a maximum of $50,000.

The Acquired Assets may include some or all of those executory contracts and leases listed on **Exhibit A** (the "Assigned Contracts") attached hereto.[3]

**PLEASE TAKE FURTHER NOTICE** that the amount shown on **Exhibit A** attached to this Notice as the "Cure Amount" for the Assigned Contract listed on **Exhibit A** is the amount, based upon the Debtor's books and records, which the Debtor asserts are owed to cure any defaults existing under the Assigned Contract as of the Petition Date to which you are a counterparty (the "Counterparty").  Information prepared by the Stalking Horse Bidder relating to adequate assurance of future performance by the Stalking Horse Bidder, for purposes of section 365 of the Bankruptcy Code, is enclosed herewith.

**PLEASE TAKE FURTHER NOTICE** that the Debtor will deliver a copy of the Sale Motion to you by facsimile, email or overnight delivery if you fax a written request for such delivery to Kathe Finlayson, kfinlayson@pszjlaw.com, at Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801.

---

[3]  Such Assigned Contracts may or may not be assumed and assigned to the Successful Bidder, and nothing contained herein or otherwise shall be deemed as an assumption or assumption and assignment of any such contracts or leases.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the Cure Amount shown for the Assigned Contract on **Exhibit A** hereto and/or object to the assumption and assignment of the Assigned Contract with respect to the Stalking Horse Bidder's ability to provide adequate assurances of future performance under the Assigned Contract, you must file in writing with the United States Bankruptcy Court for the District of Delaware, Marine Midland Plaza, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, an objection on or before 4:00 p.m. Eastern Time on February 20, 2015, provided, however, that if the Stalking Horse Bidder, the proposed assignee of a Counterparty's Assigned Contract, is not the Successful Bidder, any Counterparty may raise at the hearing (the "Sale Hearing") to consider the *Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of Debtor's Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) And 363(m); (C) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "Sale Motion"), an objection to the assumption and assignment of the Assigned Contract solely with respect to the Successful Bidder's ability to provide adequate assurances of future performance under the Assigned Contract. In addition, any objection must set forth the specific default or defaults alleged and set forth any cure amount as alleged by you.

**PLEASE TAKE FURTHER NOTICE** that if you have any other objection to the Debtor's assumption and assignment of the Assigned Contract to which you are a party, to the successful bidder at the Auction, or to any of the other relief requested, you also must file that objection in the manner and by the date and time stated above.

**PLEASE TAKE FURTHER NOTICE** that any objection so filed must be served so as to be received by that same date and time upon the parties below: (i) the Debtor, Hipcricket, Inc. c/o Todd Wilson, Chief Executive Officer, 110 110th Avenue NE, Suite 410, Bellevue, Washington 98005, facsimile: 425-449-4286; (i) Debtor's counsel, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899, Attn: James O'Neill, joneill@pszjlaw.com; Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn:   Ira Kharasch and Linda Cantor, ikharasch@pszjlaw.com and lcantor@pszjlaw.com; (ii) counsel to the Stalking Horse Bidder, Greenberg Traurig, LLP, 200 Park Avenue, New York, NY 10166, Attn:  Matthew Hinker and Joseph Gangitano, hinkerm@gtlaw.com and gangitanoj@gtlaw.com; (iii) counsel to the Official Committee of Unsecured Creditors appointed in this case, (a) Cooley LLP, The Grace Building, 1114 Avenue of the Americas, New York, NY  10036-7798, Attn:   Jay Indyke, Esq., jindyke@cooley.com; and (b) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE  19899-1709, Attn: Donald J. Detweiler, Esq., detweilerd@pepperlaw.com and Henry J. Jaffe, Esq, jaffeh@pepperlaw.com; and (iv) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 N. King Street, Suite 2207, Lock Box 35, Wilmington, DE 19801, Attn: Jane M. Leamy, Esq., jane.m.leamy@usdoj.gov (collectively, the "Notice Parties"), so as to be received by February 20, 2015, at 4:00 p.m. (Eastern Time).

PLEASE TAKE FURTHER NOTICE THAT IF YOU DO NOT TIMELY FILE AND SERVE AN OBJECTION AS STATED ABOVE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE SALE MOTION WITH NO FURTHER NOTICE.

ANY NON-DEBTOR PARTY TO ANY ASSIGNED CONTRACT WHO DOES NOT FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR SUCH ASSIGNED CONTRACT IS DEEMED TO HAVE CONSENTED TO SUCH CURE AMOUNT.

Dated: February 11, 2015           PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James O'Neill*

Ira D. Kharasch (CA Bar No. 109084)
Linda F. Cantor (CA Bar No. 153762)
James O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      ikharasch@pszjlaw.com
            lcantor@pszjlaw.com
            joneill@pszjlaw.com

Counsel to Debtor and Debtor in Possession

**EXHIBIT A**

| Counterparty | Contract | Cure Amount |
|---|---|---|
| Gay Gabrilska | Confidentiality and Non-Solicitation Agreement | $0.00 |

*The contract identified above includes any and all applicable amendments and modifications thereof and/or supplements thereto, if any.