## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIPCRICKET, INC.,[1] | Case No. 15-10104 (LSS) |
| Debtor. | |

### EMERGENCY MOTION TO (I) ENFORCE THE PROVISIONS OF THE ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; (C) APPROVING PAYMENT OF A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; AND (D) GRANTING RELATED RELIEF [DOCKET NO. 118], (II) VACATE THE PURPORTED AUCTION AND (III) DECLARE SITO MOBILE LTD AS SUCCESSFUL BIDDER

SITO Mobile, Ltd ("SITO"), by and through its undersigned counsel, hereby submits this emergency motion (the "Motion") for entry an order substantially in the form hereto as **Exhibit A**, (I) enforcing the provisions of this Court's February 11, 2015 *Order (A) Approving Bid Procedures for the Sale of Substantially All of Debtor's Assets Outside the Ordinary Course of Business; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee and Expense Reimbursement; and (D) Granting Related Relief* [Docket No. 118] (the "Bid Procedures Order"), (II) vacating the purported Auction and (III) declaring SITO the Successful Bidder. The Bid Procedures Order is attached hereto as **Exhibit B**. In support of this Motion, SITO respectfully states as follows:

---

[1] The last four digits of the Debtor's tax identification number are 2076. The location of the Debtor's headquarters and the service address for the Debtor is 110 110th Avenue NE. Suite 410, Bellevue, WA 98004.

**Status of the Case**

1.      On January 20, 2015 (the "Petition Date"), the above captioned debtor (the "Debtor") commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtor has continued in possession of its properties and is operating and managing its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner.  On February 19, 2015, an official committee of unsecured creditors was appointed in this case (the "Committee").

**Jurisdiction**

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  In addition, in paragraph 20 of the Bid Procedures Order, the Bankruptcy Court specifically retained jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), with respect to all matters arising from or related to the implementation of the Bid Procedures Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Bid Procedures and the implementation of the Bid Procedures Order.

5.      This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O) and this Court has jurisdiction to enter a final order with respect thereto.

6.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**[2]

7.      On January 20, 2015, SITO and the Debtor entered into that certain *Asset Purchase Agreement* (the "Stalking Horse Agreement") pursuant to which SITO agreed to act as Stalking Horse Bidder in a § 363 sale.  As part of the Stalking Horse Agreement, SITO required that the Bid Procedures be acceptable to SITO.  Upon information and belief, SITO was the only party who was willing to act as a stalking horse.

8.      On January 21, 2015, the Debtor filed the *Motion for Order (A) Approving Bid Procedures for the Sale of Substantially All of Debtor's Assets; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Approving Payment of a Break-Up Fee and Expense Reimbursement; and (D) Granting Related Relief* [Docket No. 12] (as modified as set forth in the *Notice of Errata Re: Bid Procedures* [Docket No. 58], the "Bid Procedures Motion").  The bidding procedures attached to the Bid Procedures Motion (the "Bid Procedures") were negotiated between the Debtor and SITO, as Stalking Horse Bidder, and were an integral component of SITO's willingness to act as the Stalking Horse Bidder and the DIP Lender (as defined in the *Final Order (I) Authorizing the Debtor to (A) Obtain Post-Petition Secured Financing; (B) Utilize Cash Collateral; and (C) Pay Certain Related Fees and Charges; and (II) Scheduling a Final Hearing* [Docket No. 117] (the "Final DIP Order")).

9.      The Bid Procedures were such an integral component of SITO's willingness to act as Stalking Horse Bidder and the DIP Lender that SITO insisted the Bid Procedures provide that "nothing in these Bidding Procedures should be construed to permit the Debtor to … amend the Bid Procedures in a manner that would substantively impact the Stalking Horse Bidder without

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bid Procedures Order.

prior approval of the Stalking Horse Bidder." Bid Procedures at 11. SITO further insisted on language that prevented the Debtor, in consultation with the Committee, from employing or announcing any substantive changes to the procedural rules at the Auction without prior approval of SITO. Bid Procedures at 9. SITO viewed these provisions as protection against the Debtor changing the rules or modifying the process while the process was ongoing.

10.     On February 11, 2015, the Bankruptcy Court entered the Bid Procedures Order, which, *inter alia*, approved the Bid Procedures substantially in the form negotiated between SITO and the Debtor.[3]

11.     The Bid Procedures, *inter alia*, required that any Potential Bidder must meet certain Participation Requirements and submit a Qualified Bid by the Bid Deadline in order to be a Qualified Bidder. Bid Procedures at 3. The Bid Procedures agreed to by SITO, the Debtor and the Committee, and subsequently approved by the Bankruptcy Court did not contemplate that a Potential Bidder could submit a bid structured as a plan of reorganization.

12.     The fact that the Bid Procedures did not contemplate bids based on a plan of reorganization was consistent with the Debtor's focus on a § 363 sale throughout the process, even prior to SITO's involvement with the Debtor. *See* Transcript of January 23, 2015 Hearing at 10 ("Canaccord continued its marketing efforts during the same time period. And finally in late 2014, about two months ago, Your Honor, it focused its marketing on a 363 bankruptcy sale alternative"); *Id* at 11 ("Given the company's deepening liquidity issues during the past few months, it was clear to the company that the … factoring facility was not going to be sufficient to carry this company, even through a 363 sale that would hopefully close in March."); *see also*,

---

[3] The Bid Procedures Order specifically provides that the failure of the Bid Procedures Order to specifically include or reference any particular provision, section or article of the Bid Procedures does not diminish or impair the effectiveness of the Bid Procedures, as the intent of the Bid Procedures Order was to authorize and approve the Bid Procedures in their entirety. Bid Procedures Order ¶5.

*Declaration of Todd E. Wilson In Support of First Day Motions* [Docket No. 2] ("At that time, with Canaccord's assistance, the Company broadened its efforts to gauge interest specifically in a potential § 363 sale.").  In fact, the Debtor indicated that the "primary purpose of this Chapter 11 is to facilitate an auction based on our stalking horse bid."  Transcript of January 23, 2015 Hearing at 12.  Given the Debtor's focus on a 363 sale, SITO was never provided with the opportunity to structure a plan of reorganization.

13.    The Bid Procedures also reflected the importance of closing the sale in a timely manner.  The Bid Procedures specifically included requirements that Qualified Bids must (a) close no later than the Stalking Horse Bid and (b) close to later than March 14, 2015 (fifteen (15) days after the Sale Hearing.

14.    Pursuant to the Bid Procedures Order the Debtor was authorized to conduct an auction (the "Auction") if the Debtor received a Qualified Bid (other than the Stalking Horse Bid) by the Bid Deadline.  Bid Procedures at 7.  If no Qualified Bids were submitted by the Bid Deadline other than the Stalking Horse Bid then the Bid Procedures provided that the Debtor would cancel the Auction and accept the Stalking Horse Bid as the Successful Bidder.  Bid Procedures at 7.]

15.    The Bid Procedures Order established February 23, 2015 as the Bid Deadline and the Bid Procedures Order authorized the Debtor to conduct an Auction, if necessary, on February 25, 2015.  Bid Procedures Order ¶3.  The Bid Procedures Order further provided that a Sale Hearing to approve the sale of the Acquired Assets to the Successful Bidder was to be held on February 27, 2015.  Bid Procedures Order ¶15.

16.    Prior to the Bid Deadline on February 23, 2015, the Debtor received one bid (the "February 23 Bid") from ESW Capital, LLC ("ESW").  A copy of the February 23 Bid is

attached hereto as **Exhibit C**.  The February 23 Bid was structured as a plan of reorganization and, as set forth before, did not meet the requirements for a Qualified Bid.  On February 24, 2015, the Debtor and Committee informed SITO that they had determined that the February 23 Bid was not a Qualified Bid.

17.    On February 25, 2015, the Debtor informed SITO that, although the Debtor had not received a Qualified Bid by the Bid Deadline, the Debtor did not intend to designate SITO as the Successful Bidder, or proceed with the Sale Hearing as required by the Bid Procedures Order. Instead, the Debtor and the Committee informed SITO that they intended to seek an extension of the deadlines contained in the Bid Procedures Order.  SITO did not believe that the Debtor had the right to seek an extension of the deadlines without SITO's consent and informed the Debtor that any such extension would be inconsistent with the Final DIP Order and the Bid Procedures Order and would constitute an Event of Default under the Final DIP Order.  Despite SITO negotiating the protections in the Bid Procedures, the Debtor decided to change the rules in the middle of the process. After discussions with the Debtor and the Committee and in an effort to avoid litigation that could have been damaging to the Debtor, SITO reluctantly consented to a limited extension of the Bid Deadline.

18.    At the hearing on February 27, 2015, the Debtor requested an extension of the Bid Deadline to March 4, 2015 at 8:00 p.m. Eastern Time (the "Revised Bid Deadline") as well as a revised date for the Sale Hearing.  At that hearing, the Debtor, the Committee and SITO also agreed that the Debtor and the Committee would not support any Qualified Bid that was received after the Revised Bid Deadline or seek any further extension of time.

19.    Prior to the Revised Bid Deadline, the Debtor received a revised bid from ESW (the "March 4 Bid").  A copy of the March 4 Bid is attached hereto as **Exhibit D**.  Similar to the

February 23 Bid, the March 4 Bid was structured as a plan of reorganization and, as set forth below, did not meet the requirements for a Qualified Bid set forth in the Bid Procedures.

20.    Over SITO's objection and despite both the clear and unequivocal language of the Bid Procedures Order and the Bid Procedures and the admission by the Debtor that the March 4 Bid did not meet the requirements for a Qualified Bid, the Debtor filed the *Notice of Receipt of Bid and Rescheduled Auction* [Docket No. 187] and indicated that the Debtor intended to conduct an Auction on March 6, 2015 at 10:00 a.m.  Once again, the Debtor elected to unilaterally change the rules in the middle of the process to the detriment of SITO.

21.    At the Auction the Debtor accepted the March 4 Bid as the highest and best bid and closed the Auction subject to the Bankruptcy Court's ruling as to whether the March 4 Bid is a Qualified Bid.  SITO did not participate in the Auction; instead, SITO made a short statement indicating that (i) the bid submitted by SITO was the only Qualified Bid and is therefore the Successful Bid, (ii) the Debtor's decision to conduct the Auction violated the Bid Procedures Order and (iii) SITO reserved any and all of its rights.

### Relief Requested

22.    By this Motion, in accordance with the Court's inherent authority to interpret and enforce its own orders, SITO respectfully requests that this Court enforce the terms of the Bid Procedures approved by the Bid Procedures Order, vacate the purported Auction, and to compel the Debtor to comply with the terms of the Bid Procedures Order and designate SITO as the Successful Bidder.

### Basis for Relief Requested

A.    *The Court Should Enforce the Bid Procedures and the Bid Procedures Order*

23.     The Bid Procedures and the terms of the Bid Procedures Order were negotiated between the Debtor and SITO prior to the Debtor filing the Bid Procedures Motion.  SITO negotiated provisions to the Bid Procedures to assure that the process could not be changed to their detriment at the whim of the Debtor. The terms of the Bid Procedures were important to SITO and were instrumental in SITO's determination to submit the Stalking Horse Bid and provided the DIP Loan (as defined in the Final DIP Order).

24.     Throughout the negotiations of the Stalking Horse Agreement, the Bid Procedures and the Bid Procedures Order, the Debtor expressed a concern as to the Debtor's ability to function in a chapter 11 proceeding, and expressed an interest in a relatively expeditious sale process, a belief SITO both agreed with and supported.  Although the advisors to SITO mentioned a plan process, the Debtor's advisors indicated that they were not interested in pursuing a plan process and were focused solely a sale process.  As a result, SITO proceeded with a 363 sale and did not evaluate a plan option.  The Bid Procedures clearly reflected the desire of the Debtor and SITO to proceed with a 363 sale process and did not contemplate bids in any other form.

25.     After the filing of the Bid Procedures Motion, the Bid Procedures and the Bid Procedures Order were further negotiated upon the appointment of the Committee.  During these negotiations the Debtor and Committee focused on a sale pursuant to section 363 of the Bankruptcy Code; at no point did the Debtor or the Committee request that the Bid Procedures be modified to include alternative transactions.   The Bid Procedures and the Bid Procedures Order were prepared by experienced counsel and reflect the understandings reached between the Debtor, the Committee, and SITO.   Despite these negotiations and the entry of the Bid Procedures Order by this Court, the Debtor and the Committee blatantly disregarded the terms of

the Bid Procedures Order in determining that the March 4 Bid is a Qualified Bid. This Court should enforce the terms of the Bid Procedures Order and determine that the March 4 Bid is not in fact a Qualified Bid.

26.    The Bid Procedures Order expressly provides that Bid Procedures are fully incorporated into the Bid Procedures Order and shall apply with respect to the proposed sale of the Acquired Assets contemplated by the Bid Procedures Motion. Bid Procedures ¶1. The Bid Procedures state that a Qualified Bidder is a Potential Bidder who meets the Participation Requirements and submits a Qualified Bid by the Bid Deadline; provided that the Stalking Horse Bidder shall be deemed a Qualified Bidder. Bid Procedures at 3. The Bid Procedures further provide that a Qualified Bid, shall be in writing, meet certain conditions, and include the Required Bid Materials, including:

   i.    "State that the Potential Bidder is prepared to enter into a legally binding purchase agreement for the acquisition of the Acquired Assets on terms and conditions no less favorable to the Debtor than the terms and conditions in the Stalking Horse Bid (as determined by the Debtor in its business judgment and taking into account the Bid Protections (as defined below))." Bid Procedures at 4.

   ii.   "Include a clean and duly executed binding asset purchase agreement (the "Marked Purchase Agreement") reflecting any variations from the Stalking Horse Agreement (including the exhibits and schedules thereto)." Bid Procedures at 4.

   iii.  "Include a letter stating and agreeing that the offer is irrevocable until the earlier of (i) the second business day after the Acquired Assets have been sold pursuant to the closing of the sale or sales or (ii) up to and including the close of business on the date that is three (3) days after the Termination Date of the applicable asset purchase agreement, and that such offer will serve as a Backup Bid (as defined below)." Bid Procedures at 4.

   iv.   "Provide (a) a commitment to close within the same (or shorter) time period set forth in the Stalking Horse Agreement; (b) a representation that the Potential Bidder will, if applicable (1) make all necessary filings under any applicable regulatory filing, and pay the fees associate with such filings and (2) submit all necessary regulatory filings within the same (or shorter) time period, if any, set forth in the Stalking Horse Agreement." Bid Procedures at 4-5.

v.    "The bid shall provide that the Potential Bidder shall be bound as a "Backup Bidder" as provided below."  Bid Procedures at 6.

vi.    "Provide for a closing date which shall be no later than 15 days after the date of the Sale Hearing."  Bid Procedures at 6.

27.    The Bid Procedures further provide that a bid received from a Potential Bidder that meets the Participation Requirements, includes all of the Required Bid Materials and otherwise meets the conditions set forth in the Bid Procedures to the satisfaction of the Debtor in its discretion, and is received by the Bid Deadline is a Qualified Bidder.

28.    The February 23 Bid was not a bid for a 363 sale.  The February 23 Bid failed to include the Required Bid Materials and failed to meet certain conditions necessary for a bid to be deemed a Qualified Bid.  Specifically, the February 23, 2015 Bid did not (i) include a statement that ESW was prepared to enter into a legally binding asset purchase agreement on terms and conditions no less favorable to the Debtor than the terms and conditions in the Stalking Horse Bid, (ii) include a Marked Purchase Agreement reflecting any variations from the Stalking Horse Agreement (including the exhibits and schedules thereto), (iii) include a letter stating and agreeing that the offer is irrevocable until the earlier of (a) the second business day after the Acquired Assets have been sold pursuant to the closing of the sale or sales or (b) up to and including the close of business on the date that is three (3) days after the Termination Date of the applicable asset purchase agreement, and that such offer will serve as a Backup Bid, (iv) provide (x) a commitment to close within the same (or shorter) time period set forth in the Stalking Horse Agreement; (y) a representation that the Potential Bidder will, if applicable (1) make all necessary filings under any applicable regulatory filing, and pay the fees associate with such filings and (2) submit all necessary regulatory filings within the same (or shorter) time period, if

any, set forth in the Stalking Horse Agreement, and (v) provide for a closing date which shall be no later than 15 days after the date of the Sale Hearing.

29.    The February 23 Bid was not deemed a Qualified Bid by the Debtor or the Committee.  The Debtor's determination that the February 23 Bid was not a Qualified Bid further reaffirmed SITO's understanding that the Debtor was not interested in pursuing any transaction other than an expeditious sale pursuant to section 363 of the Bankruptcy Code.

30.    The March 4 Bid did not contemplate a sale pursuant to section 363 of the Bankruptcy Code.  The March 4 Bid failed to address the deficiencies of the February 23 Bid, and in fact failed to meet a condition the February 23 Bid previously met.  Specifically, the March 4 Bid did not: (i) include a statement that ESW was prepared to enter into a legally binding asset purchase agreement on terms and conditions no less favorable to the Debtor than the terms and conditions in the Stalking Horse Bid, (ii) include a Marked Purchase Agreement reflecting any variations from the Stalking Horse Agreement (including the exhibits and schedules thereto), (iii) include a letter stating and agreeing that the offer is irrevocable until the earlier of (a) the second business day after the Acquired Assets have been sold pursuant to the closing of the sale or sales or (b) up to and including the close of business on the date that is three (3) days after the Termination Date of the applicable asset purchase agreement, and that such offer will serve as a Backup Bid, (iv) provide (x) a commitment to close within the same (or shorter) time period set forth in the Stalking Horse Agreement; (y) a representation that the Potential Bidder will, if applicable (1) make all necessary filings under any applicable regulatory filing, and pay the fees associate with such filings and (2) submit all necessary regulatory filings within the same (or shorter) time period, if any, set forth in the Stalking Horse Agreement, and (v) provide for a closing date which shall be no later than 15 days after the date of the Sale

Hearing.  Further, the March 4 Bid removed the language that "the Bid may be deemed a Backup Bid subject to the outcome of the Auction" and therefore fails to meet an additional requirement of the Bid Procedures.

31.    Despite the clear deficiencies in the March 4 Bid, and contrary to the clear and unequivocal language of the Bid Procedures, on March 5, 2015, the Debtor and Committee informed SITO that the March 4 Bid was a Qualified Bid.

32.    The March 4 Bid is not only not a Qualified Bid but it is detrimental to the Debtor's estate as it requires the Debtor's to continue to operate in bankruptcy for an additional three months.  The Debtor's weekly reporting in connection with the Final DIP Order makes clear that the Debtor's business is not performing well in this chapter 11 proceeding as the Debtor has repeatedly lowered projections for weekly collections and failed to meet even those reduced projections.    Furthermore, on information and belief, the Debtor's employees, especially salespeople who are critical to the Debtor's operations, are terminating their employment with the Debtor and seeking opportunities elsewhere, including at competitors of the Debtor.   The Debtor only recently filed motions to establish bar dates for parties to submit claims, therefore, neither ESW nor the Debtor know whether the  plan attached to the March 4 Bid will be able to be confirmed.  The transaction proposed by the March 4 Bid is fraught with additional risk to the Debtor's estate, especially considering the Debtor's performance thus far during the pendency of this chapter 11 case.

33.    The Debtor's determination that the March 4 Bid was a Qualified Bid violates the clear terms of the Bid Procedures and the Bid Procedures Order.  The Court should enforce the terms of the Bid Procedures Order as well as the terms of the Bid Procedures and determine that the March 4 Bid is not a Qualified Bid.  It is fundamental that a court has the inherent authority

to interpret and enforce its own orders. *See In re TWA Inc. Post Confirmation Estate*, 2007 Bankr. LEXIS 3182, *8-10 (Bankr. Del. 2007); *see also*, *Heartland Hospital v. Thompson*, 328 F. Supp. 2d 8, 11-12 (D.D.C. 2004), *aff'd*, 415 F.3d 24 (2005) ("Within a court's power to administer its decrees is the power to construe and interpret the language of the judgment"); *Chandler v. State of Oklahoma ex rel. Oklahoma Tax Commission (In re Chandler)*, 251 B.R. 872, 877 fn. 5 (B.A.P. 10th Cir. 2000) ("[I]t is well-settled that bankruptcy courts have the power to interpret and enforce their orders."); *Travelers Indem. Co. v. Bailey*, 577 U.S. 137 (2009) (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *In re Trans World Airlines, Inc.*, 278 B.R. 42, 49 n. 16 (Bankr. D. Del. 2002) ("Core proceedings under § 157(b)(2)(N) are those which arise from, concern, or have impact on 'orders approving the sale of property'").

34.    Further, the Court explicitly retained jurisdiction with respect to all matters arising from or related to the implementation or interpretation of the Bid Procedures Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Bid Procedures and the implementation of the Bid Procedures Order.  Bid Procedures Order ¶20; *see also, In re Nortel Networks Corp.*, 445 B.R. 370, 375 (Bankr. D. Del. 2011) (order with similar language "compels the Court to act in its supervisory and enforcement roles …").  As the Court clearly has jurisdiction to enforce the Bid Procedures Order, the Court should exercise such jurisdiction to prevent and/or remedy the injustice caused by the Debtor and the Committee's determination that the March 4 Bid is a Qualified Bid.  *See* Transcript of Record at 44, *In re Finlay Enters.*, No. 09-14873 (Bankr. S.D.N.Y. Nov. 12, 2009) (Docket No. 378) ("The only reason that I should be dealing with [interpreting bid procedures and the outcome of an auction] is if there is a legitimate

concern that there has been a violation of a court order.  Only then does this dispute really rise to the level of judicial intervention.").

35.    To the extent the Debtor claims that the March 4 Bid may result in additional consideration to the Debtor's estate, despite the fact that the qualification of the March 4 Bid is in clear violation of the Bid Procedures, such rationale is not sufficient justification for the Debtor and the Committee's actions.  *See Id*. at 44, 45 ("Indeed, if money trumped principles bidding procedures would never mean anything. … Imbedded in the debtor's response, as I noted earlier, imbedded in the committee's comments, imbedded in the Harbinger comments, and a principal theme of the Zales' objection is if we can somehow convert this into an opportunity to make more money for the estate, let's do that.  I want you to recognize as I take this under advisement, that will not be what guides my review.  I will be looking to see if there has or has not been a material deviation from the auction procedures that somehow prejudice Zales.").  The Debtor and the Committee should not be permitted to neglect the process established by the Bid Procedures.

36.    Additionally, the Court should not allow the Debtor to compromise the integrity of the process established by the Bid Procedures and deliberately violate the terms of the Bid Procedures Order. *See In re Farmland Indus., Inc.*, 284 B.R. 111, 120 (Bankr. W.D. Mo. 2002) *aff'd,* 289 B.R. 122 (B.A.P. 8th Cir. 2003) ("This Court fully agrees that the integrity of the auction and bid process, as established in its previous Order, should be upheld. As the Court of Appeals noted, finality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, because devotion to those principles encourages fervent bidding and ensures that interested parties will sincerely extend their best and highest offers at the auction itself. … Let there be no mistake that this Court will uphold auction and bid

procedures in the future, unless there are mistakes or violations of such a serious nature that the auction and bid procedures must give way to weightier considerations.") (internal quotations removed).   The integrity of the Bid Procedures should be upheld, the Debtor and the Committee's willful violations of the Bid Procedures Order should not be permitted.

37.     Indeed, if parties are to be encouraged to bid at judicial sales, "there must be a stability in such sales and a time must come when a fair bid is accepted and the proceedings are ended." *In the Matter of Chung King, Inc.* 753 F.2d 547, 550 (7th Cir. 1985); *see also in re Gil-Bern Indus., Inc.*, 526 F.2d 627, 628 (1st Cir.) ("...it is important that the bidder receive what he had reason to expect, and that nothing impair public confidence in the regularity of judicial sales.").   In this instance, SITO, at the request of the Debtor and the Committee, consented to a modification of the Bid Procedures, specifically the extension of the Bid Deadline to allow the Debtor additional time to solicit interest from Potential Bidders and to allow Potential Bidders an opportunity to submit Qualified Bids.   It is axiomatic that SITO anticipated that another party could submit a Qualified Bid as a result of the extension, and SITO was prepared to proceed to a competitive auction process to determine the highest and otherwise best bid; however, rather than adhere to the terms of the Bid Procedures Order, the Debtor chose to qualify a bid that contained many of the same deficiencies as a bid the Debtor previously determined was not a Qualified Bid.   The Debtor failed to ensure that SITO would receive what it had reason to expect, that the Debtor intended to conduct an expeditious sale pursuant to section 363 of the Bankruptcy Code and has patently failed to adhere to a process that would inspire confidence in the regularity of a judicial sale.   In fact the time has come when a fair bid should be accepted and the proceedings are ended – at the expiration of the Revised Bid Deadline, when the Debtor did not receive any other Qualified Bids.

38.     Therefore, SITO believes this Court should enter an order enforcing the terms of the Bid Procedures Order and determine that the March 4 Bid is not a Qualified Bid.

B.   *The Court Should Vacate the Auction and the Results of the Auction*

39.     The Bid Procedures provide that "[i]f no Qualified Bid is submitted by the Bid Deadline other than the Stalking Horse Bid … then the Debtor shall cancel the Auction and accept the Stalking Horse Bid (in which case, the Successful Bid shall be the Stalking Horse Bid, and the Successful Bidder shall be the Stalking Horse Bidder)."  Bid Procedures at 7.  As the Debtor did not receive a Qualified Bid other than the Stalking Horse Bid, the Auction should not have occurred; however, despite the clear language in the Bid Procedures, on March 6, 2014 the Debtor commenced the Auction.

40.     For the reasons set forth above, the Debtor did not have the authority to conduct the Auction pursuant to the Bid Procedures or the Bid Procedures Order, and therefore the Court should vacate the Auction and any determination by the Debtor that the March 4 Bid is the Successful Bid.

C.   *The Court Should Determine the Stalking Horse Bid is the Successful Bid*

41.     Pursuant to the clear and plain language of the Bid Procedures, if the Debtor did not receive a Qualified Bid prior to the Bid Deadline, the Debtor was to cancel the Auction and accept the Stalking Horse Bid as the Successful Bid.  As discussed *supra*, the March 4 Bid was not a Qualified Bid.  Therefore the Court should determine that the Stalking Horse Bid is the Successful Bid and that the Stalking Horse Bidder is the Successful Bidder in accordance with the terms of the Bid Procedures Order.

**Notice**

42.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known; (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtor; (c) counsel to the Committee; and (d) those parties requesting notice pursuant to Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### Conclusion

WHEREFORE, SITO respectfully request that this Court an order granting the relief requested herein and that it grant SITO such other and further relief as is just and proper.


Dated:  March 6, 2015                        GREENBERG TRAURIG, LLP


                                             /s/ Dennis A. Meloro
                                             Dennis A. Meloro (DE Bar No. 4435)
                                             The Nemours Building
                                             1007 North Orange Street, Suite 1200
                                             Wilmington, Delaware 19801
                                             Telephone:  (302) 661-7000
                                             Facsimile:  (302) 661-7360
                                             Email: melorod@gtlaw.com

                                             -and-

                                             Nancy A. Mitchell (*pro hac vice*)
                                             Matthew L. Hinker (DE Bar No. 5348)
                                             200 Park Avenue
                                             New York, New York  10166
                                             Telephone:  (212) 801-9200
                                             Facsimile:  (212) 801-6400
                                             Email: mitchelln@gtlaw.com
                                                     hinkerm@gtlaw.com

                                             Counsel for SITO Mobile, Ltd.